EXHIBIT C

Stephen Melia

1            IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF TEXAS
2                SAN ANTONIO DIVISION

3
NANCY CASTRO,                    &
4  PLAINTIFF                 &
                          &
5  VS.                    &
                          & Civil Action No.
6  WAL-MART, INC., CINTAS      & 5:1-CV-00702-XR
   CORPORATION NO. 2 D/B/A CINTAS   &
7  CORPORATION, WAL-MART STORES   &
   TEXAS, LLC, AND WAL-MART REAL   &
8  ESTATE BUSINESS TRUST,         &
   DEFENDANTS                 &
9

10

11  _____

12         ORAL AND VIDEOTAPED DEPOSITION OF
               STEPHEN MELIA
13             SEPTEMBER 15, 2022

14  _____

15      ORAL AND VIDEOTAPED DEPOSITION of STEPHEN MELIA
   produced as a witness at the instance of the Plaintiff, and
16  duly sworn, was taken in the above-styled and numbered cause
   on the 15th of September 2022 from 2:03 p.m. to 4:36 p.m.,
17  before Christie Tawater, CSR, RPR, in and for the State of
   Texas, reported by computerized stenotype machine remotely
18  via Zoom from her home located in Fort Worth, Texas
   pursuant to the Federal Rules of Civil Procedure and the
19  provisions stated on the record or attached hereto; that the
   deposition shall be read and signed before any notary public
20  pursuant to Rule 30(e)(1).  Job No. 57851

21

22

23

24

25

**Stephen Melia**

(Page 2)

```
 1        A P P E A R A N C E S
 2
 3  FOR PLAINTIFF(S):  NANCY CASTRO
 4
      Mr. Lucas W. Williams
 5    DESOUZA INJURY LAWYERS
      3201 Cherry Ridge Drive
 6      Suite C-300
      San Antonio, Texas 78230
 7    Phone:  (210) 714-4215
      E-mail:  lucas@jfdlawfirm.com
 8
 9
10
11  FOR DEFENDANT(S):  WAL-MART, INC., ET AL
12
13    Ms. Elizabeth Ferguson Herrera
      COLVIN, SAENZ, RODRIGUEZ & KENNAMER, LLP
14    1201 East Van Buren Street
      Brownsville, Texas 78520
15    Phone:  (956) 542-7441
      E-mail:  e.herrera@rcclaw.com
16
17
18
19  FOR DEFENDANT(S):  CINTAS CORPORATION
20
21    Mr. Evan F. Patterson
      NAMAN, HOWELL, SMITH & LEE, PLLC
22    10001 Reunion Pl.
      Suite 600
23    San Antonio, Texas 78216
      Phone:  (210) 731-6300
24    E-mail:  epatterson@namanhowell.com
25
```

(Page 3)

```
 1      A P P E A R A N C E S   C O N T I N U E D
 2
 3  ALSO PRESENT:  THE VIDEOGRAPHER
 4
 5    Ms. Brittany McCarble
      Firm Registration No. 189
 6    Southwest Reporting & Video Service, Inc.
      826 Heights Boulevard
 7    Houston, Texas 77007
      Phone:  (713) 650-1800
 8    Fax:  (713) 650-6245
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

(Page 4)

```
 1            INDEX
 2  Appearances ............................  2
 3
      Stephen Melia
 4
        Examination by Mr. Williams ..............  6
 5
 6  Signature and Change ..................  107
 7  Reporter's Certificate ..................  109
 8
 9         EXHIBITS
10
    NO.      DESCRIPTION              PAGE
11
    Exhibit 1    Curriculum Vitae of        28
12             Stephen Melia
13  Exhibit 2    ASTM Standard          28
14  Exhibit 3    American National Standard   31
             on Commercial Entrance Matting
15
16  Exhibit 4    Walmart Standard        35
17  Exhibit 5    Photographs           46
18  Exhibit 6    Photo             48
19  Exhibit 7    Video             54
20  Exhibit 8    Affidavit of Stephen Melia    -
21  Exhibit 9    Report by Stephen Melia      77
             Dated 2/16/2022
22
23  Exhibit 10   Testimonial History       78
             of Stephen Melia
24
25  Exhibit 11   Updated Curriculum Vitae     78
             for Stephen Melia
```

(Page 5)

```
 1          EXHIBITS
 2
    NO.      DESCRIPTION              PAGE
 3
 4  Exhibit 12   S. Melia Consulting, LLC,      83
             Invoice Dated 2/17/2022
 5
 6  Exhibit 13   Photo             103
 7
 8
 9      REQUESTED DOCUMENTS/INFORMATION
10
11  NO.      DESCRIPTION          PAGE/LINE
12  Exhibit 10   Testimonial History      78 / 14
             of Stephen Melia
13
    Exhibit 11   Updated Curriculum Vitae    78 / 23
14           for Stephen Melia
15
16
17
18  CERTIFIED QUESTIONS/INSTRUCTIONS NOT TO ANSWER
19  NONE
20
21
22
23
24
25
```

**Stephen Melia**

(Page 6)

1        P R O C E E D I N G S
2        THE VIDEOGRAPHER:  We can go on the
3   record at 2:03 p.m.
4        (Witness sworn.)
5        THE COURT REPORTER:  Can you, please,
6   state where you are located, city, state and county.
7        THE WITNESS:  Yes.  It is in Forney,
8   F-O-R-N-E-Y, Texas, and that is in Kaufman County.
9        THE COURT REPORTER:  Okay.  And I am
10   Christie Moss.  I'm the court reporter.  I'm located
11   in Fort Worth, Texas, Tarrant County.
12        Counsel, you may proceed.
13        STEPHEN MELIA,
14   having been first duly sworn, testified as follows:
15        EXAMINATION
16   BY MR. WILLIAMS:
17   Q.   Good afternoon, sir.
18   A.   Good afternoon.
19   Q.   Can you, please, state your name for the
20   record.
21   A.   Yes.  Stephen Melia.
22   Q.   And when I say the incident, can we agree
23   that I'm talking about Nancy Castro's trip-and-fall
24   that happened on February 25th, 2020 at the Walmart
25   gas station in Universal City, Texas?

(Page 7)

1   A.   Yes.
2   Q.   And when I say Walmart, can we agree that
3   I'm referring to the Walmart gas station that's
4   located at 510 Kitty Hawk Road in Universal City,
5   Texas?
6   A.   Yes.
7   Q.   Have you ever worked at Walmart or Sam's
8   Club?
9   A.   Yes, I have.
10   Q.   When did you first start working there?
11   A.   It was in 1984 when I first was hired on
12   with Walmart.
13   Q.   How many years total did you work for them?
14   A.   With Walmart Stores, Inc., which included
15   the – the Walmart store format as well as Sam's Club
16   division, it was 31 years.
17   Q.   What did your role consist of whenever you
18   first started out with them?
19   A.   Well, initially, started working in the
20   stores at – at the age of 19 and was just a general
21   stocker, cart attendant, associate to assist the
22   store on a part-time basis.  Through the years it
23   evolved into newer elevated positions to an assistant
24   manager within a store and then to a district loss
25   prevention supervisor throughout my career, remainder

(Page 8)

1   of the time was spent in the safety and loss
2   prevention or SF protection division for Walmart and
3   Sam's.
4   Q.   Now, you talked a little bit about a loss
5   prevention director.
6        Did you get promoted to a regional
7   loss prevention director?
8   A.   Yes.  I was promoted, I believe, in 1995
9   from a district LP manager to a regional loss
10   prevention director.
11   Q.   And what does that role consist of?
12   A.   All of the aspects of – of loss prevention
13   in the role as Walmart defined it involved every
14   aspect of providing a safe environment for the
15   customers and the associates, investigating incident
16   or accident claims, ensuring stores were maintaining
17   safety within the guidelines, as well as the more
18   traditional loss prevention aspect of conducting
19   internal and external investigations, audits,
20   reviewing general operational procedures within
21   the – within the stores.
22   Q.   What does accident prevention mean?
23   A.   It simply states the process of knowing
24   your environment, assessing the environment for any
25   known risks and then taking steps to mitigate or

(Page 9)

1   correct unsafe conditions to prevent an incident from
2   happening, obviously, before it occurs is the
3   objective.
4   Q.   And were you in charge of preventing
5   accidents and mitigating unsafe conditions?
6   A.   Well, it's certainly everyone's
7   responsibility, and in my role it would have been in
8   the area of teaching, leading, directing, correcting,
9   situations, be it a – a process breakdown or a – a
10   new risk that may be identified that we want to
11   ensure we have compliance, adequate measures in place
12   within the store.  So as my position developed over
13   the years from a store level to a district to
14   regional level, of course, that scope expanded into
15   traveling to the store locations, meeting with
16   management teams, safety teams, to not only teach and
17   educate but also inspect the premises and – and
18   ensure that procedures were being followed.
19   Q.   Did you teach and educate Walmart employees
20   on how to prevent customers from tripping over rugs?
21   A.   It would have been one of the standard
22   expectations, if you will, when I would go to a store
23   for a – a visit certainly would look at a
24   number of things, slip-and-falls being one of them,
25   or I should say the risk of, so that would include

**Stephen Melia**

(Page 10)

1 the entrances. Of course, it'd really start in the
2 parking lot, from the parking lot to the entrance
3 doors, all the way to the back room just to ensure
4 safe standards were being followed in relation to the
5 floor conditions.
6   Q.   And do you remember what you taught about
7 how to -- or excuse me.
8       Do you remember what you taught about
9 how to prevent customers from tripping over rugs to
10 these Walmart employees?
11   A.   Well, in a -- in a general sense, I mean,
12 certainly training, and -- and over time procedures
13 are developed and -- and improved, if you will. But
14 in -- in the general sense over the years it has
15 always started with an awareness certainly of what
16 the procedure is that is expected. And by the
17 awareness is the observation to ensure that the
18 floors are inspected as part of the -- the routine
19 of -- of maintaining a safe floor environment if it
20 involved elevation changes or going from a carpeted
21 area to a -- a tile area or from a mat that may be
22 placed on the floor to a tile area. So there were a
23 number of expectations from a safety professional
24 that you would look at, and then, of course, teach
25 and train to -- to those expectations.

(Page 11)

1   Q.   After that role did you get promoted to
2 security services director?
3   A.   I did. It was a lateral move.
4       THE COURT REPORTER: Hold on. Hold on
5 one second, sir. Sir, one second.
6       Mr. Williams, you cut out that whole
7 question.
8       MR. WILLIAMS: Oh.
9       THE COURT REPORTER: So if you can
10 reask it. I -- I -- I just got that you did
11 promote, promoted to.
12       MR. WILLIAMS: Beth, Evan, you guys
13 having that same audio issue?
14       MR. PATTERSON: No. I heard you.
15       MS. HERRERA: Mine was okay.
16       THE COURT REPORTER: Okay.
17       MR. WILLIAMS: Okay. I'll -- I'll
18 just reask it then.
19   Q.   (BY MR. WILLIAMS) Sir, did you get
20 promoted to security and services director?
21   A.   Yes, I did.
22   Q.   And what did that role consist of?
23   A.   That role involved more of the security
24 functions to support all of the Walmart stores, Sam's
25 Clubs and distribution centers with the

(Page 12)

1 implementation of closed-circuit TV, the procurement
2 of the items, the installation through our in-house
3 or through third-party contractors, so it was more of
4 the physical security, premise's security from that
5 perspective.
6   Q.   And when did you get promoted to that
7 position?
8   A.   Probably need to refer to my resume if I
9 can grab it here.
10       That was in, let's see, summer of
11 transition from a regional loss prevention role in
12 1999, and again, as more of a lateral move over to
13 the security services director, and that was for 1999
14 to 2001.
15   Q.   Did you testify on behalf of Walmart during
16 that time?
17   A.   I have testified on behalf of Walmart in
18 various capacities over my years. I don't have a --
19 a recollection of the specific years or -- or
20 anything of that nature, but that would have been one
21 of my responsibilities at that time, so likely the
22 answer would be, yes.
23   Q.   And when Walmart prepared you to testify on
24 their behalf did they teach you about when a rug is
25 safe or unsafe?

(Page 13)

1       MS. HERRERA: Objection, form.
2       THE WITNESS: Yeah. I -- I wouldn't
3 recall any of the specifics. Again, the -- the
4 deposition testimony certainly would have been --
5 relate to the facts in the case and in giving factual
6 testimony based on whatever the -- the case may have
7 involved.
8   Q.   (BY MR. WILLIAMS) And how long were you in
9 this role for?
10   A.   I was in that role for about two years,
11 and -- and then moved into the role of director of
12 security and alarm services until 2003. So the
13 transition, essentially, went from leading and
14 directing the -- the premise's security, CCTB,
15 procurement and installation to taking on additional
16 responsibility for the Walmart corporate alarm
17 division which then became the security and alarm
18 services, so it was really combined and elevated to
19 that next level of supervision of that -- of that
20 entire grate [SIC] for the security and the alarm
21 division.
22   Q.   And whenever you were in that role did you
23 learn about how the cameras and security footage in
24 Walmart worked?
25   A.   Yes. Of course, I was familiar with it

**Stephen Melia**

(Page 14)

1  prior to that but more directly involved in the
2  aspect of purchase and installation.
3      Q.   And did you learn about the quality of
4  video footage that those cameras take for their
5  security footage?
6      A.   I would say, yes, in the general sense.  I
7  was not the technical expert.  There were people that
8  worked for me that have a greater understanding of
9  the technical aspects.  It certainly has evolved from
10  black and white cameras to color cameras and now
11  digital and IP cameras, so – but familiar enough,
12  but not – not an expert in those areas.
13      Q.   How long were you in the role – or how
14  long were you in that role for?
15      A.   So the two combined roles as security
16  service director and director of security and alarm
17  services, 1999 to 2003, so about four years.
18      Q.   And after that did you get promoted to the
19  regional director of safety and asset protection as
20  well.
21      A.   That would have been, I would say, more of
22  a lateral move again, just different title, headings,
23  but the basic same level of supervision, if you will,
24  (Zoom failure) work for the same (Zoom failure)
25  division and learned aspect of (Zoom failure) and

(Page 15)

1  then as the regional director of asset protection
2  safety and compliance in 2003, which, essentially,
3  evolved from the older terminology of loss prevention
4  or safety and loss prevention.
5      Q.   And what did your job as the regional
6  director of safety consist of?
7      A.   So in that role it was, again, responsible
8  for a number of Sam's Clubs.  At different times it
9  was different geographic locations across the country
10  and traveling to those locations with operation vice
11  presidents and other members of the team to visit the
12  Sam's Club locations, meet with the teams, inspect
13  the premises, of course, and appreciate them for
14  doing a good job, as well as ensuring corrections
15  were in place if something was needing to be
16  addressed in the area of safety or – or asset
17  protection or compliance.
18      Q.   Now, all total, about how many stores were
19  you responsible for the customer safety?
20      A.   Well, I would say that there certainly were
21  expectations that it started at the store level with
22  the associates and the assistant manager, store
23  manager, on up the line, so it was a – a combined
24  effort, but my overall responsibility was to help
25  lead, teach and direct those leaders and visit the

(Page 16)

1  stores.  It – it would range from 100 stores.  I
2  think the most I had at – at one time was a little
3  over 200 Sam's Clubs in my area of responsibility.
4      Q.   How long were you in that role for?
5      A.   I was with Sam's from 2003 until 2015.
6  Some of that time in Bentonville, Arkansas, and then
7  from 2010 to 2015 was here in the Dallas/Fort Worth
8  area.
9      Q.   And what were you doing from 2010 to 2015?
10      A.   So I was the senior director of asset
11  protection, safety compliance, again, for Sam's
12  Clubs.  Reorganization of the company, I believe at
13  one point, I had half of the company, mostly from the
14  southern territories from California to Florida
15  and – and the number of Sam's Clubs, and, of course,
16  in those areas and – same basic expectation,
17  leading, directing teams in – in the field of
18  operations and the asset protection teams to ensure
19  we were maintaining safe, secure premises and
20  following compliance procedures.
21      Q.   So you went from the regional director of
22  safety to the senior director of safety; is that
23  fair?
24      A.   That's correct.
25      Q.   And all total about how many stores did you

(Page 17)

1  oversee regarding customer safety whenever you were
2  the senior director of safety?
3      A.   So towards the end it was – it was
4  continuing to evolve, but it went from about 200
5  Sam's Clubs to – to having half of the company, so
6  about 300 Sam's Clubs there towards the later part
7  of, you know, the time that I was with Sam's in 2015.
8      Q.   And are the safety standards the same in
9  Walmart and Sam's Club?
10      A.   Well, there certainly are differences
11  because of the nature of the business involving Sam's
12  and – and the type of – size of merchandise and –
13  and the set up of the facility.  But, in general,
14  safety procedures in many cases in retail and
15  grocery, you know, entities where the public is
16  invited, the same standards apply in relation to
17  customer safety, preventing slips, trips, falls from
18  occurring in the standards that go with, you know,
19  providing that level of awareness, notification
20  and – and prevention of those types of incidents I
21  would say were very – very consistent with – with
22  Walmart and Sam's and – and within the industry.
23      Q.   And would you say that Walmart safety
24  standards and Sam's safety standards are the same or
25  similar whenever it comes to trip-and-fall prevention

**Stephen Melia**

(Page 18)

1  or entrance mats?
2  A.  Yes, I would say that is correct.
3  Q.  Okay.  And why would you say that?
4  A.  Well, just certainly my knowledge of
5  expectations there's, you know, a very defined
6  location of – of an entranceway.  While you may have
7  different flooring materials you certainly have
8  procedures, and Walmart and Sam's were very similar
9  in the procedures in the placement of the floor mats
10  and the purpose of the floor mats during inclement
11  weather, or otherwise, to ensure that the transitions
12  from outside of the facility to the inside provided a
13  safe transition for customers –
14  Q.  Are you familiar with the general industry
15  safety standards for trip-and-fall prevention?
16  A.  I am, yes.
17  Q.  How so?
18  A.  Well, certainly the experience obtained
19  over the years and attending numerous conferences,
20  understanding OSHA expectations for floor safety,
21  and, obviously, OSHA deals with employee safe work
22  practices, but many of the same standards in safe
23  walking conditions apply to areas where you have
24  customers walking in – in generally the same area,
25  so entrance doors, for example.  So the standards are

(Page 19)

1  fairly consistent and common in the areas of
2  entrances, entrance mats that are utilized.
3  Certainly there are companies that provide mats for
4  stores and businesses to provide that level of
5  consistency across an organization.  And, of course,
6  some stores may utilize their own or purchase their
7  own mats.  But the standards are generally there and
8  aligned to, again, provide a safe walking surface
9  then transition, for speaking specifically as in this
10  case, of an entrance to a facility to ensure that
11  safe transition from outside to inside the store.
12  Q.  And are you here today to offer your
13  opinions as a safety expert on trip-and-fall
14  prevention?
15  A.  Yes, I am.
16  Q.  And I'm going to briefly share my screen
17  with you.  Okay.  Mr. Melia, can you see my screen
18  fine?
19  A.  Yes, I can.
20  Q.  Is this a copy of your CV?
21  A.  It is.  It's actually an older copy, but it
22  is, I think, the one I would have submitted at the
23  time for this case.
24  Q.  Has your CV changed any recently?
25  A.  It has.

(Page 20)

1  Q.  How so?
2  A.  So from my last tenure there at Gateway
3  Church as director – as executive director of safety
4  services I have started my own consulting business in
5  2015.  I don't believe that's listed on there.  So
6  in – in that role as the position in which – as an
7  independent security consultant would be providing
8  review – documentation review, providing opinions
9  for litigation – litigation support in areas of
10  premise's safety and security.  So that would be
11  listed there.  And I can certainly send an updated
12  copy.  But that's one area over the past seven years
13  that I've maintained S dot [SIC] Melia Consulting.
14  In that capacity I've also worked as an independent
15  security contractor for my church through a third
16  party, and then most recently, as of about three or
17  four weeks ago, started a new position as a director
18  of asset protection for a grocery – a grocery store
19  that has stores in Texas, Arkansas, Oklahoma and
20  Louisiana.
21  Q.  Well, congratulations.
22  A.  Thanks.
23  Q.  When answering my questions today you agree
24  you will only give an answer if it's to a reasonable
25  degree of professional certainty?

(Page 21)

1  A.  Yes.
2  Q.  Who were you hired by in this case?
3  A.  I was hired in this case to give
4  consultation – hired by the DeSouza Law Firm.
5  Q.  And what for?
6  A.  To review the matter of Nancy Castro vs.
7  Walmart Stores and Cintas in relation to a
8  trip-and-fall incident that occurred at the Walmart
9  fuel station there in Universal City, to provide
10  review as well as testimony in the event that it was
11  necessary, to offer opinions related to my
12  conclusions of this incident.
13  Q.  And are your opinions regarding
14  trip-and-fall prevention?
15  A.  Yes, they are.
16  Q.  And would your opinions today be any
17  different if the Defendants or Walmart hired you?
18  MS. HERRERA:  Objection, form.
19  THE WITNESS:  No.  I base my review on
20  the facts of the case, as well as the industry
21  standards, what's not only published but what's known
22  to me in my experience, and those – those would not
23  change regardless of which – defense or – or
24  plaintiff counsel would have retained me.  The facts
25  are as I would state them and offer opinions in this

**Stephen Melia**

(Page 22)

1  case.
2  Q.  (BY MR. WILLIAMS)  Is there a method that
3  you use to arrive at your opinions and conclusions?
4  A.  The terminology that I apply is, of course,
5  based on the experience, but also based on the
6  general OSHA industry standard with looking at a root
7  cause analysis in determining not just what happened.
8  So, in other words, not just to say someone tripped
9  and fell, and not just to say someone tripped on a
10  mat and fell, but to go further into examining the
11  facts and defining it to the point where you really
12  establish the point where the risk was generated.
13  And -- and I've done that many times over the years
14  to -- certainly as OSHA would state in their
15  documentation, I believe I cited in one of my
16  references, that your goal is to identify that root
17  cause and put procedures in place to ensure that it
18  doesn't occur again.
19  Q.  Is it standard practice in your industry to
20  do a root cause analysis?
21  A.  It is, yes.
22  Q.  Why is that?
23  A.  Well, again, as I was giving the example if
24  you -- if you just take an incident and stop at the
25  initial conclusion you may not find the actual cause

(Page 23)

1  agent or the point in which the risk was originated
2  that needs to be corrected, and so it's very common
3  in -- in investigative work, which accident review or
4  accident investigation would be considered, to ask
5  all of the questions until you are at a point where
6  you have that -- that conclusion of what caused the
7  risk.
8  Q.  Did you do a root cause analysis in this
9  case?
10  A.  I did.
11  Q.  And is your root cause analysis repeatable
12  by a peer in your industry?
13  A.  Yes.
14  Q.  And how did you do a root cause analysis in
15  this case?
16  A.  Again, from the study of the facts that
17  were provided in this case, that being the incident
18  report provided by Walmart, the photographs, the
19  video, and then testimony, witness statements, et
20  cetera.  Again, a baseline of what the facts are.
21  And from that begin to examine the points of risk
22  throughout that process and determining what I would
23  consider to be the root cause of -- of the incident
24  and what more so would have likely prevented the
25  incident from occurring had additional procedures

(Page 24)

1  been taken.
2  Q.  And so you learned the industry standards,
3  learned the facts and determined the cause of
4  incident?
5  A.  Yes.
6  Q.  Now, I want to go over those industry
7  standards with you first.  Okay?
8      Are you familiar with safety first?
9  A.  Well, safety first is generally a slogan
10  that a lot of companies adopt, and -- and sometimes
11  in the construction industry, and certainly in the
12  retail and other sectors, but certainly familiar with
13  the slogan.
14  Q.  What does safety first mean to you?
15      MS. HERRERA:  Objection, form.
16      THE WITNESS:  Well, it certainly means
17  that safety is an important factor in any business,
18  providing a safe environment for customers, for
19  associates.  And so, again, it's a -- very much a --
20  a -- a tag line, if you will, in the safety industry
21  and in various other industries to ensure that it is
22  creating an awareness for businesses to operate in a
23  safe manner.
24  Q.  (BY MR. WILLIAMS)  All right.  And as a
25  safety expert do you have an opinion on what safety

(Page 25)

1  first means?
2      MS. HERRERA:  Objection, form.
3      THE WITNESS:  Again, I -- I think it
4  could be defined in a number of different industries,
5  but in -- in my opinion and experience it is
6  certainly designed to elevate the -- the level of
7  participation and expectation to maintain a safe
8  environment regardless of what else may be going on,
9  and taking those steps to place safety above other
10  factors that -- you know, that may also be competing
11  for attention, if you will, but that safety is a top
12  priority and in the location of the industry in which
13  is using that slogan.
14  Q.  (BY MR. WILLIAMS)  So you would say that
15  you put safety above everything else?
16      MS. HERRERA:  Objection, form.
17      THE WITNESS:  Yeah.  I mean, my
18  opinion, and, obviously, what I've seen and taught
19  and reviewed is that safety is a top priority and
20  that safety first (unintelligible) that -- that
21  slogan to ensure that is easily reviewed and an
22  easy reminder for people.  I understand that -- that
23  safety is -- is more important than anything else so
24  that when you have the opportunity to correct a
25  hazard that you stop and correct the hazard.  So

**Stephen Melia**

(Page 26)

1 before you go and, you know, take a – a lunch break,
2 or before you go and stock your shelf, for example,
3 if you see an unsafe condition, safety first. And --
4 and that's the premise of having that awareness
5 campaign, if you will, for – for companies to ensure
6 that is in place.
7    Q.   (BY MR. WILLIAMS) Do you have an opinion
8 on whether Walmart must put safety first or safety
9 above everything else?
10        MS. HERRERA: Objection, form.
11        THE WITNESS: Well, it's certainly a
12 practice that is put into place, and so I guess my
13 opinion is that safety is a priority and would be
14 first above taking care of other task items, if you
15 will.
16    Q.   (BY MR. WILLIAMS) Why do you believe that?
17    A.   Well, certainly, I'll speak to the
18 experience at Walmart, and some of the other
19 businesses would apply the same principle, is you
20 just don't want to injure people, whether it's your
21 customers, whether it's your associates, you want
22 them to be able to – to walk out of the store the
23 same way they came in. Again, whether they're
24 working or shopping you – you want to maintain
25 safety for the benefit of their – their personal

(Page 27)

1 health and their personal safety.
2    Q.   Do you have an opinion on whether Walmart's
3 day-to-day business is more important than the safety
4 of its customers?
5        MS. HERRERA: Objection, form.
6        THE WITNESS: Well, you know, my
7 opinion would be that – that it is interwoven, or
8 should be interwoven, into the day-to-day business,
9 so it is as important as anything else that – that
10 is to be done, and safety, whether it's a risk of a
11 [SIC] accident or incident or violent situation is a
12 top priority above anything else.
13    Q.   (BY MR. WILLIAMS) Now, should Walmart ever
14 place profits over safety?
15        MS. HERRERA: Objection, form.
16        THE WITNESS: Again, I would say that
17 that is not a good business practice for any company
18 to have unsafe conditions that exist and in – you
19 know, with the opportunity to save a – a dollar, if
20 you will, which is my – my experience and – and
21 understanding.
22    Q.   (BY MR. WILLIAMS) And are you familiar
23 with the industry standards for maintaining a safe
24 entrance mat?
25    A.   I am, yes.

(Page 28)

1    Q.   I'm going to show you what's marked as
2 Plaintiff's Exhibit 2.
3        MR. WILLIAMS: And then for the record
4 I marked his CV as Plaintiff's Exhibit 1.
5    Q.   (BY MR. WILLIAMS) Okay. Mr. Melia, do you
6 see what I'm marking as Plaintiff's Exhibit 2?
7    A.   Yes. Is that the – yeah, ASTM standard,
8 yes.
9    Q.   Now, is – you said the ASTM standard.
10        Is this document the American Society
11 for Testing and Material Standard?
12    A.   Yes, that's correct.
13    Q.   Okay. And are you familiar with this
14 standard?
15    A.   I am.
16    Q.   And is this more of the industry standards
17 regarding a safe entrance mat?
18    A.   Yes. There is a section in this document,
19 I think it starts at 5.4, and that discusses mats and
20 runners as they are often referred to.
21    Q.   And what does the applicable industry
22 standard say regarding the American Society for
23 Testing and Materials?
24        MR. PATTERSON: Form.
25        THE WITNESS: Well, I can certainly

(Page 29)

1 read from the document in front of me as well, but
2 expectations, the standards that apply here, are to
3 include entrance – or – or mats and runners at the
4 entrance. Obviously, inclement weather is one of the
5 key focus points because you have not only a – a
6 transition potentially from outside to inside, but
7 the mats are designed to provide that number of steps
8 and transition if you're bringing water into a store,
9 you know, based upon precipitation, whether it's
10 rain, sleet, snow, et cetera. So many of these
11 standards are designed for that. There's points in
12 there in relation to how they are to be maintained to
13 not create pedestrian hazards in a specific point.
14 If you want me to continue. I'm sorry.
15    Q.   (BY MR. WILLIAMS) Yeah. Let me just
16 highlight this for you real quick.
17        Do you see the section that's titled
18 5.46?
19    A.   Yes. That – that was the point I was
20 going to – yes, sir.
21    Q.   Okay. Can you read that standard for me,
22 please?
23        MS. HERRERA: Objection, form.
24        THE WITNESS: Sure. 5.4.6 states,
25 mats, runners and areas rugs shall be maintained so

**Stephen Melia**

(Page 30)

1  as to – it says to – I'm sorry – to not create
2  pedestrian hazards, mats, runners and area rugs shall
3  not have loose or frayed edges, worn areas, holes,
4  wrinkles or other hazards that may cause a trip
5  occurrence.
6  　　Q.　(BY MR. WILLIAMS) Do you agree with the
7  standard?
8  　　A.　I do.
9  　　　　MS. HERRERA: Objection, form.
10  　　Q.　(BY MR. WILLIAMS) Why is that?
11  　　A.　Well –
12  　　　　MS. HERRERA: Objection, form.
13  　　　　THE WITNESS: – it – it's a standard
14  　–
15  　　　　MR. PATTERSON: (Zoom failure), Lucas?
16  　　　　MR. WILLIAMS: What's that?
17  　　　　MS. HERRERA: You want an agreement
18  that one objection's good for all.
19  　　　　MR. WILLIAMS: Sure. I don't think it
20  matters much.
21  　　　　MS. HERRERA: Agreed for Walmart
22  Defendants [SIC]. I – I did not agree then [SIC].
23  　　　　MR. WILLIAMS: Yeah. Yeah. It
24  doesn't matter. You can – it's – but, sure.
25  It's – it's fine.

(Page 31)

1  　　Q.　(BY MR. WILLIAMS) Anyways, let me reask
2  that question.
3  　　　　Why do you agree with that statement,
4  Steven – or Mr. Melia?
5  　　A.　Well, the standard – procedures and
6  standards are generally created due to a known
7  history of incidents occurring, and so my agreement
8  with it is certainly in a – the publication that
9  provides direction and clarity for the industry in
10  relation to this, and also cite my experience in
11  knowing risks that can occur when a – mats or carpet
12  areas are not maintained or they may have loose or
13  frayed edges or curled. In addition to mats that
14  are – are not properly placed at an entrance during
15  inclement weather leaves that risk of some slip
16  occurrence more prevalent in areas where you don't
17  have a – a mat transition from outside to inside
18  during inclement weather.
19  　　Q.　Can you see my screen fine?
20  　　A.　I can.
21  　　Q.　Do you see that I'm showing you what's been
22  marked as Plaintiff's Exhibit 3?
23  　　A.　Yes, I can see that.
24  　　Q.　Do you see that this document is the
25  American National Standard on commercial entrance

(Page 32)

1  matting?
2  　　A.　Yes, I see that.
3  　　Q.　And do you see at Section 8.10 of this
4  standard?
5  　　A.　I do, yes.
6  　　Q.　And can you read that standard to me,
7  please, on the left side of the table?
8  　　　　MS. HERRERA: Objection, form.
9  　　　　THE WITNESS: It's in reference to
10  mats. And the – the point made here in 8.10 is mats
11  may buckle and not lay flat while in service where
12  traffic may catch and curl the border or the end of
13  the mat, and, obviously, all those create hazards.
14  And it cites a number of solutions for ensuring that
15  their edges are not curled or cannot be at risk of
16  moving as either – and my opinion I'm not reading
17  directly from this, but as carts roll over areas, or
18  people walk over areas, to ensure that the mats
19  remain in place and that the edges are not curled
20  or – or worn.
21  　　Q.　(BY MR. WILLIAMS) Mr. Melia, do you see
22  what I've just highlighted?
23  　　A.　Yes, I do.
24  　　Q.　Okay. Can you read that to me, please?
25  　　A.　Yes.

(Page 33)

1  　　　　MS. HERRERA: Objection, form.
2  　　　　THE WITNESS: 8.10. Mats not lying
3  flat. Where mats do not lie flat the mat shall be
4  secured to the floor so that it lies flat or is
5  removed from service.
6  　　Q.　(BY MR. WILLIAMS) And do you agree with
7  this standard?
8  　　　　MS. HERRERA: Objection, form.
9  　　　　THE WITNESS: Well, I – I don't
10  necessarily agree with it in 100 percent of the
11  cases. I believe there are environments and
12  industries that have to evaluate the best course of
13  action for placing a mat in determining how that mat
14  should be placed which could include it being secured
15  mechanically or otherwise or whether the mat should
16  be easily placed and removed, again, at different
17  times. So there are – there's a – a (Zoom failure)
18  to be made, but certainly I would not say across the
19  board. It would be dependent upon the environment or
20  location where the mat is placed.
21  　　Q.　(BY MR. WILLIAMS) Do you agree that a – a
22  mat should lie flat or it should be removed from
23  service?
24  　　A.　That I agree with, yes.
25  　　Q.　And why do you agree with that?

**Stephen Melia**

(Page 34)

1      MS. HERRERA: Objection, form.
2      THE WITNESS: Well, if – if the mat
3   cannot be – if it's not lying flat or – and, again,
4   it's one of the reasons you have to conduct a [SIC]
5   evidence-based review and get to the root cause
6   analysis, if it's not lying flat and the – the edges
7   or any portion of the mat is rippled, curled, edged
8   in a way that creates a trip hazard, then certainly
9   if it cannot be laid flat and cannot be secured then
10   the next course of action is to remove that mat
11   and – and place a more appropriate mat in its place
12   if it is deemed necessary.
13      Q.   (BY MR. WILLIAMS) Now, based on these
14   standards when does an entrance mat become a trip
15   hazard?
16      MS. HERRERA: Objection, form.
17      THE WITNESS: Well, it certainly would
18   become a trip hazard if it is not laid flat in – in
19   the most simplistic terms.
20      Q.   (BY MR. WILLIAMS) Now, do you know if
21   Walmart has its own internal standard for floor mats?
22      A.   I – I do, yes.
23      Q.   Do you see that I'm on what's been Bates
24   stamped as Walmart 143?
25      A.   Yes.

(Page 35)

1      Q.   And do you see that this document is marked
2   as Plaintiff's Exhibit 4?
3      A.   I do see that, yes.
4      Q.   Are you familiar with this standard?
5      A.   I am, yes.
6      Q.   Is this Walmart's standard for maintaining
7   the front end of its stores?
8      A.   It is the standard operating procedures,
9   yes.
10      Q.   And what does the standard operating
11   procedure mean here?
12      A.   It basically provides our – or provides
13   the management and the associates in the store with
14   the expectation and the understanding of what that
15   particular topic is addressing.   In this case it's
16   the – the front end and the vestibule area
17   specifically to create a safe environment for the
18   entrance and exits.
19      Q.   All right.   Do you see Line 2 of this
20   standard operating procedure?
21      A.   I do.
22      Q.   All right.   Is Walmart supposed to correct
23   all trip hazards at the front of its store?
24      A.   Yes.   Identify, correct any type of slip,
25   trip-and-fall hazard would be the – the standard

(Page 36)

1   expectation.
2      Q.   And you see Line 3, Walmart's procedure?
3      A.   I do.
4      Q.   Is Walmart supposed to ensure that its mats
5   lie flat on the floor?
6      A.   Yes.
7      Q.   And why is that?
8      A.   That goes back to the earlier standards
9   that we referenced.   It's – many of the standards
10   from my experience that – that Walmart, and many
11   other retailers for that matter, apply are gained
12   through national standards, and – and so the – the
13   fact that this is very consistent with the standards
14   we referenced earlier is not surprising and – and is
15   expected to ensure you have safe walking and floor
16   conditions.
17      Q.   Now, if Walmart notices that a mat is not
18   lying flat what is it supposed to do?
19      MS. HERRERA: Objection, form.
20      THE WITNESS: Well, certainly the
21   identification is – is critical, but once it's
22   identified even more critical is the immediate
23   correction.   So to answer your – your question it is
24   to correct the unsafe condition or remove the unsafe
25   condition.

(Page 37)

1      Q.   (BY MR. WILLIAMS) And right here in the
2   standard operating procedure Walmart even instructs
3   its employees to discard and replace the floor mat;
4   is that right?
5      MS. HERRERA: Objection, form.
6      THE WITNESS: Yes.
7      Q.   (BY MR. WILLIAMS) Why is Walmart supposed
8   to do that?
9      MS. HERRERA: Objection, form.
10      THE WITNESS: (Unintelligible) the
11   point I mentioned earlier about the goal is to – to
12   maintain a safe environment and to not create any
13   hazards that would cause a person to be injured while
14   shopping in the store.
15      Q.   (BY MR. WILLIAMS) Now, based on your
16   knowledge and experience working at Walmart for more
17   than 30 years do you know if Walmart employees are
18   supposed to look for these trip hazards?
19      MS. HERRERA: Objection, form.
20      THE WITNESS: It – it is an
21   expectation, again, safe – to place safety first
22   that as they're walking in their general area of work
23   or going to and from that they would be observant to
24   and look for any unsafe condition, not just the floor
25   or mats but any object (Zoom failure) that may (Zoom

**Stephen Melia**

(Page 38)

1 failure.

2    Q.   (BY MR. WILLIAMS)  Okay.  So as they're

3 walking to and from wherever they are walking to and

4 from they're supposed to be looking for unsafe

5 conditions?

6    A.   Yes.  As a general rule for all associates

7 and management.  Certainly there are more specific

8 detailed positions generally referred to as -- as

9 maintenance that would more specifically be looking

10 for risks or hazards that may be evident, spills, et

11 cetera, that they would be responsible for

12 identifying and cleaning up or being called to a

13 location to clean the area with the proper equipment.

14    Q.   Now, how is Walmart and its employees

15 supposed to look for these hazards?

16        MS. HERRERA:  Objection, form.

17        THE WITNESS:  Well, it -- it starts

18 with training and awareness, and that, you know,

19 expectation of looking not just in one area but

20 wherever you may be traveling in -- in throughout the

21 store, that your awareness [SIC] and alert to unsafe

22 conditions.  And that is -- again, begins with

23 documentation such as standard operating procedures,

24 training that takes place, communication through

25 weekly meetings, et cetera, to instill that knowledge

(Page 39)

1 and expectation in -- into the employees that work at

2 a location.

3    Q.   (BY MR. WILLIAMS)  What's a safety sweep?

4    A.   A safety sweep in Walmart terms and in --

5 really in -- in the industry is [SIC] used by a

6 variety of -- of companies is to do almost exactly

7 what I described, it's to not necessarily sweep with

8 a broom, as it's often sometimes thought of, it is to

9 visually walk through areas to identify risks and is

10 oftentimes done on a periodic basis, or it can be

11 announced by management over -- over a PA system to

12 conduct a safety sweep, and not uncommon in the

13 industry.  Again, it's that reminder to be vigilant

14 in identifying and addressing unsafe conditions in a

15 facility.

16    Q.   Now, how often are Walmart employees

17 supposed to do a safety sweep and look for these trip

18 hazards?

19        MS. HERRERA:  Objection, form.

20        THE WITNESS:  Well, it has certainly

21 changed over the years, and I have, obviously, been

22 out of specific day-to-day operations of Walmart for

23 the past seven years.  To my knowledge and

24 understanding that is a -- a routine that is

25 generally expected anywhere from every 30 minutes to

(Page 40)

1 every hour for associates to stop from the -- the

2 task at hand and -- and look and view their area as

3 termed as a safety sweep.  So that is the

4 understanding that I have at this time.

5    Q.   (BY MR. WILLIAMS)  And you believe doing a

6 safety sweep every 30 minutes to an hour is a safe

7 practice?

8        MS. HERRERA:  Objection, form.

9        THE WITNESS:  I believe it's a -- a

10 good standard in the industry, in addition to what we

11 discussed earlier with every associate, management,

12 regardless of the time of day, but if they're walking

13 to and from that they're observant to and looking

14 for risks and correcting risks.

15    Q.   (BY MR. WILLIAMS)  So -- so whenever you

16 were talking I asked how they're supposed to identify

17 trip hazards and two of the things I've got are that

18 they're supposed to do safety sweeps and look for

19 trip hazards while they're walking; is that fair?

20        MS. HERRERA:  Objection, form.

21        THE WITNESS:  That is correct.  That

22 is correct.

23    Q.   (BY MR. WILLIAMS)  Now, when there is a mat

24 that is not flush with the floor what is Walmart

25 supposed to do?

(Page 41)

1        MS. HERRERA:  Objection, form.

2        MR. WILLIAMS:  Did we lose him?

3        MR. PATTERSON:  I think maybe we did.

4        MR. WILLIAMS:  Well, let me

5 (inaudible).

6    Q.   (BY MR. WILLIAMS)  Let me just reask the

7 question, okay, Mr. Melia.

8        THE WITNESS:  Stand by.  Let me -- I'm

9 not sure if this is on my end, but I received a

10 notification of a [SIC] Internet signal connection

11 issue.

12        MR. WILLIAMS:  Let's go off real

13 quick.

14        THE WITNESS:  Okay.  I -- I'm good.

15        MR. WILLIAMS:  You're good?

16        THE WITNESS:  If you-all can hear me,

17 yeah.  But everyone froze and then I lost everyone

18 for a moment.

19    Q.   (BY MR. WILLIAMS)  Okay.  I'm going to

20 reask my question.  Okay?

21    A.   Yes, please.

22    Q.   When there is a mat that's not flush with

23 the floor what is your opinion as to what Walmart is

24 supposed to do?

25        MS. HERRERA:  Objection, form.

**Stephen Melia**

(Page 42)

1        THE WITNESS: You have really just a
2 few options, maybe two options. One is reposition
3 the mat to be -- ensure it is flush with the floor.
4 The second option, obviously, is to ensure it is the
5 correct mat for the location, that it's not going to
6 wrinkle or -- or buckle under the weight of shopping
7 carts going in and out, so then the proper mat is
8 important. And then the last one, obviously, is the
9 removal of a mat if it cannot be laid flat or laid
10 safely on a floor to allow customers to walk over.
11        MR. WILLIAMS: And what -- what was
12 the basis for that objection?
13        MS. HERRERA: Relevance.
14    Q.   (BY MR. WILLIAMS) Do those standards apply
15 in this case?
16    A.   Yes, they -- they do.
17    Q.   And all of those standards we went over,
18 the two standards and Walmart's internal standards,
19 how do they apply in this -- in this case?
20    A.   Well certainly giving direction in what not
21 only is considered the industry standards in --
22 regarding the mats and the proper placement and
23 proper mat, but also Walmart's own standards. So the
24 importance is that it is clear that the policy and
25 the expectation is would -- and I would say

(Page 43)

1 well-written to the extent that it lays clearly the
2 expectation for the management to follow the
3 execution of that is certainly where a risk can occur
4 when procedures are not followed [SIC].
5    Q.   Now, after you determine these industry
6 standards that apply did you learn the facts of the
7 case?
8    A.   I did.
9    Q.   And what did you learn?
10    A.   I certainly learned from review of the
11 video, as well as the photographs, that this
12 particular mat in question that you see on Page 3 of
13 my report -- I don't know if my report's been
14 introduced yet -- but that the mat was clearly
15 rippled and not laid flat in the photograph, and from
16 the video observation points as well appears that the
17 mat and that location was the cause of Ms. Castro
18 (Zoom failure) --
19        THE COURT REPORTER: Is he frozen for
20 you-all as well?
21        MR. WILLIAMS: Yeah.
22        THE COURT REPORTER: Okay.
23        MS. HERRERA: Yes.
24        MR. WILLIAMS: It's not me this time.
25 We're here. Can you hear us?

(Page 44)

1        MS. HERRERA: (Unintelligible).
2        THE WITNESS: (Zoom failure).
3        MR. WILLIAMS: Yeah. Yeah. Yeah.
4 We're here. Can -- can you hear us?
5        THE WITNESS: Are you -- can you hear
6 me?
7        MR. WILLIAMS: Yes, sir. Yeah, I can
8 hear you there.
9        THE WITNESS: Lucas, can you hear me?
10        MR. WILLIAMS: There -- there you are.
11        THE WITNESS: Hello. Can you hear me?
12        MR. WILLIAMS: Yeah. Yeah. Your
13 video's cutting in and out on us.
14        THE WITNESS: Yeah. And I -- I
15 apologize. I could go to my phone if needed. We --
16 the house is new and the cable company just came out
17 last week and buried the cable and we have had no
18 issues at all until right now, so I apologize. If we
19 need to -- if I need to try to go to my phone, we
20 can, but hopefully, I'm disconnecting a few other
21 WIFI devices so hopefully that will help.
22        MR. PATTERSON: Okay.
23        MS. HERRERA: Or sometimes if you do
24 just the audio through your phone it'll give you more
25 bandwidth on your video and it -- it might start

(Page 45)

1 working.
2        THE WITNESS: Okay.
3        MS. HERRERA: We've -- we've all
4 become Internet savvy over the past couple of years
5 in trying to deal with bandwidth issues.
6        THE WITNESS: Yeah. I'm showing a
7 better connection now, but I am -- you guys are still
8 freezing up.
9        MR. WILLIAMS: Yeah. Let's say -- do
10 you mind calling in with your phone? Can you hear
11 us?
12        THE COURT REPORTER: I'm assuming
13 we're still on the record because the videographer
14 has not gotten us off.
15        THE VIDEOGRAPHER: We can be off the
16 record. The recording's been paused, so...
17        THE COURT REPORTER: Okay.
18        (Short recess taken.)
19    Q.   (BY MR. WILLIAMS) Mr. Melia, earlier I
20 asked you if you learned the facts of the case; do
21 you remember?
22    A.   Yes.
23    Q.   What did you learn?
24    A.   That Ms. Castro had completed making a
25 purchase at the register and as she was exiting,

Stephen Melia

(Page 46)

1 walking towards the exit door, she tripped and fell.
2    Q.   And how did you learn that?
3    A.   It was through the – of course, the video
4 in addition into the incident report and the, of
5 course, deposition testimony that was provided from
6 Ms. Castro as to what – what caused her to
7 trip-and-fall.
8    Q.   And what did she trip-and-fall on?
9    A.   As stated in the Walmart incident report it
10 stated that she tripped and fell on the entrance mat
11 as she was exiting the store.
12    Q.   And did you look at photos of the mat taken
13 after the incident?
14        MR. PATTERSON:  He's gone again.
15        THE COURT REPORTER:  Off the record?
16        MS. HERRERA:  Yeah.
17        MR. WILLIAMS:  Uh-huh.
18        (Short pause in proceedings.)
19        THE VIDEOGRAPHER:  On the record.
20    Q.   (BY MR. WILLIAMS)  Did you look at photos
21 of the mat taken after the incident?
22    A.   I did.
23    Q.   And I'm showing you what's been marked as
24 Plaintiff's Exhibit 5.  Have you seen these photos
25 before today?

(Page 47)

1    A.   Yes, I have.
2    Q.   And you see that it's five photos?
3    A.   Yes.
4    Q.   What do you see in this photo?
5        MR. PATTERSON:  Form.
6        THE WITNESS:  It clearly shows a – a
7 black carpeted mat at the entrance/exit to the – to
8 the fuel station convenience store.
9    Q.   (BY MR. WILLIAMS)  Can we just call this
10 the mat?
11    A.   Yes.
12    Q.   Do you see any curls on this mat?
13        MS. HERRERA:  Objection, form.
14        THE WITNESS:  I do.  I see curls and
15 ripples as I would describe them.
16    Q.   (BY MR. WILLIAMS)  Now, how many curls does
17 it take for a mat to become a trip hazard?
18        MS. HERRERA:  Objection, form.
19        THE WITNESS:  Well, it – it certainly
20 only requires there to be one imperfection of a mat
21 that's not laying flat to become a trip hazard.
22    Q.   (BY MR. WILLIAMS)  And how many curls do
23 you see in this mat?
24        MS. HERRERA:  Objection, form.
25        THE WITNESS:  I – I see at least four

(Page 48)

1 or five.  There's one larger one on the very front of
2 this photo, one directly to the left, a smaller
3 imperfection, and then the sides, each side of the
4 mat, at least from this photograph, appear to have at
5 least two to three ripples along that long edge on
6 each side of the – the mat that's shown here.
7    Q.   (BY MR. WILLIAMS)  Do you see that I'm
8 showing you what's been marked as Plaintiff's Exhibit
9 6?
10    A.   Yes, I do.
11    Q.   Do you see it's just this exact same photo
12 as the last one we went over except that it has red
13 circles around it?
14    A.   Yes.
15    Q.   Do you see those red circles are where the
16 curls are at?
17    A.   That would be what I was describing as the
18 curls that I was identifying, or the ripples that I
19 was identifying as we spoke earlier.
20    Q.   And how many curls do you see in this mat?
21    A.   Well, again, from the photograph, as I
22 described earlier, the two (Zoom failure) identified
23 as the trip initiated from Ms. Castro and then the –
24 the ones on the side.  If you're asking how many
25 circles I see drawn in this photo, there are seven

(Page 49)

1 circles identified.
2    Q.   So you seen seven curls in this mat?
3        MS. HERRERA:  Objection, form.
4        THE WITNESS:  Well, there are – there
5 are certainly seven circles identified.  It is my
6 representation that those are areas of a ripple or
7 a – a curled section of the mat.
8    Q.   Now, do you have a – do you have an
9 opinion on whether these curls made this mat a trip
10 hazard?
11        MS. HERRERA:  Objection, form.
12        THE WITNESS:  I do.
13    Q.   (BY MR. WILLIAMS)  And what is that
14 opinion?
15    A.   Well, in my opinion, it is a risk.  It is a
16 trip hazard based on the mat not lying flat and the
17 risk of someone catching one of those curled sections
18 or ripples in the mat that would potentially cause a
19 trip-and-fall to occur.
20    Q.   Looking at this photo is this mat flat or
21 flush with the floor?
22        MS. HERRERA:  Objection, form.
23        MR. PATTERSON:  Objection, form.
24        THE WITNESS:  It is – it is not.
25 It's just a different angle of the – the same

Stephen Melia

(Page 50)

1  incident photo that was provided, and it is not lying
2  flat, it is – indicates the ripples as we described
3  previously.
4      Q.   (BY MR. WILLIAMS)  And do you have an
5  opinion on whether the mat not lying flat on the
6  ground is a trip hazard?
7      A.   Yes, I do.
8      Q.   And what's that opinion?
9          MR. PATTERSON:  Form.
10         THE WITNESS:  Well, the opinion is
11 that if the mat is not lying flat it does represent a
12 risk of a trip-and-fall hazard.
13         MR. WILLIAMS:  And, Evan, what was the
14 basis for that objection?
15         MR. PATTERSON:  Ambiguous, vague,
16 speculation.
17         MR. WILLIAMS:  On whether a mat lying
18 flat on the ground is a trip hazard is vague?
19         MR. PATTERSON:  Correct.
20     Q.   (BY MR. WILLIAMS)  Now, Mr. Melia, when I
21 say trip hazard what do you think I am referring to,
22 or how would you like to define the words trip
23 hazard?
24     A.   I – I would define a trip hazard as any
25 type of object, piece of equipment or item that is on

(Page 51)

1  the floor that would cause an individual to – their
2  foot to make contact with that object or item that
3  would then cause them to trip over that said item and
4  cause a fall.  Not all trips result in a fall, but it
5  is a trip-and-fall risk.
6      Q.   And based on that definition of trip hazard
7  do you believe that this mat is a trip hazard?
8      A.   I do, yes.
9      Q.   And why is that?
10     A.   Because it is not lying flat and the
11 ripples indicated, as we've discussed, creates that
12 potential for a person to catch their foot or their
13 shoe in the rippled part of the mat that would cause
14 them to potentially lose balance and trip-and-fall.
15     Q.   Okay.  And if a mat is a trip hazard is it
16 a safe or an unsafe mat?
17         MS. HERRERA:  Objection, form.
18         THE WITNESS:  Well, certainly it would
19 be an unsafe mat.
20     Q.   (BY MR. WILLIAMS)  And is Walmart supposed
21 to provide safe mats to its customers to use?
22         MS. HERRERA:  Objection, form.
23         THE WITNESS:  The expectation would be
24 to provide a safe walking surface.  In this case
25 we're obviously referring to a mat, then the answer

(Page 52)

1  would be, yes, the expectation would be to provide an
2  appropriate mat that does not create a tripping
3  hazard.
4      Q.   (BY MR. WILLIAMS)  And did this mat create
5  that tripping hazard?
6          MS. HERRERA:  Objection, form.
7          THE WITNESS:  It is my professional
8  opinion that it did, yes.
9      Q.   (BY MR. WILLIAMS)  Is Walmart supposed to
10 look and correct – excuse me.
11         Is Walmart supposed to look for and
12 correct trip hazards like this?
13         MS. HERRERA:  Objection, form.
14         THE WITNESS:  Yes.
15     Q.   (BY MR. WILLIAMS)  How so?
16     A.   Part of the standard operating procedures
17 as discussed, the safety sweep, the observation, the
18 maintenance, folks assigned to inspecting the floors
19 to ensure they're safe, that is the – the standard
20 that not only Walmart but many – many companies in
21 the – in the retail grocery sector implement, and
22 the expectation is to inspect and correct the unsafe
23 condition before an incident occurs.
24     Q.   Did you review any video to see if Walmart
25 looked for or found the trip hazards in the mat?

(Page 53)

1          MS. HERRERA:  Objection, form.
2          THE WITNESS:  I did review the video
3  that was provided by Walmart.
4          MR. WILLIAMS:  And what was the –
5  what was your basis there for that objection?
6          MS. HERRERA:  Leading, counsel's
7  testifying, misstates evidence, mischaracterizes
8  evidence.  I can go on if you –
9          MR. WILLIAMS:  Yeah.  Go on.
10         MS. HERRERA:  – care for me to.  You
11 just proceed with your questioning of him.
12         MR. WILLIAMS:  Oh, okay.
13     Q.   (BY MR. WILLIAMS)  Did you review any video
14 in this case?
15     A.   Yes, I did.
16     Q.   What for?
17     A.   Again, the purpose of – somewhat of a
18 forensic analysis, to go back and review an incident
19 you want to obtain as many of the facts as you can as
20 they were represented at the time of the incident,
21 that includes video, photographs, witness statements,
22 et cetera.  So the purpose was to go and look at and
23 make observations as to the activity that was taking
24 place and the actual incident itself to help
25 determine that root cause.

Stephen Melia

(Page 54)

1   Q.   Okay. And whenever you reviewed the video
2 did you learn if Walmart looked for or found trip
3 hazards in the mat?
4        MS. HERRERA: Objection, form.
5        THE WITNESS: Certainly there was only
6 a period of time, approximately an hour, prior to the
7 incident the video provided. While I believe there
8 were Walmart associates in and around the area and
9 walking past the mat there was no indication during
10 that period of time that there was any identification
11 and certainly no action to remove the mat prior to
12 the incident.
13   Q.   (BY MR. WILLIAMS) Can you see my screen
14 fine, sir?
15   A.   Yes.
16   Q.   And I'll put on the record that I'm going
17 to mark this as Exhibit 7 which is the video.
18        Do you recognize this video?
19   A.   I do.
20   Q.   And have you reviewed it before today?
21   A.   I have, yes.
22   Q.   And do you see that I'm on the 9 minute 49
23 second mark of this video?
24   A.   Unfortunately, I have to testify that based
25 on me reviewing this from my phone it is difficult

(Page 55)

1 for me to read the – the numbers, so I don't know
2 that I can testify to that. Let the record reflect
3 whatever it may show on the larger screen.
4   Q.   Okay. I'll represent to you that we're on
5 the 9 minute 49 second mark of this video. Okay?
6   A.   Okay.
7   Q.   And as I'm playing this video can you just
8 see how many Walmart's employees are behind the
9 counter?
10   A.   Well, is it playing right now? Because it
11 appears to be stopped.
12   Q.   No, no. Just asking you to – if you're
13 going to be able to do that?
14   A.   It – I see at least one and possibly two.
15 It's, unfortunately, a little difficult to tell. If
16 you play it then I may see the activity that would
17 draw a better answer.
18   Q.   Okay. Are you able to look at this video
19 on your computer screen?
20   A.   Give me a minute, I will see if I have it.
21 I had to shut down and restart when I was trying to
22 do this on the computer so this may take a moment.
23        MR. WILLIAMS: You guys want to go off
24 the record and take a break while he does that?
25        MR. PATTERSON: Up to you.

(Page 56)

1        MS. HERRERA: I'm good.
2        MR. WILLIAMS: Okay. Well, we'll –
3 we'll stay on it. Whatever works on you-all
4 (unintelligible).
5        THE WITNESS: Yeah. It's going to
6 take me just a minute to get to.
7        MS. HERRERA: What was Exhibit 6
8 again?
9        MR. WILLIAMS: The curls in the mat.
10 The red circles.
11        MS. HERRERA: The other – all the
12 red – okay. Has his report been numbered yet? I
13 need to know. Well, just for the record, since we're
14 on the record we do object to having just been
15 provided with his report today, the day of his
16 deposition, but we're still prepared to go forward.
17        MR. WILLIAMS: You didn't get the
18 report before today?
19        MS. HERRERA: It was not –
20        MR. PATTERSON: It was an affidavit.
21        MS. HERRERA: We didn't – it wasn't
22 produced to us before today.
23        THE WITNESS: Working as quickly as I
24 can, folks, to get – to get back to this.
25        MR. WILLIAMS: Was the affidavit any

(Page 57)

1 different than the report?
2        MR. PATTERSON: Yeah. One's 20 pages.
3        MR. WILLIAMS: Well, I guess you-all
4 got it the same time I did. My report or my thing is
5 just an affidavit, so that's – that's what I got
6 ready to mark, so I don't think it makes any
7 difference on any of the questions I'm going to ask,
8 though, so...
9        THE WITNESS: All right. We may have
10 to proceed without the video. I believe I had to
11 download to a laptop and not my desktop, and this
12 was months back, so I'm not going to be able to get
13 to it. I can try to log back in on my desktop for
14 this video deposition so perhaps I can see it in a
15 larger screen, but just due to technical difficulties
16 I apologize. I certainly can see the video once it's
17 playing on my phone. I don't think it'll be any
18 different than what my recollection is from watching
19 the video in the past.
20   Q.   (BY MR. WILLIAMS) Okay. You ready to
21 proceed then?
22   A.   Yes. Let's try to continue.
23   Q.   Okay. Mr. Melia, I'm on the 9 minute 38
24 second mark of this video. I'll represent that to
25 you. Okay?

**Stephen Melia**

(Page 58)

1  A.  Okay.
2  Q.  How many people do you see behind the
3  counter?
4  A.  So I see three Walmart associates behind
5  the counter.
6  Q.  Do you see four Walmart associates behind
7  the counter?
8  A.  I do now, yes.  One just left.
9  Q.  Now, does the mat seem close or far from
10  where these employees are at?
11  A.  It's just across the counter from where
12  they are ringing up customers.  So I was able to
13  observe two of the associates leave the register and
14  walk past the mat.
15  Q.  And you were able to observe that with the
16  video being played to the 10 minute 25 second mark,
17  right?
18  A.  Again, if the record reflects that time
19  frame.  I -- I can't conclusively state that.  I
20  don't have visual on that.
21  Q.  Now, how many people -- or excuse me.
22       How many Walmart employees did you see
23  walk over the mat?
24  A.  Two.
25  Q.  And could those two employees had noticed

(Page 59)

1  the trip hazard in the mat?
2       MS. HERRERA:  Objection, form.
3       THE WITNESS:  I would believe that
4  that would have been noticeable, yes.
5  Q.  (BY MR. WILLIAMS)  Could they have
6  corrected the trip hazards in the mat?
7       MS. HERRERA:  Objection, form.
8       THE WITNESS:  Yes, I believe they
9  could have.
10  Q.  (BY MR. WILLIAMS)  And did they do so here?
11  A.  They did not.
12  Q.  Okay.  I'll represent to you that we're on
13  the 46 minute and 3 second mark of the video.  Okay?
14  A.  Okay.  Okay.
15  Q.  And I'll represent to you that we just
16  played the video to the 46 minute and 20 second mark
17  of the video.  Okay?
18  A.  Okay.
19  Q.  Did you notice a third Walmart employee
20  walk over the mat?
21  A.  I did.  He was pushing a rolling cart.
22  Q.  And could that employee have also noticed
23  the trip hazard in the mat?
24  A.  He could have, yes.
25  Q.  And could that employee also have corrected

(Page 60)

1  the trip hazards in the mat?
2  A.  Yes.
3  Q.  Did the employee do so?
4  A.  No, they did not.
5  Q.  And I'll represent to you that -- excuse
6  me.
7       I'll represent to you that I'm on the
8  47 minute 45 second mark of the video.  Okay?
9  A.  Okay.
10  Q.  How many people do you see in the store at
11  this time?
12  A.  I believe I -- there is one person behind
13  the counter.
14  Q.  Is that person a Walmart employee?
15  A.  It would appear so, yes.  Yes, they are.
16  Q.  Now, I'm going to play this video for about
17  20 to 30 seconds.  All right.  Do you see that I just
18  played the video to the -- or excuse me.
19       I'll represent to you that I played
20  the video to the 48 minute 6 second mark.  Okay?
21  A.  Okay.
22  Q.  How many people are in that store during
23  the time?
24  A.  There's only one visible through this angle
25  of the video.

(Page 61)

1  Q.  And who is that?
2  A.  It was the Walmart associate that left from
3  behind the counter and then returned.
4  Q.  And when she returned from behind the
5  counter did she look towards the entrance mat?
6  A.  I can't speak to what direction her eyes
7  were -- were looking.  She was walking towards that
8  direction before she -- before she turned -- left to
9  go behind the -- counter and then into the back
10  room it appears.
11  Q.  And when she was walking towards that
12  direction could she have noticed a trip hazard in the
13  mat if she looked?
14       MS. HERRERA:  Objection, form.
15       THE WITNESS:  I believe that would be
16  observed, yes.
17  Q.  (BY MR. WILLIAMS)  And could she have
18  corrected the trip hazards in the mat?
19  A.  Yes.
20       MS. HERRERA:  Objection, form.
21  Q.  (BY MR. WILLIAMS)  Did she do so?
22  A.  She did not take any action towards the
23  mat.
24  Q.  And there was no one in the store during
25  this time, was there?

**Stephen Melia**

(Page 62)

1 A. Again, I only have this portion of the
2 video. I know there's one other angle that I did
3 view from the side looking towards the -- doors
4 and the mat, but I don't have full view of the video,
5 so I can't answer that conclusively.
6 Q. Did you see -- did you see anyone else in
7 the store during this video?
8 A. No, not for the time frame that you just
9 represented.
10 Q. And could this employee have safely removed
11 this mat without interfering with other customers?
12 A. Yes.
13 Q. And could this employee have safely removed
14 the mat without interfering with Walmart's day-to-day
15 business?
16 A. Certainly could have, yes.
17 Q. Sir, do you see that I paused this video?
18 A. I do, yes.
19 Q. Okay. And I'll represent to you that I'm
20 on the 53 minute 26 second mark of the video. Okay?
21 A. Okay.
22 Q. Sir, do you see that I've paused this
23 video?
24 A. I do, yes.
25 Q. And I'll represent to you that I've paused

(Page 63)

1 the video at the 53 minute 30 second mark. Okay?
2 A. Okay.
3 Q. How many people are in the store at this
4 time?
5 A. One customer appears to have just exited
6 the store you see at the top of the screen, and then
7 you have the one employee associate that has just
8 walked out from behind the counter towards the --
9 towards the doors.
10 Q. And is that Walmart employee walking
11 towards the mat?
12 A. It appears that she is at this point
13 towards the mat and the Gatorade display that is
14 there.
15 Q. Is that Gatorade display orange?
16 A. It is, yes.
17 Q. And is that the same orange Gatorade
18 display that we see in the photos?
19 A. It is, yes.
20 Q. Is this the -- I'll represent to you that I
21 just played the video to the 53 minute 35 second
22 mark. Okay?
23 A. Okay.
24 Q. Did you see a fourth Walmart employee walk
25 past the mat?

(Page 64)

1 A. I did see that same employee, yes, walk
2 past the mat and turn to the right.
3 Q. And is that the fourth employee of Walmart
4 that we've seen walk past this mat in this video?
5 A. That would be correct, yes.
6 Q. And how many people did you see in the
7 store (Zoom failure) the mat?
8 A. Again, there were -- there was one customer
9 that walked out just prior to this associate walking
10 towards the mat and then turning to the right just
11 past the mat.
12 Q. So whenever she walked past the mat there's
13 no one else in the store at the time store; is that
14 right?
15 A. Again, I want to qualify based on the --
16 the video angles that we have available I believe
17 there's more parts to the store, but on this video
18 that is correct.
19 Q. Then when the -- a fourth Walmart employee
20 walked past the mat could she have noticed the trip
21 hazard in that mat?
22     MS. HERRERA: Objection, form.
23     THE WITNESS: Yes.
24 Q. (BY MR. WILLIAMS) And could she have
25 corrected the trip hazard in the mat?

(Page 65)

1 A. Yes.
2     MS. HERRERA: Objection, form.
3 Q. (BY MR. WILLIAMS) All right. Did she do
4 so?
5 A. No.
6 Q. And could this employee once again have
7 safely removed this mat without interfering with
8 customers at this time?
9     MS. HERRERA: Objection, form.
10     THE WITNESS: Yes.
11 Q. (BY MR. WILLIAMS) And could this employee
12 once again have safely removed this mat without
13 interfering with Walmart's day-to-day business at
14 this time?
15     MS. HERRERA: Objection, form.
16     THE WITNESS: Yes.
17 Q. (BY MR. WILLIAMS) Okay. Earlier you said
18 that Walmart was supposed to do a safety sweep every
19 30 minutes to an hour; do you remember?
20 A. Yes, I do.
21 Q. And what is Walmart supposed to do during a
22 safety sweep again to find these trip hazards?
23 A. The description in the operating procedures
24 are to walk the aisles in the space in your work area
25 and visibly look for, identify and correct any -- any

**Stephen Melia**

(Page 66)

1 unsafe conditions that you might find.
2   Q.  Are these employees supposed to be
3 intentionally looking for trip hazards?
4   A.  Yes.  That is the – the purpose of
5 conducting the safety sweep on a – on a regular
6 basis.
7   Q.  Did you see any evidence of Walmart doing a
8 safety sweep in that video?
9       MS. HERRERA:  Objection, form.
10      THE WITNESS:  No, not on the – the
11 video that we observed.
12  Q.  (BY MR. WILLIAMS)  Did you see any evidence
13 of any Walmart employee intentionally looking for a
14 trip hazard in that video?
15      MS. HERRERA:  Objection, form.
16      THE WITNESS:  Again, they – if they
17 were they – there were no actions taken, so I – I
18 don't want to – I never want to speak to what they
19 may have been thinking or what they saw through their
20 eyes, but no actions were taken to correct the – the
21 mat.
22  Q.  (BY MR. WILLIAMS)  Now, what does that
23 indicate to you?
24  A.  I'm sorry.  Could you ask that...
25  Q.  Sure.  Earlier in –

(Page 67)

1   A.  I'm not sure what you're referencing.
2   Q.  Yes.
3       Earlier I – I asked you if you saw
4 any evidence of Walmarts [SIC] doing a safety sweep
5 and you said no; do you remember?
6   A.  Yes.
7   Q.  What does that indicate to you?
8   A.  Well, it – it could indicate a number of
9 things.  It certainly, first and foremost, could
10 indicate a lack of training.  It could indicate a
11 lack of awareness of the procedure or simply a lack
12 of execution of the – of the expected procedure.
13  Q.  Would Walmart have noticed the trip hazards
14 in the mat if they did a safety sweep?
15      MS. HERRERA:  Objection, form.
16      THE WITNESS:  Again, it is – yes, it
17 is likely proper observation would have identified
18 that.
19  Q.  (BY MR. WILLIAMS)  Is it more likely than
20 not Walmart would have found the trip hazards in the
21 mat if they did a safety keep?
22      MS. HERRERA:  Objection, form.
23      THE WITNESS:  Yes.  And it's my
24 opinion that it would have and could have been
25 identified.

(Page 68)

1   Q.  (BY MR. WILLIAMS)  But did Walmart ever
2 find or correct this trip hazard?
3   A.  Not until after the incident occurred.  It
4 was – the mat was removed but not prior to at – at
5 least for the hour of video that we have.
6   Q.  Would it have been helpful to have video
7 for more than an hour before this incident?
8       MS. HERRERA:  Objection, form.
9       THE WITNESS:  I don't believe it would
10 have been necessary.  It's standard to retain video
11 an hour prior to and an hour after an incident
12 occurs, so while it may have provided more footage of
13 what did or didn't occur, for me, it's reviewing the
14 incident investigation, it was sufficient to – to
15 see that you – the condition of the mat and what had
16 taken place prior to and – and after the incident.
17  Q.  (BY MR. WILLIAMS)  Was just that hour of
18 video sufficient for you to learn whether or not
19 Walmart should have noticed the mat was a dangerous
20 condition?
21  A.  Yes, that was sufficient for me.
22  Q.  And why is that?
23  A.  Well, you have a period of time where you
24 have – well, the customers, but an associate's
25 walking through and past the area and we had

(Page 69)

1 opportunity – the associates would have had an
2 opportunity to identify and remove or – or correct
3 the unsafe condition.
4   Q.  And do you have an opinion on whether that
5 mat was a dangerous condition at the time of the
6 incident?
7       MR. PATTERSON:  Form.
8       THE WITNESS:  I do.
9   Q.  (BY MR. WILLIAMS)  Okay.  And what's that
10 opinion?
11  A.  Well, certainly based on the condition of
12 the mat not lying flat it created the risk exposure
13 for this incident to occur.
14  Q.  And do you have an opinion on whether
15 Walmart should have noticed the mat was a dangerous
16 condition –
17      MS. HERRERA:  Objection, form.
18  Q.  (BY MR. WILLIAMS)  – at the time of the
19 incident?
20  A.  I do.
21  Q.  And what's that opinion?
22  A.  That certainly would have been imminent
23 and more likely than not would have been noticed.
24  Q.  What do you mean by would have been
25 noticed?

### Stephen Melia

(Page 70)

1    A.   Based on observations that the
2    observation's been made and -- and conducted by the
3    associates walking through the store, or even through
4    the front doors as they were exiting, the opportunity
5    was there to identify the unsafe condition and take
6    actions to remove it.
7    Q.   And why do you believe that Walmart should
8    have noticed the mat was a dangerous condition?
9         MS. HERRERA:  Objection, form.
10        THE WITNESS:  Well, again, relying on
11   the -- the knowledge that there would have been
12   sufficient training, and the standard procedures are
13   well documented to specifically look for the
14   condition of mats at the entrance of the store, that
15   would be the basis of that opinion.
16   Q.   (BY MR. WILLIAMS)  And do you believe that
17   condition was there long enough for Walmart to find
18   it?
19        MS. HERRERA:  Objection, form.
20        THE WITNESS:  I do, yes.
21   Q.   (BY MR. WILLIAMS)  And why is that?
22   A.   Well, it is a small area, it's not a large
23   footprint of the stores, a smaller confined space,
24   and you've got to -- got to consider four associates
25   working in or passing through that area would have

(Page 71)

1    provided enough time and opportunity to identify the
2    risk and correct it.
3    Q.   Okay.  If this testimony -- excuse me.
4         If there is testimony and evidence
5    that this mat had been on the floor for six days
6    before this incident do you believe that Walmart
7    would have or certainly should have noticed this mat
8    was in a dangerous condition?
9         MS. HERRERA:  Objection, form.
10        THE WITNESS:  Well, I certainly do not
11   want to speculate, of course, on the condition of the
12   mat for the prior days.  I only have the information
13   available for the -- the time frame of the video, so
14   it'd be difficult for me to -- draw any
15   determinations prior to the condition of the mat in
16   the prior days.
17   Q.   (BY MR. WILLIAMS)  And do you have an
18   opinion on whether this incident would have occurred
19   had Walmart noticed the trip hazards and picked up
20   the mat?
21        MS. HERRERA:  Objection, form.
22        THE WITNESS:  Well, certainly, yes, I
23   do have an opinion on that.
24   Q.   (BY MR. WILLIAMS)  And what's that opinion?
25   A.   I certainly believe that had the -- the mat

(Page 72)

1    not been in the condition it was at the location at
2    the time that it would have eliminated that risk as
3    Ms. Castro was walking towards the exit.
4    Q.   And what do you mean by eliminated a risk?
5    A.   Well, then you have -- when you have
6    conditions that are present that -- that pose a risk
7    for a trip hazard, obviously, you have to mitigate
8    that risk by either correcting the unsafe condition
9    or removing it completely.  And as I've stated, one
10   of my reference materials, the -- the hierarchy of
11   controls that -- that OSHA often refers to is -- is
12   simply that, the -- the opportunity to once a risk is
13   identified take the appropriate steps to correct or
14   mitigate, substitute or remove the condition so that
15   it does not continue to pose a risk.
16   Q.   And do you have opinion [SIC] -- excuse me.
17        Do you have an opinion on whether
18   Walmart was supposed to pick up this mat?
19        MS. HERRERA:  Objection, form.
20        THE WITNESS:  Well, certainly I'll
21   offer this, and it's in -- in my opinions in the
22   report, in typical expectations and standard
23   operating procedures in those that are in the Walmart
24   guidelines and the -- the mats themselves are
25   utilized when there's inclement weather, and the type

(Page 73)

1    of mat is important for those situations, so I cite
2    in my report as one of the opinions that it did not
3    appear to be raining or had rained based on the video
4    and sunshine coming through, so I do have a question
5    as to the necessity of the mat being placed there at
6    this time of the incident, and then certainly had an
7    observation been made that could have easily been
8    removed since it was not raining prior to the
9    incident which would have, of course, removed the
10   risk.
11   Q.   (BY MR. WILLIAMS)  Did Walmart ever pick up
12   this mat before the incident?
13   A.   For the time frame of one hour that I have
14   reviewed prior to the -- the mat was not picked up in
15   that one-hour time frame prior to Ms. Castro tripping
16   on it.
17   Q.   And did Walmart violate any industry
18   standards in not picking up the mat?
19   A.   Well, the industry standard would be to
20   ensure that mats were laying flat properly, so to
21   that regard failure to identify, and -- and, yes,
22   failure to correct the unsafe condition, would be
23   that -- that violation of the standard to maintain a
24   safe environment.
25   Q.   Did Walmart also violate its own standard

**Stephen Melia**

(Page 74)

1  in not picking up the mat?
2       MS. HERRERA: Objection, form.
3       THE WITNESS: It did in not
4  identifying and correcting the -- the unsafe
5  condition.
6    Q.  (BY MR. WILLIAMS) And do you have an
7  opinion on whether this incident would have occurred
8  had Walmart picked up this mat?
9    A.  Well, certainly, it is my opinion that
10  the -- the risk is -- the -- the fact that the mat was
11  curled, if -- if there was no mat there, then to
12  answer your question there would -- there would be no
13  risk of tripping on a mat.
14       MR. WILLIAMS: Okay. Guys, do you
15  mind if I take a break and review my notes?
16       MR. PATTERSON: Sure.
17       MS. HERRERA: No problem.
18       THE WITNESS: And -- and I'd like to
19  try to get logged back in. We'll use my phone as a
20  standby, but while we're on break I'm going to try to
21  log in on my computer. It looks like I've got a good
22  connection.
23       MR. WILLIAMS: Okay. Thanks.
24       THE WITNESS: Five minutes?
25       MS. HERRERA: Yep.

(Page 75)

1       THE VIDEOGRAPHER: Off the record at
2  3:42.
3       (Short recess taken.)
4       THE VIDEOGRAPHER: Okay. On the
5  record at 3:55.
6    Q.  (BY MR. WILLIAMS) Now, Mr. Melia, earlier
7  you described how Walmart must put safety above
8  everything else; do you remember?
9    A.  Yes. We were discussing safety first.
10    Q.  Did Walmart do that here, did Walmart put
11  safety above everything else in this case?
12       MS. HERRERA: Objection, form.
13       THE WITNESS: Well, they certainly did
14  not identify the risks associated with the mat, so I
15  would answer it that way.
16    Q.  (BY MR. WILLIAMS) All right. And did they
17  do a safety sweep in the hour that you watched that
18  video?
19       MS. HERRERA: Objection, form.
20       THE WITNESS: There was no evidence of
21  a safety sweep in -- in my understanding of a safety
22  sweep that was performed in the hour meaning after
23  the incident.
24    Q.  (BY MR. WILLIAMS) And how often are they
25  supposed to do them?

(Page 76)

1    A.  Typically, it's every 30 minutes to an
2  hour.
3    Q.  And so two safety sweeps were supposed to
4  occur on that video?
5       MS. HERRERA: Objection, form.
6       THE WITNESS: Yes. And, again, at --
7  the size or the format and the footprint can often
8  make a difference, but, typically, 30 minutes to an
9  hour would be standard for a -- a safety sweep of --
10  of an area where an associate is working.
11    Q.  (BY MR. WILLIAMS) And had Walmart done
12  that safety sweep, found the mat, removed the mat,
13  would we be here today?
14       MS. HERRERA: Objection, form.
15       THE WITNESS: Yes, my opinion that the
16  risk would have been -- had it been removed then the
17  incident would not have happened, so, no, we probably
18  would not be here today.
19       MR. WILLIAMS: I'll pass the witness.
20       EXAMINATION
21  BY MS. HERRERA:
22    Q.  All right. Mr. Melia, I'm going to go
23  first asking you some question. I'm Elizabeth
24  Herrera. I represent the Walmart defendants in this
25  case. And just for the record, I'm going to

(Page 77)

1  introduce your affidavit as Exhibit A. And you did
2  have a paper copy of that; is that right, Mr. Melia?
3    A.  That is correct.
4    Q.  And how many pages is your paper copy just
5  so I can make sure I've -- we have the same one?
6    A.  Three.
7    Q.  And then you also have a copy of your
8  report, which I have as 23 pages, there with you?
9    A.  That is correct.
10    Q.  Okay. I'm going to go ahead and mark that
11  report as Exhibit 9. And in looking at what we've
12  marked as Exhibit 9, your report, that also includes
13  your CV there, which I believe has also been included
14  as Exhibit 1. Is -- is the CV that's attached there
15  as Exhibit B -- or Appendix B to your report more
16  updated than that other one or is this -- or is this
17  also an older one?
18    A.  It would be an older one that was submitted
19  at the time of this report, so it would likely be the
20  one that we reviewed earlier, the original question.
21    Q.  And also included with your report on Page
22  22 is your testimonial history. This, then, would
23  also have been current as of the date the report was
24  authored.
25       So do you have other testimonial

**Stephen Melia**

(Page 78)

1  history since the date the report was authored?
2    A.   Yes.  I do not have an updated one in front
3  of me, but I can certainly supplement that.  But I
4  believe there's been at least one or two more
5  depositions since this report was submitted.
6    Q.   And in addition to the one or two
7  additional depositions have you testified at trial at
8  all since February 2022?
9    A.   I -- I will need to look.  I would like to
10  verify that through some record at some point.  We
11  can do it maybe at the next break.  I should be able
12  to pull that up and answer that affirmatively, but I
13  don't want to guess.
14    Q.   And then what we'll do is, is if you do
15  find an -- updated documents or updated information
16  for your testimonial history we'll include that as
17  Exhibit 10 to your deposition and we can just confirm
18  that later.  That's fine.
19    A.   Yeah.  I'd be happy to (Zoom failure)
20  depositions included.
21    Q.   Do you also have an updated CV?
22    A.   I do.
23    Q.   Let's attach an updated CV, then, as
24  Exhibit 11.
25    A.   Okay.

(Page 79)

1    Q.   And you can send that to us as well after
2  the deposition.  That's fine.
3        And your fee schedule is also attached
4  as Appendix D on Page 23 of your report.
5        Is this your current fee schedule?
6    A.   I -- I would say, yes, on the hourly rates.
7  I think recently we may have updated the mileage
8  reimbursement, but that's minimal and I don't believe
9  there was any mileage in this case, so -- but it is
10  accurate for the -- the hour -- hourly rates for
11  testimony and deposition and so forth.
12    Q.   What did you do to prepare for your
13  deposition today?
14    A.   I read through my affidavit and read
15  through my report.
16    Q.   Did you meet with or speak with
17  Ms. Castro's attorneys?
18    A.   I did, yes.
19    Q.   And when did you speak to them?
20    A.   It was earlier this afternoon.  I don't
21  recall exactly.  It would have been possibly around
22  11:30 or 12 noon.
23    Q.   And for how long did you speak with them?
24    A.   I would estimate maybe five minutes, five
25  to ten minutes.

(Page 80)

1    Q.   And other than reading through your report
2  and your affidavit did you review any other documents
3  to prepare for your deposition today?
4    A.   No, I did not review necessarily.  Pulled
5  some of my paper copy documents of some of the
6  standards that have been discussed, or at least the
7  ones that I had provided in the appendix as
8  documentation reviewed or relied upon for -- for my
9  opinions.
10    Q.   And that -- that was going to be my next
11  question.
12        So on Page 15 of your report, Appendix
13  A, it has the list of documents that you've reviewed
14  for this case.
15        Are -- other than what's included in
16  that list have you -- you reviewed anything else with
17  respect to this case?
18    A.   No.  That should be the -- the complete
19  list at the time of this report.
20    Q.   And since the time the report was authored
21  have you reviewed any new documents or information
22  with respect to this case?
23    A.   I do not believe I have, but I would need
24  to check.  I know I did not amend the report.  I am
25  fairly certain that no new documentation has been

(Page 81)

1  provided since then, but fairly certain doesn't mean
2  absolute, so I -- I may need to verify that.
3    Q.   And this document here, the -- the cover
4  page states it's expert witness report with a date of
5  February 16, 2022.
6        Is that the only report that you've
7  authored for this case?
8    A.   It is the only report.  I also provided
9  that affidavit, as we discussed, that was on, let's
10  see, the 17th of February 2022.
11    Q.   When were you first contacted about being
12  involved in this case?
13    A.   Let me refer back to my -- Page 2 of my
14  report.
15        It would have been on October 8th,
16  2021.
17    Q.   And you have previously worked with the
18  DeSouza Law Firm; is that right?
19    A.   Yes, I have.
20    Q.   About how many other cases have you
21  reviewed for them in the past five years?
22    A.   I do not have an exact number in front of
23  me.  I would say at least five cases that I can feel
24  comfortable stating.
25    Q.   And did each of these cases involve a

**Stephen Melia**

(Page 82)

1 slip-and-fall or trip-and-fall accident at a retail
2 store?
3    A.  I would have to go back and refer to my
4 case history on what the DeSouza firm has retained me
5 for. I – it would – I would have to really confirm
6 that.
7    Q.  How much have you billed the DeSouza firm
8 so far for this case?
9    A.  I do not have a number in front of me. I
10 can get that to you as well. I'll certainly have the
11 invoicing that I have no problem submitting, you
12 know, based on the information, what I've reviewed in
13 the case and what I've billed for the case. I can
14 add that to my list if you'd like.
15    Q.  Yes. Well, so we'll attach – I've got an
16 invoice here, and I'm going to see if I can share my
17 screen and you can take a look at this one. It's
18 dated February 17th of 2022. Let me know if you need
19 me to zoom in.
20    A.  Yeah, you can – you can –
21    Q.  Can you see that date?
22    A.  Yes, I can. You can scroll down. That is
23 probably going to be the last invoice. I would say
24 that is most likely the most recent, and there have
25 been no other charges or documents reviewed, of

(Page 83)

1 course, other than what the invoicing for the time
2 today in deposition will be.
3    Q.  And what is your hourly rate for your time
4 preparing for the deposition?
5    A.  It would be 200 an hour, similar to the
6 document review preparation, and then 300 per hour
7 for actual deposition or trial testimony.
8    Q.  And have you been retained to testify at
9 trial for this case?
10    A.  I have, yes.
11    Q.  Well, that – that invoice that I pulled up
12 there we're going to just attach that as Exhibit 12
13 to your deposition.
14       And, Mr. Melia, you think that's your
15 most recent invoice; is that correct?
16    A.  Yes, that is correct.
17    Q.  When did you first begin doing expert
18 witness work?
19    A.  It would have been in 2015.
20    Q.  And in the CV that's attached as Appendix B
21 to your report it lists S. Melia Consulting, LLC, as
22 your current employer, your current company.
23       Is that your company?
24    A.  Yes, it is.
25    Q.  And you started that business in May of

(Page 84)

1 2015; is that right?
2    A.  That is correct, yes.
3    Q.  Does anyone else work for S. Melia
4 Consulting, LLC?
5    A.  No. It is just myself. Of course, my wife
6 is wonderful at assisting with all of the information
7 related to invoicing and taxes and all the other
8 things that go with it, but she is not in any way
9 part of a – a review, or document review,
10 testifying, et cetera.
11    Q.  What does your company do?
12    A.  So I have – I started out after I left
13 Sam's Club and the practice area would be providing
14 litigation support in cases involving premise's
15 liability, either safety or security.
16    Q.  And has that been the same since 2015, the
17 same line of work?
18    A.  Yes. For S. Melia Consulting, that's
19 correct.
20    Q.  And does S. Melia Consulting only do
21 litigation services?
22    A.  That is all that I have done, yes.
23 Certainly available to conduct other risk assessments
24 and other types of security safety assessments, but
25 primarily it has all been in the area of litigation

(Page 85)

1 support.
2    Q.  So all of your work since 2015 through
3 Melia Consulting, LLC, has been providing expert
4 witness services for litigation; would that be
5 correct?
6    A.  That is correct, yes.
7    Q.  Right now what percentage of the time are
8 you retained by plaintiffs versus defense?
9    A.  Are you talking about the course of the
10 seven years?
11    Q.  Well, right now, your current case load.
12    A.  Without looking I may only have one defense
13 case where I've been retained by defense. All the
14 others would be plaintiff's counsel that has retained
15 me.
16    Q.  And about how many cases are in your case
17 load right now?
18    A.  I have right at 30 cases currently.
19    Q.  And just one of those 30 were you retained
20 by defense; is that right?
21    A.  To the best of my recollection right now in
22 current cases, yes.
23    Q.  Have your opinions ever been excluded from
24 a case by any court?
25    A.  Yes, they have.

**Stephen Melia**

(Page 86)

1  Q.  And how many times?
2  A.  There was an instance in, I believe, it was
3  the State of Mississippi where the judge, based on
4  the Daubert filings for both sides, had ruled that –
5  that expert testimony was not necessary, so I was not
6  allowed to testify in that case.
7  Q.  And that was another premise's liability
8  case; is that correct?
9  A.  It was – yes, it was.  Trying to draw
10  memory from that one, yes.  It's a few years ago.
11  Q.  And in that case the judge had determined
12  that the information that you were providing would be
13  the same as what the jury could decide for
14  themselves; would that be fair to say?
15      MR. WILLIAMS:  Objection.
16      THE WITNESS:  In that case, yes.
17      MR. WILLIAMS:  – mischaracterization.
18  Q.  (BY MS. HERRERA)  And in referring, again,
19  to your CV and going through your educational
20  background what is your highest level of education?
21  A.  So graduated from high school and then
22  attended about a year and a half, two years, on and
23  off at Sam Houston State University with general
24  business management degree in mind, however, never
25  completed that.  I started working for Walmart while

(Page 87)

1  I was in college and never went back to complete my
2  degree.
3  Q.  So you do not have any college degree from
4  any university; is that correct?
5  A.  That is correct.
6  Q.  So that also means, then, you do not have a
7  college degree in safety or retail safety training as
8  it pertains to customers or – or employees; is that
9  right?
10  A.  That is correct.
11  Q.  And in reviewing your certifications you're
12  also not certified in safety or retail safety as it
13  pertains to customers; is that right?
14      MR. WILLIAMS:  Objection, vague.
15      THE WITNESS:  In – in what regard is
16  certification?  Clearly, there's OSHA certifications
17  for safety which I've attended OSHA course [SIC] in
18  the past with my time at Walmart.  But no, I do not
19  currently hold any certifications in safety or safety
20  engineering or anything of that nature.
21  Q.  (BY MS. HERRERA)  Well, and OSHA
22  certifications wouldn't apply to retail customers;
23  would you agree?
24  A.  I disagree with that.
25  Q.  And why would you disagree with that?

(Page 88)

1  A.  In my experience over the years in
2  developing policies and procedures for customers in
3  many instances there are OSHA guidelines that help
4  businesses identify risks to keep employees safe, and
5  it is my experience, professional experience, that
6  where you have risks for employees, if customers are
7  also in those areas, that you have risks for
8  employees, so the same mitigation standards would
9  apply, although, obviously, OSHA does not regulate or
10  inspect for customer incidents, but from a business
11  perspective it is very common that many of the same
12  practices to provide a safe environment for your
13  employees also applies to customers.
14  Q.  So do you agree or disagree that OSHA would
15  have no involvement in an accident like this one that
16  involves a customer?
17  A.  I agree with that.
18  Q.  And this case is not about an accident that
19  happened to an employee, right?
20  A.  That's correct.
21  Q.  And you left your employment with Walmart
22  in 2015; is that correct?
23  A.  That is correct, yes.
24  Q.  And you had been with them for 31 years; is
25  that – is that right?

(Page 89)

1  A.  Yes.  By the time that I left.
2  Q.  Did you retire?
3  A.  It was – to explain it, a relocation, a
4  reorganization, so – and I'll be brief – so 2010 we
5  moved from Bentonville, Arkansas to Dallas, Texas to
6  open the divisional office for Sam's Club, and we
7  moved here, relocated.  And then in 2015 the decision
8  was made to reorganize again, all of the structure of
9  the Sam's leadership, and move everyone back to
10  Bentonville.  At that point, the restructuring
11  requirements were that everyone had to be displaced
12  and reapply for positions and make a decision to
13  move.  So short story is I accepted a severance
14  package and left employment to remain here in Dallas
15  at that time.
16  Q.  And in looking through your CV, the
17  different titles that you held at Walmart, your most
18  recent one appears to have been as the director of
19  asset protection; is that correct?
20  A.  It was director of asset protection, safety
21  and compliance for Sam's Club.  Senior director.  I
22  think you may have said that.
23  Q.  And the most recent position that you held
24  with Walmart was as director of security and alarm
25  services; is that right?

**Stephen Melia**

(Page 90)

1   A.  That is correct, yes.
2   Q.  But while you were in the asset protection
3   position you would have been aware of incidents where
4   customers may have tripped or fallen or other types
5   of accidents like that; is that right?
6   A.  Yes.
7   Q.  And based on your experience in that
8   position you would agree, also, that just because a
9   customer at a retail store falls it's not necessarily
10  the store's fault, right?
11  A.  Well, it would certainly go back to the
12  point earlier on conducting a -- a thorough accident
13  investigation in determining the root cause.  If
14  you're asking if all falls are caused by either the
15  company or the person who was injured that has -- has
16  to be determined based on the facts, so they're --
17  not to belabor the question, but a person could fall
18  if there are no obstructions in just their stepping
19  and their actions upon their own negligence.
20  Q.  Did you ever speak with Ms. Castro about
21  this accident?
22  A.  I did not.
23  Q.  Or have you ever spoken with Ms. Castro at
24  all?
25  A.  I have not.

(Page 91)

1   Q.  Other than speaking to Ms. Castro's
2   attorneys have you talked to anyone else about the
3   accident or about this case?
4   A.  No, I have not.  Just reviewed the facts
5   and depositions and information that was available in
6   conducting my assessment.
7   Q.  And the only documents that you reviewed
8   about the accident were documents that were provided
9   to you by Ms. Castro's lawyers; is that correct?
10  MR. WILLIAMS:  Objection, asked and
11  answered.
12  THE WITNESS:  Well, like, there would
13  have been documents produced by Walmart, photographs,
14  incident reports, policies and procedures that came
15  by way of the DeSouza Law Firm, of course, as well as
16  depositions, and then the industry standards and
17  information that I reviewed as well that's listed in
18  the appendix.
19  Q.  (BY MS. HERRERA)  And that is the Appendix
20  A of your 23-page report; is that correct?
21  A.  I -- yes.  Page 15 of 23, Appendix A, that
22  is correct.
23  Q.  Now, earlier you had testified that three
24  or four Walmart employees walking towards the mat on
25  that video should have seen the mat and seen it was a

(Page 92)

1   trip hazard.
2   If that's so would you agree that Ms.
3   Castro also should have seen the mat and that it was
4   a trip hazard and avoided the accident?
5   MR. WILLIAMS:  Objection, form.
6   THE WITNESS:  No, not necessarily.
7   Q.  (BY MS. HERRERA)  And why not?
8   A.  So certainly --
9   MR. WILLIAMS:  Objection, form.
10  THE WITNESS:  -- I'm sorry?
11  MR. WILLIAMS:  Oh, it was just my
12  objection for the record.
13  THE WITNESS:  Yeah.  So certainly
14  working in the industry and preventing incidents it
15  is clear that policies and procedures are in place
16  for employees, employers to inspect premises and make
17  conditions safe.  In my experience that's the
18  expectation.  Customers certainly would not have that
19  same level of expectation, although they should be
20  careful or they would -- they're typically walking
21  and in looking at merchandise or the direction of
22  their travel they're not required to inspect such as
23  what an -- an employee or a business would be
24  required to inspect premises for safety.  So that's
25  the reason I would disagree with that.

(Page 93)

1   Q.  (BY MS. HERRERA)  You would agree, though,
2   that customers also have a duty to exercise ordinary
3   care in walking around at a retail store, right?
4   MR. WILLIAMS:  Objection, calls for a
5   legal conclusion.
6   THE WITNESS:  And certainly --
7   certainly believe everyone should take reasonable
8   steps for their own safety.
9   Q.  (BY MS. HERRERA)  Do you have any opinion
10  in this case based on what you've seen in the
11  photographs and on the video that Ms. Castro should
12  or should not have been able to avoid tripping on the
13  rug?
14  A.  It's my opinion that she did not do
15  anything inappropriately or incorrectly as she was
16  exiting the store.  I believe she was acting as a
17  normal customer leaving a location.
18  Q.  And on Page 3 of your report it includes
19  the photograph of the mat that we were referencing
20  before, and that photograph has also been included as
21  exhibit -- the first photo, I believe, in Exhibit 5,
22  that's been attached to your deposition.
23  Are your opinions with respect to the
24  condition of the mat at the time of the accident
25  based on how the mat looks in those photographs?

**Stephen Melia**

(Page 94)

1    A.  In those photographs, as well as the video
2  and the incident report, allowed me to draw the
3  conclusion that the condition of the mat is clear in
4  this photo as to what I testified to earlier with the
5  ripples and the imperfections of how it is not laying
6  flat onto the floor surface.
7    Q.  And those photographs that you're
8  referencing, you would agree, though, that these were
9  taken only after the accident had happened after that
10  mat had been picked up, put back down and those
11  pictures were taken, right?
12    A.  That is correct.  They were taken by
13  Walmart in documenting the condition of the mat
14  that -- that caused the trip to occur.
15    Q.  So you'll agree, also, then, that those
16  photos do not show how the rug looked before
17  Ms. Castro's accident, correct?
18    MR. WILLIAMS:  Objection,
19  mischaracterization.
20    THE WITNESS:  That is correct.  There
21  were no photos provided immediately at the time of
22  the incident.  We have the video documenting that
23  condition of the mat prior to the incident and at the
24  time of and -- and after the incident.
25    Q.  (BY MS. HERRERA) And, Mr. Melia, you're

(Page 95)

1  not a medical doctor, right?
2    A.  That's correct, I am not.
3    Q.  And you're not going to be offering any
4  opinions, then, on Ms. Castro's medical prognosis or
5  diagnosis; is that right?
6    A.  Correct.
7    Q.  And you are not offering any opinions on
8  her medical conditions or on injury causation; is
9  that correct?
10    A.  That is correct.  To -- to the injury or
11  the extent of her injuries the causation as relation
12  to her tripping and falling is where I would offer my
13  opinions.
14    Q.  All right.  So we -- we can agree to
15  distinguish between causation for injuries and
16  causation for the incident, but with respect to
17  causation for the injuries you're not offering those
18  opinions; is that right, Mr. Melia?
19    A.  That is correct.
20    Q.  All right.
21    MS. HERRERA:  That's all the questions
22  I have.  I'll pass the witness.
23    MR. PATTERSON:  One second.
24    EXAMINATION
25  BY MR. PATTERSON:

(Page 96)

1    Q.  Mr. Melia, my name's Evan Patterson.  I
2  represent Cintas in this case.  I just have a few
3  questions for you.
4    I was looking through your opinions,
5  and I think one of them, I'm going to say -- I guess
6  it's opinion No. 1, is it your opinion that Ms.
7  Castro was walking as a normal customer and she did
8  not do anything to cause the incident; is that one of
9  your opinions?
10    A.  Yes, it is.
11    Q.  Would you agree with me that on the video
12  that we watched there was a number of other normal
13  customers who walked in the same place that Ms.
14  Castro did?
15    A.  I would say that that is correct based upon
16  walking over the mat.  To state it was the exact same
17  location would be more difficult to state.
18    Q.  And would you agree with me that no else in
19  the video tripped over the mat?
20    A.  I would agree with that.  I -- I would not
21  actually -- there was -- and it's -- it was after the
22  fact of Ms. Castro's fall, but when you watch the
23  video all the way through, when the paramedics
24  arrived, one of them actually didn't trip-and-fall
25  but caught their foot on the condition of the mat on

(Page 97)

1  the right-hand side as we're looking at that video,
2  so it's certainly after this incident, but it draws
3  the correlation for the condition of the mat and how
4  a foot could get caught underneath that mat.
5    MR. PATTERSON:  Objection,
6  nonresponsive.
7    Q.  (BY MR. PATTERSON) My question, I guess,
8  is a little bit different.
9    Did you see any customers prior to
10  Nancy's fall trip on the mat?
11    A.  No, I did not.
12    MR. WILLIAMS:  Objection, asked and
13  answered.
14    Q.  (BY MR. PATTERSON) And earlier I think
15  what you were saying about the definition of a trip
16  hazard was it's anything that's on the floor that
17  could cause a person to catch their foot and
18  trip-and-fall; is that correct?
19    A.  It was the -- yes.
20    Q.  In so many words?
21    A.  In -- in so many -- yeah.  Sure.  Yeah.
22    Q.  If you need to elaborate, go ahead.  I'm
23  just -- I don't -- you -- you can go back there, but
24  I'm just -- in so many words that's what I understood
25  it to mean; is that correct?

**Stephen Melia**

(Page 98)

1    A.   Yes.  And, typically, there would be in –
2  in the – what points of incident investigation there
3  is a cause agent, your object, a – a fixture, if
4  it's a trip incident, of course, a slip incident
5  could be (unintelligible) and other substances, but
6  those are in many cases the – the causes for
7  trip-and-fall incidents in the – in a workplace or
8  an environment.
9    Q.   And I'm going to show you my screen.  This
10  is, I think – I think I heard someone say this is
11  marked as Exhibit 5, but it's in your report.  In any
12  case, it's the mat picture we've kind of been talking
13  about.
14        I see a raised lip there on the door.
15  Do you see that?
16    A.   I do.
17    Q.   Would you agree with me that under your
18  definition of a trip hazard that would also
19  constitute a trip hazard?
20    A.   It – it could, yeah.
21    Q.   And that's something that every customer
22  just has to watch out for and make sure that they
23  don't trip over, correct?
24    A.   That would be accurate.
25    Q.   Because that's important for any person

(Page 99)

1  who's walking to make sure that they don't trip over
2  things that are on the ground, right?
3    A.   Well, again, in – in the area of something
4  that is placed there in a normal condition of the
5  business or the expectation walking over a threshold
6  is certainly normal.  I think it is different than
7  the condition of a mat, a mat in and of itself laid
8  properly would be easily to – to traverse over in
9  the condition and the point that I referenced and my
10  findings was the mat was not laying flat which caused
11  the – the risk to, you know, present.
12    Q.   Would you agree with me that a mat that –
13  even if a mat is laying flat it can present a trip
14  hazard?
15    A.   I don't believe it would cause necessarily
16  a trip hazard, although, certainly people can trip on
17  their own shoes.  You know, that's obviously, been
18  shown over years of people walking.  But in this case
19  the evidence that I reviewed reflects the risk
20  condition of being a – not a normal condition which
21  created the risk.
22        MR. PATTERSON:  I'll object to the
23  nonresponsive portion.
24    Q.   (BY MR. PATTERSON)  Do you have any
25  opinions about how Cintas laid the mat in this case?

(Page 100)

1    A.   The – there's information that Cintas
2  provided the mats and that the – nobody had offered
3  any direct opinions, but from recollection that
4  Walmart was to utilize and place the mats, replace
5  them if they are worn, tattered, and then put them in
6  the back room until the next service agreement is –
7  or the next service from Cintas is made, so I do not
8  believe I correlated any specific direction or saw
9  any evidence that Cintas placed the mat there.  It
10  certainly wasn't viewable in the video.
11    Q.   Do you have any specific criticisms of
12  Cintas in this case?
13        MR. WILLIAMS:  Objection, broad,
14  vague.
15        THE WITNESS:  The – certainly I
16  offered my opinion that the – the type of mat and
17  the decision to utilize that size, that type of mat
18  at an entrance door in my experience would likely be
19  like a condition of a contract between Walmart and
20  the provider, in this case, Cintas.  I do have an
21  opinion that I do not believe the mat was
22  appropriately positioned or placed, but I, again, do
23  not have any information to say that Cintas made the
24  decision on the timing or the placement of the mat.
25    Q.   Okay.

(Page 101)

1        MR. PATTERSON:  That's all I've got.
2        EXAMINATION
3  BY MR. WILLIAMS:
4    Q.   Okay.  Mr. Melia, are you fine to continue
5  on or would you like a quick break?
6    A.   I am good to continue considered all the
7  delays I created earlier.
8    Q.   Okay.  Mr. Melia, earlier you and a
9  Mr. Patterson were talking; do you remember that?
10    A.   Yes.
11    Q.   And you and Mr. Patterson were discussing
12  the threshold or and whether or not that's a trip
13  hazard; do you remember that?
14    A.   I do.
15    Q.   More likely than not is that threshold
16  going to cause someone to trip?
17        MS. HERRERA:  Objection, form.
18        THE WITNESS:  Again, it – it is
19  something someone could trip over, but it is in a
20  consistent normal position and likely expectation of
21  someone stepping over a threshold entering into a
22  facility is considered a – a normal condition in my
23  opinion where mats are placed differently at
24  different times either based on weather conditions or
25  other needs, and so I – I do draw a distinction

**Stephen Melia**

(Page 102)

1  between a -- a permanent fixture at a known entryway
2  versus items that can be placed or moved, if you
3  will, in such -- such as the case with a mat.
4      Q.  (BY MR. WILLIAMS)  And, Mr. Melia, I
5  understand.
6          My question is: Is it more likely
7  than not or less likely than not that the threshold
8  is a trip hazard that you and Mr. Patterson
9  discussed?
10         MS. HERRERA: Objection, form.
11         THE WITNESS:  Well, again, there is a
12  potential of a risk of someone stepping over a
13  threshold and hitting their foot causing them to
14  trip, so there is -- every case has to be reviewed
15  and determined, but if there were a trip over a
16  threshold there are guidelines and standards for the
17  height of thresholds and entryways, that would be a
18  totally different subject that I have not reviewed in
19  this case, but I'm aware of the standards for
20  elevation heights and -- and threshold standards for
21  standard entryways but not that I've reviewed to be
22  able to speak on at this time.
23     Q.  (BY MR. WILLIAMS)  Right.
24         And -- my understanding is I could
25  win the lottery, but I'm probably not going to win

(Page 103)

1  the lottery.  And the same thing with this one, you
2  could trip over the threshold, but you're probably
3  not going to trip over the threshold; is that your
4  understanding as well?
5      MR. PATTERSON:  Form.
6      MS. HERRERA: Objection, form.
7      THE WITNESS:  Yeah.  I -- I just --
8  hate to say, I'd have to, you know, review every case
9  as the information and facts present itself, so
10  I'm -- I'm not sure how I can answer that.
11     Q.  (BY MR. WILLIAMS)  Okay.  I'm going to
12  share my screen with you.
13         MR. WILLIAMS:  Elizabeth, you left off
14  at 12, Exhibit 12?
15         MS. HERRERA:  Well, so we're on 13.
16     Q.  (BY MR. WILLIAMS)  Okay.  I'm going to mark
17  this as Exhibit 13.  Can you see my screen fine?
18     A.  Yes, I can.
19     Q.  And you recognize the person in the white
20  to be Nancy Castro?
21     A.  Yes, I do.
22     Q.  Okay.  And do you understand that this is a
23  screenshot of the video which is Exhibit 7 in this
24  matter?
25     A.  Yes, I'll accept that is -- that's the

(Page 104)

1  exhibit number.  But, yes, I do recognize that
2  screenshot and that that is Ms. Castro.
3      Q.  I -- I apologize for that.
4          Do you recognize this photo to be a
5  screenshot from the video of the incident?
6      A.  Yes, I do.
7      Q.  Okay.  Do you see a dangerous position on
8  the mat?
9      A.  Since one of the things that I identified
10  in reviewing the video the ripple in the mat is
11  evident from the video and from the screenshot [SIC].
12     Q.  And do you believe that this ripple in the
13  mat is a dangerous condition or not?
14         MS. HERRERA: Objection, form.
15         THE WITNESS:  I do believe that if it
16  is not laying flat then I would characterize it as a
17  risk or a dangerous condition.
18     Q.  (BY MR. WILLIAMS)  And when you reviewed
19  the video did Nancy's foot get caught underneath that
20  curl in the mat?
21         MS. HERRERA: Objection, form.
22         THE WITNESS:  Yes, that is my
23  conclusion.
24     Q.  (BY MR. WILLIAMS)  Excuse me.
25         When you reviewed the video where did

(Page 105)

1  Nancy's foot get caught under the mat?
2      MS. HERRERA: Objection, form.
3      THE WITNESS:  It was at that point
4  another one from a separate angle that were the basis
5  of that conclusion that this was where her foot was
6  caught under that -- that area of ripple.
7      Q.  (BY MR. WILLIAMS)  And do you believe that
8  this incident could have been prevented had the mat
9  simply been picked up?
10         MS. HERRERA: Objection, form.
11         THE WITNESS:  I do, yes.
12     Q.  (BY MR. WILLIAMS)  Okay.
13         MR. WILLIAMS:  I'll pass the witness.
14         MS. HERRERA:  We'll reserve.
15         MR. PATTERSON:  I'm good.
16         MR. WILLIAMS:  I don't have anything.
17         MR. PATTERSON:  I think we both said
18  we're good.
19         MR. WILLIAMS:  Ms. Moss, do you have
20  any spelling corrections or questions for us.
21         THE COURT REPORTER:  I just need to
22  know if Ms. Herrera and Mr. -- where did he go --
23  Patterson, do you guys want copies of this?
24         MS. HERRERA:  Yes.
25         THE COURT REPORTER:  What about you,

**Stephen Melia**

(Page 106)

1  Mr. Patterson?
2      MR. PATTERSON: No, I'm okay. Thank
3  you.
4      THE COURT REPORTER: Okay.
5      THE WITNESS: And I would like to
6  receive a copy and read and sign.
7      THE COURT REPORTER: Okay.
8      THE VIDEOGRAPHER: Are we okay to go
9  off the record?
10      MR. WILLIAMS: Yes.
11      THE VIDEOGRAPHER: Off the record at
12  4:36.
13      (Whereupon, the proceedings were concluded.)
14
15
16
17
18
19
20
21
22
23
24
25

(Page 107)

1      WITNESS CORRECTIONS AND SIGNATURE
2      TO THE ORAL DEPOSITION OF
        STEPHEN MELIA
3          Volume 1 of 1
           September 15, 2022
4
    Please indicate changes on this sheet of paper, giving
5  the change, page number, and line number and reason
   for the change.  Please sign each page of changes.
6
7  PAGE/LINE    CORRECTION        REASON FOR CHANGE
8
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

(Page 108)

1      I, STEPHEN MELIA, have read the foregoing
2  deposition and hereby affix my signature that same is
3  true and correct, except as noted above.
4
5
6      _____
        STEPHEN MELIA
7
8  THE STATE OF _____)
9  COUNTY OF _____)
10     Before me,_____, on this day
   personally appeared STEPHEN MELIA, known to me ( or proved
11 to me under oath or through _____)
   (description of identity card or other document)) to be the
12 person whose name is subscribed to the foregoing instrument
   and acknowledged to me that they executed the same for the
13 purposed and consideration therein expressed.
14     Given under my hand and seal of office this _____
   day of _____, _____.
15
16     _____
        NOTARY PUBLIC IN AND FOR
17     THE STATE OF _____
18
19
20
21
22
23
24
25

(Page 109)

1      UNITED STATES DISTRICT COURT
       FOR THE WESTERN DISTRICT OF TEXAS
2          SAN ANTONIO DIVISION
3
   NANCY CASTRO,           &
4  PLAINTIFF               &
                           &
5  VS.                     &
                           & Civil Action No.
6  WAL-MART, INC., CINTAS     & 5:1-CV-00702-XR
   CORPORATION NO. 2 D/B/A CINTAS  &
7  CORPORATION, WAL-MART STORES   &
   TEXAS, LLC, AND WAL-MART REAL   &
8  ESTATE BUSINESS TRUST,      &
   DEFENDANTS              &
9
10
11     REPORTER'S CERTIFICATION
12 THE STATE OF TEXAS:
   COUNTY OF TARRANT:
13
14     I, Christie L. Tawater, Shorthand Reporter in and for
15 the State of Texas, hereby certify to the following:
16     That the witness, STEPHEN MELIA, was duly sworn by the
17 officer and that the transcript of the oral deposition is a
18 true record of the testimony given by the witness;
19     That the deposition transcript was submitted on
20 September 30, 2022, to the attorney for the witness, for
21 examination, signature, and to Southwest Reporting & Video
22 Service, Inc., by October 30, 2022;
23     That the original deposition was delivered to Mr. Lucas
24 W. Williams, Custodial Attorney;
25

**Stephen Melia**

(Page 110)

1    That the amount of time used by each party to the
2  deposition is as follows:
3    Mr. Lucas W. Williams - 1 hour and 42 minutes
     Ms. Elizabeth Ferguson Herrera - 27 minutes
4    Mr. So and So Patterson - 6 minutes
5    I further certify that I am neither counsel for,
6  related to, nor employed by any of the parties or
7  attorneys in the action in which this proceeding was
8  taken, and further that I am not financially or
9  otherwise interested in the outcome of the action.
10    GIVEN UNDER MY HAND AND SEAL OF OFFICE, on this
11  the 30th day of September, 2022.
12
13
14
15    _____
     Christie L. Tawater, CSR 7352
16    Expiration Date:  12/31/2024
     Firm Registration No. 189
17    Southwest Reporting & Video Service, Inc.
     826 Heights Boulevard
18    Houston, Texas 77007
     Phone:  (713) 650-1800
19    Fax:  (713) 650-6245
20
21
22
23  Job No. 57851
24
25

(Page 111)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**1**

**1** 28:4 77:14 96:6
**10** 58:16 78:17
**100** 16:1 33:10
**11** 78:24
**11:30** 79:22
**12** 79:22 83:12 103:14
**13** 103:15,17
**143** 34:24
**15** 80:12 91:21
**16** 81:5
**17th** 81:10 82:18
**19** 7:20
**1984** 7:11
**1995** 8:8
**1999** 12:12,13 14:17

**2**

**2** 28:2,6 35:19 81:13
**20** 57:2 59:16 60:17
**200** 16:3 17:4 83:5
**2001** 12:14
**2003** 13:12 14:17 15:2 16:5
**2010** 16:7,9 89:4
**2015** 16:5,7,9 17:7 20:5 83:19 84:1,16 85:2 88:22 89:7
**2020** 6:24
**2021** 81:16
**2022** 78:8 81:5,10 82:18
**22** 77:22
**23** 77:8 79:4 91:21
**23-page** 91:20

**25** 58:16
**25th** 6:24
**26** 62:20
**2:03** 6:3

**3**

**3** 31:22 36:2 43:12 59:13 93:18
**30** 37:17 39:25 40:6 60:17 63:1 65:19 76:1,8 85:18,19
**300** 17:6 83:6
**31** 7:16 88:24
**35** 63:21
**38** 57:23
**3:42** 75:2
**3:55** 75:5

**4**

**4** 35:2
**45** 60:8
**46** 59:13,16
**47** 60:8
**48** 60:20
**49** 54:22 55:5
**4:36** 106:12

**5**

**5** 46:24 93:21 98:11
**5.4** 28:19
**5.4.6** 29:24
**5.46** 29:18
**510** 7:4
**53** 62:20 63:1,21

**6**

**6** 48:9 56:7 60:20

**7**

**7** 54:17 103:23

**8**

**8.10** 32:3,10 33:2
**8th** 81:15

**9**

**9** 54:22 55:5 57:23 77:11,12

**A**

**absolute** 81:2
**accept** 103:25
**accepted** 89:13
**accident** 8:16,22 23:3,4 27:11 82:1 88:15,18 90:12,21 91:3,8 92:4 93:24 94:9,17
**accidents** 9:5 90:5
**accurate** 79:10 98:24
**acting** 93:16
**action** 33:13 34:10 54:11 61:22
**actions** 66:17,20 70:6 90:19
**activity** 53:23 55:16
**actual** 22:25 53:24 83:7
**add** 82:14
**addition** 31:13 40:10 46:4 78:6
**additional** 13:15 23:25 78:7
**addressed** 15:16
**addressing** 35:15 39:14

**adequate** 9:11
**adopt** 24:10
**affidavit** 56:20,25 57:5 77:1 79:14 80:2 81:9
**affirmatively** 78:12
**afternoon** 6:17,18 79:20
**age** 7:20
**agent** 23:1 98:3
**agree** 6:22 7:2 20:23 30:6,22 31:3 33:6,10, 21,24,25 87:23 88:14,17 90:8 92:2 93:1 94:8,15 95:14 96:11,18,20 98:17 99:12
**Agreed** 30:21
**agreement** 30:17 31:7 100:6
**ahead** 77:10 97:22
**aisles** 65:24
**alarm** 13:12,16,17, 20 14:16 89:24
**alert** 38:21
**aligned** 19:8
**allowed** 86:6 94:2
**Ambiguous** 50:15
**amend** 80:24
**American** 28:10,22 31:25
**analysis** 22:7,20 23:8,11,14 34:6 53:18
**angle** 49:25 60:24 62:2 105:4
**angles** 64:16
**announced** 39:11
**answering** 20:23
**apologize** 44:15,18 57:16 104:3

**appears** 43:16 55:11 61:10 63:5,12 89:18

**appendix** 77:15 79:4 80:7,12 83:20 91:18, 19,21

**applicable** 28:21

**applies** 88:13

**apply** 17:16 18:23 22:4 26:19 29:2 36:11 42:14,19 43:6 87:22 88:9

**appropriately** 100:22

**approximately** 54:6

**area** 9:8 10:21,22 15:16 16:3,8 18:24 20:12 30:2 35:16 37:22 38:13,19 40:2 54:8 65:24 68:25 70:22,25 76:10 84:13,25 99:3 105:6

**areas** 14:12 16:16 18:23 19:1 20:9 29:25 30:3 31:12,16 32:17,18 39:9 49:6 88:7

**Arkansas** 16:6 20:19 89:5

**arrive** 22:3

**arrived** 96:24

**aspect** 8:14,18 14:2, 25

**aspects** 8:12 14:9

**assessing** 8:24

**assessment** 91:6

**assessments** 84:23,24

**asset** 14:19 15:1,16 16:10,18 20:18 89:19,20 90:2

**assigned** 52:18

**assist** 7:21

**assistant** 7:23 15:22

**assisting** 84:6

**associate** 7:21 40:11 61:2 63:7 64:9 76:10

**associate's** 68:24

**associates** 8:15 15:22 24:19 26:21 35:13 38:6 40:1 54:8 58:4,6,13 69:1 70:3, 24

**assuming** 45:12

**ASTM** 28:7,9

**attach** 78:23 82:15 83:12

**attached** 77:14 79:3 83:20 93:22

**attendant** 7:21

**attended** 86:22 87:17

**attending** 18:19

**attention** 25:11

**attorneys** 79:17 91:2

**audio** 11:13 44:24

**audits** 8:19

**authored** 77:24 78:1 80:20 81:7

**avoid** 93:12

**avoided** 92:4

**aware** 90:3 102:19

**awareness** 10:15,17 17:19 24:22 26:4 38:18,21 67:11

---

**B**

**back** 10:3 36:8 53:18 56:24 57:12,13 61:9 74:19 81:13 82:3 87:1 89:9 90:11 94:10 97:23 100:6

**background** 86:20

**balance** 51:14

**bandwidth** 44:25

45:5

**base** 21:19

**based** 13:6 22:5 29:9 34:13 37:15 49:16 51:6 54:24 64:15 69:11 70:1 73:3 82:12 86:3 90:7,16 93:10,25 96:15 101:24

**baseline** 23:20

**basic** 14:23 16:16

**basically** 35:12

**basis** 7:22 39:10 42:12 50:14 53:5 66:6 70:15 105:4

**Bates** 34:23

**begin** 23:21 83:17

**begins** 38:22

**behalf** 12:15,17,24

**belabor** 90:17

**benefit** 26:25

**Bentonville** 16:6 89:5,10

**Beth** 11:12

**billed** 82:7,13

**bit** 8:4 97:8

**black** 14:10 47:7

**board** 33:19

**border** 32:12

**break** 26:1 55:24 74:15,20 78:11 101:5

**breakdown** 9:9

**briefly** 19:16

**bringing** 29:8

**broad** 100:13

**broom** 39:8

**buckle** 32:11 42:6

**buried** 44:17

**business** 17:11 20:4 24:17 27:3,8,17

62:15 65:13 83:25 86:24 88:10 92:23 99:5

**businesses** 19:4 24:22 26:19 88:4

---

**C**

**cable** 44:16,17

**California** 16:14

**call** 47:9

**called** 38:12

**calling** 45:10

**calls** 93:4

**cameras** 13:23 14:4, 10,11

**campaign** 26:5

**capacities** 12:18

**capacity** 20:14

**care** 26:14 53:10 93:3

**career** 7:25

**careful** 92:20

**carpet** 31:11

**carpeted** 10:20 47:7

**cart** 7:21 59:21

**carts** 32:17 42:7

**case** 13:5,6 19:10,23 21:2,3,20 22:1 23:9, 15,17 35:15 42:15,19 43:7 45:20 51:24 53:14 75:11 76:25 79:9 80:14,17,22 81:7,12 82:4,8,13 83:9 85:11,13,16,24 86:6,8,11,16 88:18 91:3 93:10 96:2 98:12 99:18,25 100:12,20 102:3,14, 19 103:8

**cases** 17:14 33:11 81:20,23,25 84:14 85:16,18,22 98:6

**Castro** 21:6 43:17 45:24 46:6 48:23 72:3 73:15 90:20,23 92:3 93:11 96:7,14 103:20 104:2

**Castro's** 6:23 79:17 91:1,9 94:17 95:4 96:22

**catch** 32:12 51:12 97:17

**catching** 49:17

**caught** 96:25 97:4 104:19 105:1,6

**causation** 95:8,11, 15,16,17

**caused** 23:6 46:6 90:14 94:14 99:10

**causing** 102:13

**CCTB** 13:14

**centers** 11:25

**certainty** 20:25

**certification** 87:16

**certifications** 87:11,16,19,22

**certified** 87:12

**cetera** 23:20 29:10 38:11,25 53:22 84:10

**change** 21:23

**changed** 19:24 39:21

**characterize** 104:16

**charge** 9:4

**charges** 82:25

**check** 80:24

**Christie** 6:10

**church** 20:3,15

**Cintas** 21:7 96:2 99:25 100:1,7,9,12, 20,23

**circles** 48:13,15,25 49:1,5 56:10

**cite** 31:10 73:1

**cited** 22:15

**cites** 32:14

**city** 6:6,25 7:4 21:9

**claims** 8:16

**clarity** 31:9

**clean** 38:13

**cleaning** 38:12

**clear** 42:24 92:15 94:3

**close** 58:9

**closed-circuit** 12:1

**Club** 7:8,15 15:12 17:9 84:13 89:6,21

**Clubs** 11:25 15:8 16:3,12,15 17:5,6

**college** 87:1,3,7

**color** 14:10

**combined** 13:18 14:15 15:23

**comfortable** 81:24

**commercial** 31:25

**common** 19:1 23:2 88:11

**communication** 38:24

**companies** 19:3 24:10 26:5 39:6 52:20

**company** 16:12,13 17:5 27:17 44:16 83:22,23 84:11 90:15

**competing** 25:10

**complete** 80:18 87:1

**completed** 45:24 86:25

**completely** 72:9

**compliance** 9:11 15:2,17 16:11,20 89:21

**computer** 55:19,22 74:21

**concluded** 106:13

**conclusion** 22:25 23:6 93:5 94:3 104:23 105:5

**conclusions** 21:12 22:3

**conclusively** 58:19 62:5

**condition** 26:3 36:24,25 37:24 52:23 68:15,20 69:3,5,11, 16 70:5,8,14,17 71:8, 11,15 72:1,8,14 73:22 74:5 93:24 94:3,13,23 96:25 97:3 99:4,7,9,20 100:19 101:22 104:13,17

**conditions** 9:1,5 10:5 18:23 27:18 36:16 38:5,22 39:14 66:1 72:6 92:17 95:8 101:24

**conduct** 34:4 39:12 84:23

**conducted** 70:2

**conducting** 8:18 66:5 90:12 91:6

**conferences** 18:19

**confined** 70:23

**confirm** 78:17 82:5

**congratulations** 20:21

**connection** 41:10 45:7 74:22

**considered** 23:4 42:21 101:6,22

**consist** 7:17 8:11 11:22 15:6

**consistency** 19:5

**consistent** 17:21 19:1 36:13 101:20

**constitute** 98:19

**construction** 24:11

**consultant** 20:7

**consultation** 21:4

**consulting** 20:4,13 83:21 84:4,18,20 85:3

**contact** 51:2

**contacted** 81:11

**continue** 29:14 57:22 72:15 101:4,6

**continuing** 17:4

**contract** 100:19

**contractor** 20:15

**contractors** 12:3

**controls** 72:11

**convenience** 47:8

**copies** 105:23

**copy** 19:20,21 20:12 77:2,4,7 80:5 106:6

**corporate** 13:16

**correct** 9:1 16:24 18:2 25:24,25 28:12 35:22,24 36:24 40:21,22 42:5 50:19 52:10,12,22 64:5,18 65:25 66:20 68:2 69:2 71:2 72:13 73:22 77:3,9 83:15, 16 84:2,19 85:5,6 86:8 87:4,5,10 88:20, 22,23 89:19 90:1 91:9,20,22 94:12,17, 20 95:2,6,9,10,19 96:15 97:18,25 98:23

**corrected** 23:2 59:6, 25 61:18 64:25

**correcting** 9:8 40:14 72:8 74:4

**correction** 36:23

**corrections** 15:14 105:20

**correlated** 100:8

**correlation** 97:3

**counsel** 6:12 21:24 85:14

**counsel's** 53:6

**counter** 55:9 58:3,5, 7,11 60:13 61:3,5,9 63:8

**country** 15:9

**county** 6:6,8,11

**couple** 45:4

**court** 6:5,9,10 11:4, 9,16 43:19,22 45:12, 17 46:15 85:24 105:21,25 106:4,7

**cover** 81:3

**create** 29:13 30:1 32:13 35:17 37:12 52:2,4

**created** 31:6 69:12 99:21 101:7

**creates** 34:8 51:11

**creating** 24:22

**critical** 36:21,22

**criticisms** 100:11

**curl** 32:12 104:20

**curled** 31:13 32:15, 19 34:7 49:7,17 74:11

**curls** 47:12,14,16,22 48:16,18,20 49:2,9 56:9

**current** 77:23 79:5 83:22 85:11,22

**customer** 15:19 17:1,17 63:5 64:8 88:10,16 90:9 93:17 96:7 98:21

**customers** 8:15 9:20 10:9 18:13,24 24:18 26:21 27:4 42:10 51:21 58:12 62:11 65:8 68:24 87:8,13,22 88:2,6,13 90:4 92:18 93:2 96:13 97:9

**cut** 11:6

**cutting** 44:13

**CV** 19:20,24 28:4 77:13,14 78:21,23 83:20 86:19 89:16

──────────

**D**

**Dallas** 89:5,14

**Dallas/fort** 16:7

**dangerous** 68:19 69:5,15 70:8 71:8 104:7,13,17

**date** 77:23 78:1 81:4 82:21

**dated** 82:18

**Daubert** 86:4

**day** 40:12 56:15

**day-to-day** 27:3,8 39:22 62:14 65:13

**days** 71:5,12,16

**deal** 45:5

**deals** 18:21

**decide** 86:13

**decision** 89:7,12 100:17,24

**deemed** 34:12

**defendants** 21:17 30:22 76:24

**defense** 21:23 85:8, 12,13,20

**define** 50:22,24

**defined** 8:13 18:5 25:4

**defining** 22:11

**definition** 51:6 97:15 98:18

**degree** 20:25 86:24 87:2,3,7

**delays** 101:7

**dependent** 33:19

**deposition** 13:4 46:5 56:16 57:14 78:17 79:2,11,13 80:3 83:2,4,7,13 93:22

**depositions** 78:5,7, 20 91:5,16

**describe** 47:15

**describing** 48:17

**description** 65:23

**designed** 25:6 29:7, 11

**desktop** 57:11,13

**Desouza** 21:4 81:18 82:4,7 91:15

**detailed** 38:8

**determinations** 71:15

**determine** 43:5 53:25

**determined** 24:3 86:11 90:16 102:15

**determining** 22:7 23:22 33:13 90:13

**developed** 9:12 10:13

**developing** 88:2

**devices** 44:21

**diagnosis** 95:5

**difference** 57:7 76:8

**differences** 17:10

**differently** 101:23

**difficult** 54:25 55:15 71:14 96:17

**difficulties** 57:15

**digital** 14:11

**direct** 15:25 100:3

**directing** 9:8 13:14 16:17

**direction** 31:9 42:20 61:6,8,12 92:21 100:8

**directly** 14:1 32:17 48:2

**director** 8:5,7,10 11:2,20 12:13 13:11 14:16,19 15:1,6 16:10,21,22 17:2 20:3,17 89:18,20,21, 24

**disagree** 87:24,25 88:14 92:25

**discard** 37:3

**disconnecting** 44:20

**discussed** 40:11 51:11 52:17 80:6 81:9 102:9

**discusses** 28:19

**discussing** 75:9 101:11

**displaced** 89:11

**display** 63:13,15,18

**distinction** 101:25

**distinguish** 95:15

**distribution** 11:25

**district** 7:24 8:9 9:13

**division** 7:16 8:2 13:17,21 14:25

**divisional** 89:6

**doctor** 95:1

**document** 28:10,18 29:1 31:24 35:1 81:3 83:6 84:9

**documentation** 20:8 22:15 38:23 80:8,25

**documented** 70:13

**documenting** 94:13,22

**documents** 78:15 80:2,5,13,21 82:25 91:7,8,13

**dollar** 27:19

**Stephen Melia**                    **Index: door..facts**

**door** 46:1 98:14
100:18

**doors** 10:3 18:25
62:3 63:9 70:4

**dot** 20:13

**download** 57:11

**draw** 55:17 71:14
86:9 94:2 101:25

**drawn** 48:25

**draws** 97:2

**due** 31:6 57:15

**duly** 6:14

**duty** 93:2

—————————

**E**

—————————

**earlier** 36:8,14 37:11
40:11 45:19 48:19,22
65:17 66:25 67:3
75:6 77:20 79:20
90:12 91:23 94:4
97:14 101:7,8

**easily** 25:21 33:16
73:7 99:8

**easy** 25:22

**edge** 48:5

**edged** 34:7

**edges** 30:3 31:13
32:15,19 34:6

**educate** 9:17,19

**education** 86:20

**educational** 86:19

**effort** 15:24

**elaborate** 97:22

**elevate** 25:6

**elevated** 7:23 13:18

**elevation** 10:20
102:20

**eliminated** 72:2,4

**Elizabeth** 76:23
103:13

**employee** 18:21
59:19,22,25 60:3,14
62:10,13 63:7,10,24
64:1,3,19 65:6,11
66:13 88:19 92:23

**employees** 9:19
10:10 37:3,17 38:14
39:1,16 55:8 58:10,
22,25 66:2 87:8 88:4,
6,8,13 91:24 92:16

**employer** 83:22

**employers** 92:16

**employment** 88:21
89:14

**end** 17:3 32:12 35:7,
16 41:9

**engineering** 87:20

**ensure** 9:11,18 10:3,
17 16:18 18:11 19:10
22:17 24:21 25:21
26:5 32:18 36:4,15
42:3,4 52:19 73:20

**ensuring** 8:16 15:14
32:14

**entering** 101:21

**entire** 13:20

**entities** 17:15

**entrance** 10:2 18:1,
25 19:2,10 27:24
28:17 29:3,4 31:14,
25 34:14 35:18 46:10
61:5 70:14 100:18

**entrance/exit** 47:7

**entrances** 10:1 19:2

**entranceway** 18:6

**entryway** 102:1

**entryways** 102:17,
21

**environment** 8:14,
24 10:19 24:18 25:8
33:19 35:17 37:12
73:24 88:12 98:8

**environments**
33:11

**equipment** 38:13
50:25

**essentially** 13:13
15:2

**establish** 22:12

**estimate** 79:24

**evaluate** 33:12

**Evan** 11:12 50:13
96:1

**event** 21:10

**everyone's** 9:6

**evidence** 53:7,8
66:7,12 67:4 71:4
75:20 99:19 100:9

**evidence-based**
34:5

**evident** 38:10
104:11

**evolve** 17:4

**evolved** 7:23 14:9
15:3

**exact** 48:11 81:22
96:16

**EXAMINATION**
6:15 76:20 95:24
101:2

**examine** 23:21

**examining** 22:10

**excluded** 85:23

**excuse** 10:7 52:10
58:21 60:5,18 71:3
72:16 104:24

**execution** 43:3
67:12

**executive** 20:3

**exercise** 93:2

**exhibit** 28:2,4,6
31:22 35:2 46:24
48:8 54:17 56:7 77:1,
11,12,14,15 78:17,24
83:12 93:21 98:11
103:14,17,23 104:1

**exist** 27:18

**exit** 46:1 72:3

**exited** 63:5

**exiting** 45:25 46:11
70:4 93:16

**exits** 35:18

**expanded** 9:14

**expectation** 16:16
25:7 35:14 36:1
37:21 38:19 39:1
42:25 43:2 51:23
52:1,22 92:18,19
99:5 101:20

**expectations** 9:22
10:23,25 15:21 18:5,
20 29:2 72:22

**expected** 10:16
36:15 39:25 67:12

**experience** 18:18
21:22 22:5 25:5
26:18 27:20 31:10
36:10 37:16 88:1,5
90:7 92:17 100:18

**expert** 14:7,12 19:13
24:25 81:4 83:17
85:3 86:5

**explain** 89:3

**exposure** 69:12

**extent** 43:1 95:11

**external** 8:19

**eyes** 61:6 66:20

—————————

**F**

—————————

**F-O-R-N-E-Y** 6:8

**facility** 17:13 18:12
19:10 39:15 101:22

**fact** 36:13 74:10
96:22

**factor** 24:17

**factors** 25:10

**facts** 13:5 21:20,24
22:11 23:16,20 24:3
43:6 45:20 53:19

**Stephen Melia**

90:16 91:4 103:9

**factual** 13:5

**failure** 14:24,25 30:15 33:17 37:25 38:1 43:18 44:2 48:22 64:7 73:21,22 78:19

**fair** 16:23 40:19 86:14

**fairly** 19:1 80:25 81:1

**fall** 51:4 90:17 96:22 97:10

**fallen** 90:4

**falling** 95:12

**falls** 17:17 90:9,14

**familiar** 13:25 14:11 18:14 24:8,12 27:22 28:13 35:4

**fault** 90:10

**February** 6:24 78:8 81:5,10 82:18

**fee** 79:3,5

**feel** 81:23

**fell** 22:9,10 46:1,10

**field** 16:17

**filings** 86:4

**find** 22:25 65:22 66:1 68:2 70:17 78:15

**findings** 99:10

**fine** 19:18 30:25 31:19 54:14 78:18 79:2 101:4 103:17

**firm** 21:4 81:18 82:4, 7 91:15

**fixture** 98:3 102:1

**flat** 32:11 33:3,4,22 34:3,6,9,18 36:5,18 42:9 43:15 47:21 49:16,20 50:2,5,11, 18 51:10 69:12 73:20 94:6 99:10,13 104:16

**floor** 10:5,19,22 18:9,10,20 33:4

34:21 36:5,15 37:3, 24 40:24 41:23 42:3, 10 49:21 51:1 71:5 94:6 97:16

**flooring** 18:7

**floors** 10:18 52:18

**Florida** 16:14

**flush** 40:24 41:22 42:3 49:21

**focus** 29:5

**folks** 52:18 56:24

**follow** 43:2

**foot** 51:2,12 96:25 97:4,17 102:13 104:19 105:1,5

**footage** 13:23 14:4,5 68:12

**footprint** 70:23 76:7

**foremost** 67:9

**forensic** 53:18

**form** 13:1 21:18 24:15 25:2,16 26:10 27:5,15 28:24 29:23 30:9,12 32:8 33:1,8 34:1,16 36:19 37:5,9, 19 38:16 39:19 40:8, 20 41:1,25 47:5,13, 18,24 49:3,11,22,23 50:9 51:17,22 52:6, 13 53:1 54:4 59:2,7 61:14,20 64:22 65:2, 9,15 66:9,15 67:15, 22 68:8 69:7,17 70:9, 19 71:9,21 72:19 74:2 75:12,19 76:5, 14 92:5,9 101:17 102:10 103:5,6 104:14,21 105:2,10

**format** 7:15 76:7

**Forney** 6:7

**Fort** 6:11

**forward** 56:16

**found** 52:25 54:2 67:20 76:12

**fourth** 63:24 64:3,19

**frame** 58:19 62:8 71:13 73:13,15

**frayed** 30:3 31:13

**freezing** 45:8

**front** 29:1 35:7,16,23 48:1 70:4 78:2 81:22 82:9

**froze** 41:17

**frozen** 43:19

**fuel** 21:9 47:8

**full** 62:4

**functions** 11:24

---

**G**

**gained** 36:11

**gas** 6:25 7:3

**Gateway** 20:2

**Gatorade** 63:13,15, 17

**general** 7:20 8:20 10:11,14 14:6 17:13 18:14 22:6 37:22 38:6 86:23

**generally** 18:24 19:7 24:9 31:6 38:8 39:25

**generated** 22:12

**geographic** 15:9

**give** 20:24 21:3 44:24 55:20

**giving** 13:5 22:23 42:20

**goal** 22:16 37:11

**good** 6:17,18 15:14 27:17 30:18 40:10 41:14,15 56:1 74:21 101:6 105:15,18

**grab** 12:9

**graduated** 86:21

**grate** 13:20

**greater** 14:8

**grocery** 17:15 20:18 52:21

**ground** 50:6,18 99:2

**guess** 26:12 57:3 78:13 96:5 97:7

**guidelines** 8:17 72:24 88:3 102:16

**guys** 11:12 45:7 55:23 74:14 105:23

---

**H**

**half** 16:13 17:5 86:22

**hand** 40:2

**happened** 6:24 22:7 76:17 88:19 94:9

**happening** 9:2

**happy** 78:19

**hate** 103:8

**Hawk** 7:4

**hazard** 25:25 34:8, 15,18 35:25 47:17,21 49:10,16 50:6,12,18, 21,23,24 51:6,7,15 52:3,5 59:1,23 61:12 64:21,25 66:14 68:2 72:7 92:1,4 97:16 98:18,19 99:14,16 101:13 102:8

**hazards** 29:13 30:2, 4 32:13 35:23 37:13, 18 38:10,15 39:18 40:17,19 52:12,25 54:3 59:6 60:1 61:18 65:22 66:3 67:13,20 71:19

**headings** 14:22

**health** 27:1

**hear** 41:16 43:25 44:4,5,8,9,11 45:10

**heard** 11:14 98:10

**height** 102:17

**heights** 102:20

**held** 89:17,23

---

Stephen Melia

**helpful** 68:6

**Herrera** 11:15 13:1 21:18 24:15 25:2,16 26:10 27:5,15 29:23 30:9,12,17,21 32:8 33:1,8 34:1,16 36:19 37:5,9,19 38:16 39:19 40:8,20 41:1, 25 42:13 43:23 44:1, 23 45:3 46:16 47:13, 18,24 49:3,11,22 51:17,22 52:6,13 53:1,6,10 54:4 56:1, 7,11,19,21 59:2,7 61:14,20 64:22 65:2, 9,15 66:9,15 67:15, 22 68:8 69:17 70:9, 19 71:9,21 72:19 74:2,17,25 75:12,19 76:5,14,21,24 86:18 87:21 91:19 92:7 93:1,9 94:25 95:21 101:17 102:10 103:6, 15 104:14,21 105:2, 10,14,22,24

**hierarchy** 72:10

**high** 86:21

**highest** 86:20

**highlight** 29:16

**highlighted** 32:22

**hired** 7:11 21:2,3,4, 17

**history** 31:7 77:22 78:1,16 82:4

**hitting** 102:13

**hold** 11:4 87:19

**holes** 30:3

**hour** 40:1,6 54:6 65:19 68:5,7,11,17 73:13 75:17,22 76:2, 9 79:10 83:5,6

**hourly** 79:6,10 83:3

**house** 44:16

**Houston** 86:23

---

**I**

**identification** 36:21 54:10

**identified** 9:10 36:22 48:22 49:1,5 67:17,25 72:13 104:9

**identify** 22:16 35:24 39:9 40:16 65:25 69:2 70:5 71:1 73:21 75:14 88:4

**identifying** 38:12 39:14 48:18,19 74:4

**immediately** 94:21

**imminent** 69:22

**imperfection** 47:20 48:3

**imperfections** 94:5

**implement** 52:21

**implementation** 12:1

**importance** 42:24

**important** 24:17 25:23 27:3,9 42:8 73:1 98:25

**improved** 10:13

**in-house** 12:2

**inappropriately** 93:15

**inaudible** 41:5

**incident** 6:22 8:15 9:1 21:8,12 22:24 23:17,23,25 24:4 27:11 46:4,9,13,21 50:1 52:23 53:18,20, 24 54:7,12 68:3,7,11, 14,16 69:6,13,19 71:6,18 73:6,9,12 74:7 75:23 76:17 91:14 94:2,22,23,24 95:16 96:8 97:2 98:2, 4 104:5 105:8

**incidents** 17:20 31:7 88:10 90:3 92:14 98:7

**inclement** 18:10 29:4 31:15,18 72:25

**include** 9:25 29:3 33:14 78:16

**included** 7:14 77:13, 21 78:20 80:15 93:20

**includes** 53:21 77:12 93:18

**incorrectly** 93:15

**independent** 20:7, 14

**indication** 54:9

**individual** 51:1

**industries** 24:21 25:4 33:12

**industry** 17:22 18:14 21:20 22:6,19 23:12 24:2,6,11,20 25:12 27:23 28:16,21 31:9 39:5,13 40:10 42:21 43:5 73:17,19 91:16 92:14

**information** 71:12 78:15 80:21 82:12 84:6 86:12 91:5,17 100:1,23 103:9

**initial** 22:25

**initially** 7:19

**initiated** 48:23

**injure** 26:20

**injured** 37:13 90:15

**injuries** 95:11,15,17

**injury** 95:8,10

**inside** 18:12 19:11 29:6 31:17

**inspect** 9:17 15:12 52:22 88:10 92:16, 22,24

**inspected** 10:18

**inspecting** 52:18

**installation** 12:2 13:15 14:2

**instance** 86:2

**instances** 88:3

**instill** 38:25

**instructs** 37:2

**intentionally** 66:3, 13

**interfering** 62:11,14 65:7,13

**internal** 8:19 34:21 42:18

**Internet** 41:10 45:4

**interwoven** 27:7,8

**introduce** 77:1

**introduced** 43:14

**investigating** 8:15

**investigation** 23:4 68:14 90:13 98:2

**investigations** 8:19

**investigative** 23:3

**invited** 17:16

**invoice** 82:16,23 83:11,15

**invoicing** 82:11 83:1 84:7

**involve** 81:25

**involved** 8:13 10:20 11:23 13:7 14:1 81:12

**involvement** 88:15

**involves** 88:16

**involving** 17:11 84:14

**IP** 14:11

**issue** 11:13 41:11

**issues** 44:18 45:5

**item** 50:25 51:2,3

**items** 12:2 26:14 102:2

**Stephen Melia**                    Index: job..matting

---

### J

**job** 15:5,14

**judge** 86:3,11

**jury** 86:13

---

### K

**Kaufman** 6:8

**key** 29:5

**kind** 98:12

**Kitty** 7:4

**knowing** 8:23 31:11

**knowledge** 18:4
37:16 38:25 39:23
70:11

---

### L

**lack** 67:10,11

**laid** 34:9,18 42:9
43:15 99:7,25

**laptop** 57:11

**large** 70:22

**larger** 48:1 55:3
57:15

**lateral** 11:3 12:12
14:22

**Law** 21:4 81:18
91:15

**lawyers** 91:9

**lay** 32:11

**laying** 47:21 73:20
94:5 99:10,13 104:16

**lays** 43:1

**lead** 15:25

**leaders** 15:25

**leadership** 89:9

**leading** 9:8 13:13
16:17 53:6

**learn** 13:23 14:3
43:6,9 45:23 46:2
54:2 68:18

**learned** 14:25 24:2,3
43:10 45:20

**leave** 58:13

**leaves** 31:15

**leaving** 93:17

**left** 32:7 48:2 58:8
61:2,8 84:12 88:21
89:1,14 103:13

**legal** 93:5

**level** 9:13,14 13:19
14:23 15:21 17:19
19:4 25:6 86:20
92:19

**liability** 84:15 86:7

**lie** 33:3,22 36:5

**lies** 33:4

**lip** 98:14

**list** 80:13,16,19
82:14

**listed** 20:5,11 91:17

**lists** 83:21

**litigation** 20:9
84:14,21,25 85:4

**LLC** 83:21 84:4 85:3

**load** 85:11,17

**located** 6:6,10 7:4

**location** 18:6 25:12
33:20 38:13 39:2
42:5 43:17 72:1
93:17 96:17

**locations** 9:15 15:9,
10,12

**log** 57:13 74:21

**logged** 74:19

**long** 13:8 14:13,14
16:4 48:5 70:17
79:23

**looked** 52:25 54:2
61:13 94:16

**loose** 30:3 31:12

**lose** 41:2 51:14

**loss** 7:24 8:1,4,7,9,
12,18 12:11 15:3,4

**lost** 41:17

**lot** 10:2 24:10

**lottery** 102:25 103:1

**Louisiana** 20:20

**LP** 8:9

**Lucas** 30:15 44:9

**lunch** 26:1

**lying** 33:2 34:3,6
36:18 49:16 50:1,5,
11,17 51:10 69:12

---

### M

**made** 32:10 33:18
49:9 70:2 73:7 89:8
100:7,23

**maintain** 25:7 26:24
37:12 73:23

**maintained** 20:13
29:12,25 31:12

**maintaining** 8:16
10:19 16:19 27:23
35:6

**maintenance** 38:9
52:18

**make** 51:2 53:23
76:8 77:5 89:12
92:16 98:22 99:1

**makes** 57:6

**making** 45:24

**management** 9:16
35:13 38:7 39:11
40:11 43:2 86:24

**manager** 7:24 8:9
15:22,23

**manner** 24:23

**mark** 54:17,23 55:5
57:6,24 58:16 59:13,
16 60:8,20 62:20

**loose** 63:1,22 77:10 103:16

**marked** 28:1,4 31:22
35:1 46:23 48:8
77:12 98:11

**marking** 28:6

**mat** 10:21 22:10
27:24 28:17 31:17
32:13 33:3,13,15,20,
22 34:2,7,10,11,14
36:17 37:3 40:23
41:22 42:3,5,7,9,23
43:12,14,17 46:10,
12,21 47:7,10,12,17,
20,23 48:4,6,20 49:2,
7,9,16,18,20 50:5,11,
17 51:7,13,15,16,19,
25 52:2,4,25 54:3,9,
11 56:9 58:9,14,23
59:1,6,20,23 60:1
61:5,13,18,23 62:4,
11,14 63:11,13,25
64:2,4,7,10,11,12,20,
21,25 65:7,12 66:21
67:14,21 68:4,15,19
69:5,12,15 70:8 71:5,
7,12,15,20,25 72:18
73:1,5,12,14,18 74:1,
8,10,11,13 75:14
76:12 91:24,25 92:3
93:19,24,25 94:3,10,
13,23 96:16,19,25
97:3,4,10 98:12 99:7,
10,12,13,25 100:9,
16,17,21,24 102:3
104:8,10,13,20
105:1,8

**Material** 28:11

**materials** 18:7 28:23
72:10

**mats** 18:1,9,10 19:2,
3,7 28:19 29:3,7,25
30:2 31:11,13 32:10,
18 33:2,3 34:21 36:4
37:25 42:22 51:21
70:14 72:24 73:20
100:2,4 101:23

**matter** 21:6 30:24
36:11 103:24

**matters** 30:20

**matting** 32:1

meaning 75:22

means 24:16 25:1
87:6

measures 9:11

mechanically 33:15

medical 95:1,4,8

meet 15:12 79:16

meeting 9:15

meetings 38:25

Melia 6:13,21 19:17
20:13 28:5 31:4
32:21 41:7 45:19
50:20 57:23 75:6
76:22 77:2 83:14,21
84:3,18,20 85:3
94:25 95:18 96:1
101:4,8 102:4

members 15:11

memory 86:10

mentioned 37:11

merchandise 17:12
92:21

method 22:2

mileage 79:7,9

mind 45:10 74:15
86:24

Mine 11:15

minimal 79:8

minute 54:22 55:5,
20 56:6 57:23 58:16
59:13,16 60:8,20
62:20 63:1,21

minutes 39:25 40:6
65:19 74:24 76:1,8
79:24,25

mischaracterizatio
n 86:17 94:19

mischaracterizes
53:7

Mississippi 86:3

misstates 53:7

mitigate 8:25 72:7,

14

mitigating 9:5

mitigation 88:8

moment 41:18 55:22

months 57:12

Moss 6:10 105:19

move 11:3 12:12
14:22 89:9,13

moved 13:11 89:5,7
102:2

moving 32:16

_____

N

name's 96:1

Nancy 6:23 21:6
103:20

Nancy's 97:10
104:19 105:1

national 31:25 36:12

nature 12:20 17:11
87:20

necessarily 33:10
39:7 80:4 90:9 92:6
99:15

necessity 73:5

needed 44:15

needing 15:15

negligence 90:19

newer 7:23

nonresponsive
97:6 99:23

noon 79:22

normal 93:17 96:7,
12 99:4,6,20 101:20,
22

notes 74:15

notice 59:19

noticeable 59:4

noticed 58:25 59:22
61:12 64:20 67:13

68:19 69:15,23,25
70:8 71:7,19

notices 36:17

notification 17:19
41:10

number 9:24 10:23
15:8 16:15 25:4 29:7
32:14 67:8 81:22
82:9 96:12 104:1

numbered 56:12

numbers 55:1

numerous 18:19

_____

O

object 37:25 50:25
51:2 56:14 98:3
99:22

objection 13:1
21:18 24:15 25:2,16
26:10 27:5,15 29:23
30:9,12 32:8 33:1,8
34:1,16 36:19 37:5,9,
19 38:16 39:19 40:8,
20 41:1,25 42:12
47:13,18,24 49:3,11,
22,23 50:14 51:17,22
52:6,13 53:1,5 54:4
59:2,7 61:14,20
64:22 65:2,9,15 66:9,
15 67:15,22 68:8
69:17 70:9,19 71:9,
21 72:19 74:2 75:12,
19 76:5,14 86:15
87:14 91:10 92:5,9,
12 93:4 94:18 97:5,
12 100:13 101:17
102:10 103:6 104:14,
21 105:2,10

objection's 30:18

objective 9:3

observant 37:23
40:13

observation 10:17
43:16 52:17 67:17
73:7

observation's 70:2

observations 53:23
70:1

observe 58:13,15

observed 61:16
66:11

obstructions 90:18

obtain 53:19

obtained 18:18

occur 22:18 31:11
43:3 49:19 68:13
69:13 76:4 94:14

occurred 21:8 68:3
71:18 74:7

occurrence 30:5
31:16

occurring 17:18
23:25 31:7

occurs 9:2 52:23
68:12

October 81:15

offer 19:12 21:11,25
72:21 95:12

offered 100:2,16

offering 95:3,7,17

office 89:6

oftentimes 39:10

Oklahoma 20:19

older 15:3 19:21
77:17,18

One's 57:2

one-hour 73:15

open 89:6

operate 24:22

operating 35:8,10,
20 37:2 38:23 52:16
65:23 72:23

operation 15:10

operational 8:20

operations 16:18
39:22

Stephen Melia

**opinion** 24:25 25:5, 18 26:7,13 27:2,7 32:16 41:23 49:9,14, 15 50:5,8,10 52:8 67:24 69:4,10,14,21 70:15 71:18,23,24 72:16,17 74:7,9 76:15 93:9,14 96:6 100:16,21 101:23

**opinions** 19:13 20:8 21:11,13,16,25 22:3 72:21 73:2 80:9 85:23 93:23 95:4,7, 13,18 96:4,9 99:25 100:3

**opportunity** 25:24 27:19 69:1,2 70:4 71:1 72:12

**option** 42:4

**options** 42:2

**orange** 63:15,17

**ordinary** 93:2

**organization** 19:5

**original** 77:20

**originated** 23:1

**OSHA** 18:20,21 22:6, 14 72:11 87:16,17,21 88:3,9,14

**oversee** 17:1

———————

P

**p.m.** 6:3

**PA** 39:11

**package** 89:14

**pages** 57:2 77:4,8

**paper** 77:2,4 80:5

**paramedics** 96:23

**parking** 10:2

**part** 10:18 17:6 51:13 52:16 84:9

**part-time** 7:22

**participation** 25:7

**parts** 64:17

**party** 20:16

**pass** 76:19 95:22 105:13

**passing** 70:25

**past** 20:12 39:23 45:4 54:9 57:19 58:14 63:25 64:2,4, 11,12,20 68:25 81:21 87:18

**Patterson** 11:14 28:24 30:15 41:3 44:22 46:14 47:5 49:23 50:9,15,19 55:25 56:20 57:2 69:7 74:16 95:23,25 96:1 97:5,7,14 99:22, 24 101:1,9,11 102:8 103:5 105:15,17,23 106:1,2

**pause** 46:18

**paused** 45:16 62:17, 22,25

**pedestrian** 29:13 30:2

**peer** 23:12

**people** 14:7 25:22 26:20 32:18 58:2,21 60:10,22 63:3 64:6 99:16,18

**percent** 33:10

**percentage** 85:7

**performed** 75:22

**period** 54:6,10 68:23

**periodic** 39:10

**permanent** 102:1

**person** 37:13 51:12 60:12,14 90:15,17 97:17 98:25 103:19

**personal** 26:25 27:1

**perspective** 12:5 88:11

**pertains** 87:8,13

**phone** 44:15,19,24

45:10 54:25 57:17 74:19

**photo** 47:4 48:2,11, 25 49:20 50:1 93:21 94:4 104:4

**photograph** 43:15 48:4,21 93:19,20

**photographs** 23:18 43:11 53:21 91:13 93:11,25 94:1,7

**photos** 46:12,20,24 47:2 63:18 94:16,21

**physical** 12:4

**pick** 72:18 73:11

**picked** 71:19 73:14 74:8 94:10 105:9

**picking** 73:18 74:1

**picture** 98:12

**pictures** 94:11

**piece** 50:25

**place** 9:11 15:15 22:17 25:9 26:6,12 27:14 32:19 34:11 37:21 38:24 53:24 68:16 92:15 96:13 100:4

**placement** 18:9 42:22 100:24

**placing** 33:13

**plaintiff** 21:24

**plaintiff's** 28:2,4,6 31:22 35:2 46:24 48:8 85:14

**plaintiffs** 85:8

**play** 55:16 60:16

**played** 58:16 59:16 60:18,19 63:21

**playing** 55:7,10 57:17

**point** 16:13 22:11,12 23:1,5 29:13,19 32:10 37:11 63:12 78:10 89:10 90:12 99:9 105:3

**points** 23:21 29:5,11 43:16 98:2

**policies** 88:2 91:14 92:15

**policy** 42:24

**portion** 34:7 62:1 99:23

**pose** 72:6,15

**position** 9:12 12:7 20:6,17 89:23 90:3,8 101:20 104:7

**positioned** 100:22

**positions** 7:23 38:8 89:12

**possibly** 55:14 79:21

**potential** 51:12 102:12

**potentially** 29:6 49:18 51:14

**practice** 22:19 26:12 27:17 40:7 84:13

**practices** 18:22 88:12

**precipitation** 29:9

**premise** 26:4

**premise's** 12:4 13:14 20:10 84:14 86:7

**premises** 9:17 15:13 16:19 92:16,24

**preparation** 83:6

**prepare** 79:12 80:3

**prepared** 12:23 56:16

**preparing** 83:4

**present** 72:6 99:11, 13 103:9

**presidents** 15:11

**prevalent** 31:16

**prevent** 9:1,20 10:9

**prevented** 23:24
105:8

**preventing** 9:4
17:17 92:14

**prevention** 7:25 8:2,
5,7,10,12,18,22
12:11 15:3,4 17:20,
25 18:15 19:14 21:14

**previously** 50:3
81:17

**primarily** 84:25

**principle** 26:19

**prior** 14:1 54:6,11
64:9 68:4,11,16
71:12,15,16 73:8,14,
15 94:23 97:9

**priority** 25:12,19
26:13 27:12

**problem** 74:17
82:11

**procedure** 10:16
35:11,20 36:2 37:2
67:11,12

**procedures** 8:20
9:18 10:12 16:20
17:14 18:8,9 22:17
23:25 31:5 35:8
38:23 43:4 52:16
65:23 70:12 72:23
88:2 91:14 92:15

**proceed** 6:12 53:11
57:10,21

**proceedings** 46:18
106:13

**process** 8:23 9:9
23:22

**procurement** 12:1
13:15

**produced** 56:22
91:13

**professional** 10:23
20:25 52:7 88:5

**profits** 27:14

**prognosis** 95:4

**promote** 11:11

**promoted** 8:6,8
11:1,11,20 12:6
14:18

**proper** 38:13 42:7,
22,23 67:17

**properly** 31:14
73:20 99:8

**protection** 8:2 14:19
15:1,17 16:11,18
20:18 89:19,20 90:2

**provide** 19:3,4,8
21:9 29:7 51:21,24
52:1 88:12

**provided** 18:12
23:17,18 46:5 50:1
53:3 54:7 56:15
68:12 71:1 80:7 81:1,
8 91:8 94:21 100:2

**provider** 100:20

**providing** 8:14
17:19 20:7,8 24:18
84:13 85:3 86:12

**public** 17:15

**publication** 31:8

**published** 21:21

**pull** 78:12

**pulled** 80:4 83:11

**purchase** 14:2 19:6
45:25

**purpose** 18:10
53:17,22 66:4

**pushing** 59:21

**put** 22:17 25:15 26:8,
12 54:16 75:7,10
94:10 100:5

_____

**Q**

_____

**qualify** 64:15

**quality** 14:3

**question** 11:7 31:2
36:23 41:7,20 43:12
73:4 74:12 76:23
77:20 80:11 90:17
97:7 102:6

**questioning** 53:11

**questions** 20:23
23:5 57:7 95:21 96:3
105:20

**quick** 29:16 41:13
101:5

**quickly** 56:23

_____

**R**

_____

**rain** 29:10

**rained** 73:3

**raining** 73:3,8

**raised** 98:14

**range** 16:1

**rate** 83:3

**rates** 79:6,10

**read** 29:1,21 32:6,24
55:1 79:14 106:6

**reading** 32:16 80:1

**ready** 57:6,20

**real** 29:16 41:12

**reapply** 89:12

**reask** 11:10,18 31:1
41:6,20

**reason** 92:25

**reasonable** 20:24
93:7

**reasons** 34:4

**recall** 13:3 79:21

**receive** 106:6

**received** 41:9

**recent** 82:24 83:15
89:18,23

**recently** 19:24 20:16
79:7

**recess** 45:18 75:3

**recognize** 54:18
103:19 104:1,4

**recollection** 12:19
57:18 85:21 100:3

**record** 6:3,20 28:3
45:13,16 46:15,19
54:16 55:2,24 56:13,
14 58:18 75:1,5
76:25 78:10 92:12
106:9,11

**recording's** 45:16

**red** 48:12,15 56:10,
12

**refer** 12:8 81:13 82:3

**reference** 32:9
72:10

**referenced** 36:9,14
99:9

**references** 22:16

**referencing** 67:1
93:19 94:8

**referred** 28:20 38:8

**referring** 7:3 50:21
51:25 86:18

**refers** 72:11

**reflect** 55:2

**reflects** 58:18 99:19

**regard** 73:21 87:15

**regional** 8:6,9 9:14
12:11 14:19 15:1,5
16:21

**register** 45:25 58:13

**regular** 66:5

**regulate** 88:9

**reimbursement**
79:8

**relate** 13:5

**related** 21:11 84:7

**relation** 10:4 17:16
21:7 29:12 31:10
95:11

**Relevance** 42:13

**relied** 80:8

**relocated** 89:7

**relocation** 89:3

**relying** 70:10

**remain** 32:19 89:14

**remainder** 7:25

**remember** 10:6,8 45:21 65:19 67:5 75:8 101:9,13

**reminder** 25:22 39:13

**removal** 42:9

**remove** 34:10 36:24 54:11 69:2 70:6 72:14

**removed** 33:5,16,22 62:10,13 65:7,12 68:4 73:8,9 76:12,16

**removing** 72:9

**reorganization** 16:12 89:4

**reorganize** 89:8

**repeatable** 23:11

**replace** 37:3 100:4

**report** 23:18 43:13 46:4,9 56:12,15,18 57:1,4 72:22 73:2 77:8,11,12,15,19,21, 23 78:1,5 79:4,15 80:1,12,19,20,24 81:4,6,8,14 83:21 91:20 93:18 94:2 98:11

**report's** 43:13

**reporter** 6:5,9,10 11:4,9,16 43:19,22 45:12,17 46:15 105:21,25 106:4,7

**reports** 91:14

**reposition** 42:2

**represent** 50:11 55:4 57:24 59:12,15 60:5,7,19 62:19,25 63:20 76:24 96:2

**representation** 49:6

**represented** 53:20 62:9

**required** 92:22,24

**requirements** 89:11

**requires** 47:20

**reserve** 105:14

**respect** 80:17,22 93:23 95:16

**responsibilities** 12:21

**responsibility** 9:7 13:16 15:24 16:3

**responsible** 15:7,19 38:11

**restart** 55:21

**restructuring** 89:10

**result** 51:4

**resume** 12:8

**retail** 17:14 24:12 52:21 82:1 87:7,12, 22 90:9 93:3

**retailers** 36:11

**retain** 68:10

**retained** 21:24 82:4 83:8 85:8,13,14,19

**retire** 89:2

**returned** 61:3,4

**review** 20:8 21:6,10, 19 23:3 34:5 43:10 52:24 53:2,13,18 74:15 80:2,4 83:6 84:9 103:8

**reviewed** 25:19,21 54:1,20 73:14 77:20 80:8,13,16,21 81:21 82:12,25 91:4,7,17 99:19 102:14,18,21 104:18,25

**reviewing** 8:20 54:25 68:13 87:11 104:10

**right-hand** 97:1

**ringing** 58:12

**ripple** 49:6 104:10, 12 105:6

**rippled** 34:7 43:15 51:13

**ripples** 47:15 48:5, 18 49:18 50:2 51:11 94:5

**risk** 9:10,25 22:12 23:1,7,21 27:10 31:15 32:15 43:3 49:15,17 50:12 51:5 69:12 71:2 72:2,4,6, 8,12,15 73:10 74:10, 13 76:16 84:23 99:11,19,21 102:12 104:17

**risks** 8:25 31:11 38:10 39:9 40:14 75:14 88:4,6,7

**Road** 7:4

**role** 7:17 8:11,13 9:7 11:1,22,23 12:11 13:9,10,11,22 14:13, 14 15:7 16:4 20:6

**roles** 14:15

**roll** 32:17

**rolling** 59:21

**room** 10:3 61:10 100:6

**root** 22:6,16,20 23:8, 11,14,23 34:5 53:25 90:13

**routine** 10:18 39:24

**rug** 12:24 93:13 94:16

**rugs** 9:20 10:9 29:25 30:2

**rule** 38:6

**ruled** 86:4

**runners** 28:20 29:3, 25 30:2

---

**S**

---

**safe** 8:14 10:4,19 12:25 16:19 18:13, 21,22 19:8,11 24:18, 23 25:7 27:23 28:17

35:17 36:15 37:12,21 40:6 51:16,21,24 52:19 73:24 88:4,12 92:17

**safely** 42:10 62:10, 13 65:7,12

**safety** 8:1,17 9:16 10:23 14:19 15:2,4,6, 16,19 16:11,22 17:1, 2,8,14,17,23,24 18:15,20 19:13 20:3, 10 24:8,9,14,17,20, 25 25:9,11,15,19,20, 23 26:3,8,13,25 27:1, 3,10,14 37:21 39:3,4, 12,17 40:3,6,18 52:17 65:18,22 66:5, 8 67:4,14,21 75:7,9, 11,17,21 76:3,9,12 84:15,24 87:7,12,17, 19 89:20 92:24 93:8

**Sam** 86:23

**Sam's** 7:7,15 8:3 11:24 15:8,12 16:3,5, 11,15 17:5,6,7,9,11, 22,24 18:8 84:13 89:6,9,21

**save** 27:19

**savvy** 45:4

**schedule** 79:3,5

**school** 86:21

**scope** 9:14

**screen** 19:16,17 31:19 54:13 55:3,19 57:15 63:6 82:17 98:9 103:12,17

**screenshot** 103:23 104:2,5,11

**scroll** 82:22

**seconds** 60:17

**section** 28:18 29:17 32:3 49:7

**sections** 49:17

**sector** 52:21

**sectors** 24:12

**secure** 16:19

**secured** 33:4,14 34:9

**security** 11:2,20,23 12:4,13 13:12,14,17, 20,23 14:5,15,16 20:7,10,15 84:15,24 89:24

**send** 20:11 79:1

**senior** 16:10,22 17:2 89:21

**sense** 10:11,14 14:6

**separate** 105:4

**service** 14:16 32:11 33:5,23 100:6,7

**services** 11:2,20 12:13 13:12,18 14:17 20:4 84:21 85:4 89:25

**set** 17:13

**severance** 89:13

**SF** 8:2

**share** 19:16 82:16 103:12

**shelf** 26:2

**shoe** 51:13

**shoes** 99:17

**shopping** 26:24 37:14 42:6

**short** 45:18 46:18 75:3 89:13

**show** 28:1 55:3 94:16 98:9

**showing** 31:21 45:6 46:23 48:8

**shown** 48:6 99:18

**shows** 47:6

**shut** 55:21

**SIC** 13:20 20:13 27:11 30:22 34:4 38:21 39:5 41:10 43:4 67:4 72:16 87:17 104:11

**side** 32:7 48:3,6,24 62:3 97:1

**sides** 48:3 86:4

**sign** 106:6

**signal** 41:10

**similar** 17:25 18:8 83:5

**simplistic** 34:19

**simply** 8:23 67:11 72:12 105:9

**sir** 6:17 11:5,19 29:20 44:7 54:14 62:17,22

**situation** 27:11

**situations** 9:9 73:1

**size** 17:12 76:7 100:17

**sleet** 29:10

**slip** 31:15 35:24 98:4

**slip-and-fall** 82:1

**slip-and-falls** 9:24

**slips** 17:17

**slogan** 24:9,13 25:13,21

**small** 70:22

**smaller** 48:2 70:23

**snow** 29:10

**Society** 28:10,22

**solutions** 32:14

**southern** 16:14

**space** 65:24 70:23

**speak** 26:17 61:6 66:18 79:16,19,23 90:20 102:22

**speaking** 19:9 91:1

**specific** 12:19 29:13 38:7 39:22 100:8,11

**specifically** 19:9 35:17 38:9 70:13

**specifics** 13:3

**speculate** 71:11

**speculation** 50:16

**spelling** 105:20

**spent** 8:1

**spills** 38:10

**spoke** 48:19

**spoken** 90:23

**stamped** 34:24

**Stand** 41:8

**standard** 9:21 22:6, 19 28:7,9,11,14,22 29:21 30:7,13 31:5, 25 32:4,6 33:7 34:21 35:4,6,8,10,20,25 37:2 38:23 40:10 52:16,19 68:10 70:12 72:22 73:19,23,25 76:9 102:21

**standards** 10:4 17:8,16,18,24 18:15, 22,25 19:7 21:21 24:2,7 27:23 28:16 29:2,11 31:6 34:14 36:8,9,12,13 42:14, 17,18,21,23 43:6 73:18 80:6 88:8 91:16 102:16,19,20

**standby** 74:20

**start** 7:10 10:1 44:25

**started** 7:18,19 10:15 15:21 20:4,17 83:25 84:12 86:25

**starts** 28:19 38:17

**state** 6:6,19 21:25 22:14 58:19 86:3,23 96:16,17

**stated** 46:9,10 72:9

**statement** 31:3

**statements** 23:19 53:21

**states** 8:23 29:24 81:4

**stating** 81:24

**station** 6:25 7:3 21:9

47:8

**stay** 56:3

**Stephen** 6:13,21

**stepping** 90:18 101:21 102:12

**steps** 8:25 25:9 29:7 72:13 93:8

**Steven** 31:4

**stock** 26:2

**stocker** 7:21

**stop** 22:24 25:25 40:1

**stopped** 55:11

**store** 7:15,22,24 9:12,13,15,22 15:21, 22 19:11 20:18 26:22 29:8 35:13,23 37:14 38:21 46:11 47:8 60:10,22 61:24 62:7 63:3,6 64:7,13,17 70:3,14 82:2 90:9 93:3,16

**store's** 90:10

**stores** 7:14,20 8:16, 21 11:24 15:18 16:1, 25 19:4,6 20:19 21:7 35:7 70:23

**story** 89:13

**structure** 89:8

**study** 23:16

**subject** 102:18

**submitted** 19:22 77:18 78:5

**submitting** 82:11

**substances** 98:5

**substitute** 72:14

**sufficient** 68:14,18, 21 70:12

**summer** 12:10

**sunshine** 73:4

**supervision** 13:19 14:23

**supervisor** 7:25

**supplement** 78:3

**support** 11:24 20:9 84:14 85:1

**supposed** 35:22 36:4,18 37:7,18 38:4, 15 39:17 40:16,18,25 41:24 51:20 52:9,11 65:18,21 66:2 72:18 75:25 76:3

**surface** 19:8 51:24 94:6

**surprising** 36:14

**sweep** 39:3,4,7,12, 17 40:3,6 52:17 65:18,22 66:5,8 67:4, 14 75:17,21,22 76:9, 12

**sweeps** 40:18 76:3

**sworn** 6:4,14

**system** 39:11

_____ T _____

**table** 32:7

**tag** 24:20

**takes** 38:24

**taking** 8:25 13:15 25:9 26:14 53:23

**talked** 8:4 91:2

**talking** 6:23 40:16 85:9 98:12 101:9

**Tarrant** 6:11

**task** 26:14 40:2

**tattered** 100:5

**taught** 10:6,8 25:18

**taxes** 84:7

**teach** 9:16,19 10:24 12:24 15:25

**teaching** 9:8

**team** 15:11

**teams** 9:16 15:12

16:17,18

**technical** 14:7,9 57:15

**ten** 79:25

**tenure** 20:2

**termed** 40:3

**terminology** 15:3 22:4

**terms** 34:19 39:4

**territories** 16:14

**testified** 6:14 12:17 78:7 91:23 94:4

**testify** 12:15,23 54:24 55:2 83:8 86:6

**testifying** 53:7 84:10

**testimonial** 77:22, 25 78:16

**testimony** 13:4,6 21:10 23:19 46:5 71:3,4 79:11 83:7 86:5

**Testing** 28:11,23

**Texas** 6:8,11,25 7:5 20:19 89:5

**thing** 57:4 103:1

**things** 9:24 40:17 67:9 84:8 99:2 104:9

**thinking** 66:19

**third-party** 12:3

**thought** 39:8

**threshold** 99:5 101:12,15,21 102:7, 13,16,20 103:2,3

**thresholds** 102:17

**tile** 10:21,22

**time** 8:1 10:12 12:16, 21 16:2,6 17:7 19:23 40:4,12 43:24 53:20 54:6,10 57:4 58:18 60:11,23 61:25 62:8 63:4 64:13 65:8,14 68:23 69:5,18 71:1,

13 72:2 73:6,13,15 77:19 80:19,20 83:1, 3 85:7 87:18 89:1,15 93:24 94:21,24 102:22

**times** 15:8 22:13 33:17 86:1 101:24

**timing** 100:24

**title** 14:22

**titled** 29:17

**titles** 89:17

**today** 19:12 20:23 21:16 46:25 54:20 56:15,18,22 76:13,18 79:13 80:3 83:2

**top** 25:11,19 27:12 63:6

**topic** 35:15

**total** 7:13 15:18 16:25

**totally** 102:18

**traditional** 8:18

**traffic** 32:12

**train** 10:25

**training** 10:12 38:18,24 67:10 70:12 87:7

**transition** 12:11 13:13 18:13 19:9,11 29:6,8 31:17

**transitions** 18:11

**travel** 92:22

**traveling** 9:15 15:10 38:20

**traverse** 99:8

**trial** 78:7 83:7,9

**trip** 30:4 34:8,14,18 35:23 37:18 39:17 40:17,19 47:17,21 48:23 49:9,16 50:6, 18,21,22,24 51:3,6,7, 15 52:12,25 54:2 59:1,6,23 60:1 61:12, 18 64:20,25 65:22

66:3,14 67:13,20 68:2 71:19 72:7 92:1, 4 94:14 97:10,15 98:4,18,19,23 99:1, 13,16 101:12,16,19 102:8,14,15 103:2,3

**trip-and-fall** 6:23 17:25 18:15 19:13 21:8,14 35:25 46:7,8 49:19 50:12 51:5,14 82:1 96:24 97:18 98:7

**tripped** 22:8,9 46:1, 10 90:4 96:19

**tripping** 9:20 10:9 52:2,5 73:15 74:13 93:12 95:12

**trips** 17:17 51:4

**turn** 64:2

**turned** 61:8

**turning** 64:10

**TV** 12:1

**type** 17:12 35:24 50:25 72:25 100:16, 17

**types** 17:20 84:24 90:4

**typical** 72:22

**typically** 76:1,8 92:20 98:1

_____ U _____

**Uh-huh** 46:17

**uncommon** 39:12

**underneath** 97:4 104:19

**understand** 25:22 102:5 103:22

**understanding** 14:8 18:20 27:21 35:14 39:24 40:4 75:21 102:24 103:4

**understood** 97:24

**unintelligible** 25:20 37:10 44:1 56:4 98:5

**Universal** 6:25 7:4 21:9

**university** 86:23 87:4

**unsafe** 9:1,5 12:25 26:3 27:18 36:24 37:24 38:4,21 39:14 51:16,19 52:22 66:1 69:3 70:5 72:8 73:22 74:4

**updated** 20:11 77:16 78:2,15,21,23 79:7

**utilize** 19:6 100:4,17

**utilized** 19:2 72:25

---

**V**

**vague** 50:15,18 87:14 100:14

**variety** 39:6

**verify** 78:10 81:2

**versus** 85:8 102:2

**vestibule** 35:16

**vice** 15:10

**video** 14:4 23:19 43:11,16 44:25 46:3 52:24 53:2,13,21 54:1,7,17,18,23 55:5, 7,18 57:10,14,16,19, 24 58:16 59:13,16,17 60:8,16,18,20,25 62:2,4,7,17,20,23 63:1,21 64:4,16,17 66:8,11,14 68:5,6,10, 18 71:13 73:3 75:18 76:4 91:25 93:11 94:1,22 96:11,19,23 97:1 100:10 103:23 104:5,10,11,19,25

**video's** 44:13

**view** 40:2 62:3,4

**viewable** 100:10

**vigilant** 39:13

**violate** 73:17,25

**violation** 73:23

**violent** 27:11

**visible** 60:24

**visibly** 65:25

**visit** 9:23 15:11,25

**visual** 58:20

**visually** 39:9

---

**W**

**walk** 26:22 32:18 39:9 42:10 58:14,23 59:20 63:24 64:1,4 65:24

**walked** 63:8 64:9,12, 20 96:13

**walking** 18:23,24 19:8 36:15 37:22 38:3 40:12,19 46:1 51:24 54:9 61:7,11 63:10 64:9 68:25 70:3 72:3 91:24 92:20 93:3 96:7,16 99:1,5,18

**Walmart** 6:24 7:2,3, 7,12,14,15 8:2,13 9:19 10:10 11:24 12:15,17,23 13:16,24 17:9,22,23 18:8 21:7, 8,17 23:18 26:8,18 27:13 30:21 34:21,24 35:22 36:4,10,17 37:2,7,16,17 38:14 39:4,16,22 40:24 41:23 46:9 51:20 52:9,11,20,24 53:3 54:2,8 58:4,6,22 59:19 60:14 61:2 63:10,24 64:3,19 65:18,21 66:7,13 67:13,20 68:1,19 69:15 70:7,17 71:6, 19 72:18,23 73:11, 17,25 74:8 75:7,10 76:11,24 86:25 87:18 88:21 89:17,24 91:13,24 94:13 100:4,19

**Walmart's** 27:2 35:6 36:2 42:18,23 55:8 62:14 65:13

**Walmarts** 67:4

**watch** 96:22 98:22

**watched** 75:17 96:12

**watching** 57:18

**water** 29:8

**weather** 18:11 29:4 31:15,18 72:25 101:24

**week** 44:17

**weekly** 38:25

**weeks** 20:17

**weight** 42:6

**well-written** 43:1

**white** 14:10 103:19

**wife** 84:5

**WIFI** 44:21

**Williams** 6:16 11:6, 8,12,17,19 13:8 22:2 24:24 25:14 26:7,16 27:13,22 28:3,5 29:15 30:6,10,16,19, 23 31:1 32:21 33:6, 21 34:13,20 37:1,7, 15 38:2 39:3 40:5,15, 23 41:2,4,6,12,15,19 42:11,14 43:21,24 44:3,7,10,12 45:9,19 46:17,20 47:9,16,22 48:7 49:13 50:4,13, 17,20 51:20 52:4,9, 15 53:4,9,12,13 54:13 55:23 56:2,9, 17,25 57:3,20 59:5, 10 61:17,21 64:24 65:3,11,17 66:12,22 67:19 68:1,17 69:9, 18 70:16,21 71:17,24 73:11 74:6,14,23 75:6,16,24 76:11,19 86:15,17 87:14 91:10 92:5,9,11 93:4 94:18 97:12 100:13 101:3 102:4,23 103:11,13,

16 104:18,24 105:7, 12,13,16,19 106:10

**win** 102:25

**wonderful** 84:6

**words** 22:8 50:22 97:20,24

**work** 7:13 14:24 18:21 23:3 37:22 39:1 65:24 83:18 84:3,17 85:2

**worked** 7:7 13:24 14:8 20:14 81:17

**working** 7:10,19 26:24 37:16 45:1 56:23 70:25 76:10 86:25 92:14

**workplace** 98:7

**works** 56:3

**worn** 30:3 32:20 100:5

**Worth** 6:11 16:7

**wrinkle** 42:6

**wrinkles** 30:4

---

**Y**

**year** 86:22

**years** 7:13,16,22 9:13 10:14 12:18,19 13:10 14:17 18:19 20:12 22:13 37:17 39:21,23 45:4 81:21 85:10 86:10,22 88:1, 24 99:18

**you-all** 41:16 43:20 56:3 57:3

---

**Z**

**zoom** 14:24,25 30:15 33:17 37:25 43:18 44:2 48:22 64:7 78:19 82:19