## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| NANCY CASTRO | § | |
| PLAINTIFF | § | |
| | § | |
| v. | § | **CIVIL ACTION NO.** |
| | § | |
| | § | 5:21-cv-00702 |
| WAL-MART INC.; CINTAS | § | |
| CORPORATION NO 2 D/B/A CINTAS | § | |
| CORPORATION; WAL-MART STORES | § | |
| TEXAS, LLC; AND WAL-MART REAL | § | |
| ESTATE BUSINESS TRUST | § | |
| DEFENDANTS | § | |

---

### PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO STRIKE STEPHEN MELIA

---

**TO THE HONORABLE JUDGE OF THE SAID COURT:**

**COMES NOW** Plaintiff, **NANCY CASTRO**, and files her RESPONSE TO DEFENDANTS' MOTION TO STRIKE STEPHEN MELIA. In support thereof, Plaintiff respectfully submits the following:

### I. SUMMARY OF DEFENDANTS' MOTION TO STRIKE

1.1      Wal-Mart filed its *Motion to Strike Stephen Melia* on October 28, 2022 and Cintas later joined in the motion. Mr. Melia is a safety expert regarding trip and fall prevention in Wal-Mart stores. In their motion, Defendants allege that Mr. Melia is not qualified and his opinions are irrelevant. Plaintiff disagrees.

## II.   EXHIBITS

1. EXHIBIT 1 – MR. MELIA'S ORIGINAL EXPERT REPORT

2. EXHIBIT 2 – MR. MELIA'S CV

3. EXHIBIT 3 – MR. MELIA'S DEPOSITION

4. EXHIBIT 4 – PROPOSED ORDER DENYING MOTION TO STRIKE MELIA

## III.   ARGUMENTS AND AUTHORITIES

A. Qualifications

**3.1**   It is well known that an expert may be qualified based on his skill, knowledge, education, experience, or training. *See* Fed. R. Evid. 702 ("A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion…"). Mr. Melia is providing opinions as a safety expert on trip and fall prevention, especially as it pertains to Wal-Mart. As such, the Court must look to see whether his skill, knowledge, education, experience, or training qualifies him to provide opinions as a safety expert on trip and fall prevention in Wal-Mart stores.

**3.2**   Mr. Melia worked for more than 31 years with Wal-Mart Stores, Inc.[1] He first started out as a general stocker, cart attendant, and general associate. He worked all the way up to the senior director of asset protection and safety compliance, which required him to oversee and be responsible for the safety of approximately 300 stores.[2] This obviously allowed him to become with familiar with Wal-Mart's safety standards for trip and fall prevention as well as the general industry safety standards for trip

---

[1] *See Exhibit 2*; *see also Exhibit 3*, Pages 7-20, 7:7-20:21
[2] *See Exhibit 3*, Pages 16-17, Lines 16:9-17:7

and fall prevention.[3] Mr. Melia's extensive experience alone qualifies him as an expert witness on safety and trip and fall prevention in Wal-Mart stores.

**3.3**    Mr. Melia also had extensive training in order for him to be promoted to one of the top safety executives in Wal-Mart and even testified numerous times on behalf of Wal-Mart as its corporate representative. That training is detailed in his CV, which includes numerous trainings provided by Wal-Mart itself.[4]

**3.4**    Given his experience, training, education, and knowledge, Mr. Melia is certainly qualified to render an opinion as a safety expert on trip and fall prevention in a Wal-Mart store.

B. Mr. Melia's Opinions are Irrelevant

**3.5**    Defendants start off in their section that Mr. Melia's opinions are irrelevant by citing the rule that states the Court may exclude *unhelpful* evidence. Federal Rule of Evidence 703 only prevents Mr. Melia's opinions if his opinions confuse the issues, mislead the jury, are unfairly prejudicial, or waste time. Defendants continue on by stating Wal-Mart's safety standards and trip and fall prevention are within the common knowledge of the jurors. Plaintiff disagrees.

**3.6**    It is not common knowledge for a juror to know the industry safety standards applicable to Wal-Mart regarding trip and fall prevention. If Wal-Mart contends that its actions complied with industry safety standards regarding trip and fall prevention (i.e.—Wal-Mart ensured that the mat was flat at the time of the incident), then Plaintiff is entitled to present evidence that says otherwise.

---

[3] *See Exhibit 3*, Pages 17-19, Lines 17:23-19:11
[4] *See Exhibit 2*

**3.7**    This is not simply having an expert telling the jury what the video shows; it is telling the jury what actions Wal-Mart was supposed to take to ensure the mat was flat at the time of the incident. Mr. Melia is qualified to render an opinion on that and his opinion would be relevant and helpful.

## IV.    CONCLUSION AND PRAYER FOR RELIEF

**4.1.**    DEFENDANTS' MOTION TO STRIKE STEPHEN should be denied in its entirety because Mr. Melia is qualified and his opinions are relevant.

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that DEFENDANTS' MOTION TO STRIKE STEPHEN MELIA should be set for hearing, and, after hearing the issues, and that the Court deny this motion in its entirety. Plaintiff further prays for such other and further relief, at law and in equity, both general and specific, to which Plaintiff may show to be justly entitled.

RESPECTFULLY SUBMITTED,

DESOUZA INJURY LAWYERS
3201 CHERRY RIDGE DR., SUITE C-300
SAN ANTONIO, TEXAS 78230
210/ 714-4215 – PHONE
210/496-0060 – FACSIMILE

BY: */S/ Jason F. DeSouza*
JASON F. DESOUZA
STATE BAR NO.: 24073255
WDTX: ADMITTED
jason@jfdlawfirm.com

BY: */S/ Paul Bowers*
PAUL T. BOWERS
STATE BAR NO.: 24078247
WDTX: ADMITTED
robby@jfdlawfirm.com

BY: */S/ Lucas W Williams*
LUCAS W. WILLIAMS
STATE BAR NO.: 24086401
WDTX: ADMITTED
lucas@jfdlawfirm.com

*ATTORNEYS FOR PLAINTIFF*

<u>CERTIFICATE OF SERVICE</u>

This will certify that a true and correct copy of the above and foregoing instrument was duly served in accordance with the FEDERAL RULES OF CIVIL PROCEDURE on November 11, 2022 upon all parties/counsel of record VIA ECF/SERVICE, including:

**VIA E SERVICE:** ja.saenz@rcclaw.com; e.herrera@rcclaw.com
**JAIME A. SAENZ**
TEXAS BAR NO. 17514859
**ELIZABETH FERGUSON HERRERA**
TEXAS BAR NO. 24087716
**COLVIN, SAENZ, RODRIGUEZ & KENNAMER, L.L.P.**
1201 EAST VAN BUREN ST.
BROWNSVILLE, TEXAS 78520
TELEPHONE (956) 542-7441
FAX (956) 541-2170

ATTORNEY FOR DEFENDANTS
WALMART INC., WAL-MART STORES
TEXAS, LLC, AND WAL-MART REAL
ESTATE BUSINESS TRUST

**VIA E SERVICE:** warren@namanhowell.com
**LARRY D. WARREN**
TEXAS BAR NO. 20888450
**NAMAN HOWELL SMITH & LEE, PLLC**
10001 REUNION PLACE, SUITE 600
SAN ANTONIO, TEXAS 78216
TELEPHONE (210) 731-6350
FAX (210) 785-2950

ATTORNEY FOR DEFENDANTS
*CINTAS CORPORATION NO 2*
*D/B/A CINTAS CORPORATION*

By: ***/S/ Jason F. DeSouza***
JASON F. DESOUZA

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

NANCY CASTRO                §
      *Plaintiff,*           §
                           §
                           §
**v.**                          §     **Civil Action No. 5:21-cv-00702**
                           §
**WAL-MART INC.; CINTAS**    §
**CORPORATION No. 2 D/B/A**   §
**CINTAS CORPORATOION;**     §
**WALMART STORES TEXAS, LLC;**  §
**AND WALMART REAL ESTATE**   §
**BUSINESS TRUST**            §
      *Defendants.*

## AFFIDAVIT OF STEPHEN MELIA

BEFORE ME. The undersigned notary public, on this day personally appeared Stephen Melia, who being duly sworn, stated:

1. My name is Stephen Melia. I am over 18 years of age, of sound mind and am competent to make this affidavit.

2. I was retained on October 08, 2021, by The DeSouza Law Firm representing the plaintiff, Nancy Castro to provide consultation in the matter of Nancy Castro vs Walmart Inc.; Cintas Corporation No. 2 D/B/A Cintas Corporation; Walmart Stores Texas, LLC; and Walmart Real Estate Business Trust.

3. The matter involves an incident that occurred on Tuesday February 25, 2020, while Ms. Castro  was walking out of the Walmart Fuel Station located at 510 Kitty Hawk Road, Universal City, TX.

4. As an expert in the field of safety and security and with over 31 years of experience with Walmart Stores, Inc. I have specific knowledge in the areas of policy and procedure that are considered standard in the industry as it relates to security, safety, criminal investigations, crowd management, accident and injury investigation, and security event planning.



Page | 1

CASTRO, Nancy 001647

5. During my tenure at Walmart and Sam's Club, I have conducted regular visits to Walmart Stores and Sam's Clubs to inspect procedures related to safety standards that included slip/trip and fall prevention, OSHA compliance, accident reviews, and employee safe work practices.

6. I have conducted numerous employee and customer accident investigations to determine the root cause and establish new processes or enforce existing procedures to mitigate future risk.

7. The facts contained in this matter are directly related to my professional knowledge, skills, experience and my familiarity with publications and regulations concerning industry standards related to safety, accident investigation and risk management at retail establishments.

8. I am familiar with the standards as set forth by the *"American Society for Testing and Materials (ASTM) Standard Practice for Safe Walking Surfaces"* , which states in section 5.4.6:

> *"Mats, runners, and area rugs shall be maintained so as not to create pedestrian hazards. Mats, runners, and area rugs shall not have loose or frayed edges, worn areas, holes, wrinkles, or other hazards that may cause trip occurrences."*

9. Based on my review of this incident to include the photographs and video produced by Walmart, the mat was not laying flat on the floor which created the unsafe condition, resulting in Ms. Castro tripping and falling as she walked toward the exit door.

10. Ms. Castro is observed on the Walmart CCTV camera completing her transaction at the register and walking toward the exit door when she tripped on the mat, fell forward hitting the front door, and landing on the floor.

11. Walmart management knew or should have known that placing a mat in the walkway that was not laying flat on the floor creates an unreasonable trip hazard for their customers.

12. Based on the photograph as presented as evidence in this matter, the mat was not laying flat and had ripples creating the trip hazard.

13. Walmart has a responsibility to maintain a safe premises to include ensuring that the entrance and exit floors are free of hazards. Walmart management and associates neglected their duty of care when they failed to inspect, maintain, and remove the mat which allowed the dangerous condition to exist.

14. In my professional experience, temporary mats are typically placed on the floor at entrance/exit ways during times of inclement weather to maintain a dry floor. These mats are usually removed or replaced when saturated or when inclement weather is no longer present.

15. Based on review of the video, the weather conditions outside were sunny and dry; therefore, it is my professional opinion the mat that Ms. Castro tripped on was not necessary. The video shows the cashier remove the mat after the incident photos are taken and no replacement mat is placed at the entrance exit.

CASTRO, Nancy 001648

16. In my professional opinion, the root cause of this trip and fall incident involving Ms. Castro was the created by the mat that was not laying flat on the surface of the floor.

17. With a reasonable degree of professional certainty, this incident would not have occurred if the mat were in good condition.


_____

Stephen Melia, Affiant


SWORN AND SUBSCRIBED TO BEFORE ME on this the _17th_ day of February 2022, to certify, witness my hand and seal of office.


_____

NOTARY PUBLIC IN AND FOR THE STATE OF TEXAS


My Commission Expires:                              Printed or Stamped Name:

_February 28, 2024_



GISELLE CARRILLO
Notary ID #132382839
My Commission Expires
February 28, 2024

Page | 3

CASTRO, Nancy 001649

# S. MELIA CONSULTING, LLC

P.O. Box 93363, Southlake, TX 76092

479-644-4120 ● s.meliaconsulting@gmail.com ● www.meliaconsulting.com

## Professional Experience

**Gateway Church -  Southlake, Texas, October 2015 – Present**
Executive Director, Safety Services August 2017 – Current
Responsible for the safety and security at all Gateway Church locations and facilities to include The Kings University located in Southlake, Texas. Responsible for the development of policy and procedures related to creating a safe and secure environment for members and guest to worship and serve at Gateway Church. Responsible for developing the volunteer medical and security teams who support the campus locations during weekend services and special events.

Director, Safety Services October 2015- August 2017
Responsible for all safety and security initiatives at Gateway Church based in Southlake, Texas. The church consists of multiple campus locations across the Dallas/Fort Worth area.

**Walmart Stores, Inc., Bentonville, Arkansas, 1984-2015**
Senior Director Asset Protection, Safety and Compliance - Sam's Club 2010- 2015
Directed corporate asset protection initiatives for Sam's Clubs located in Western Division of United States.  Prepared budgets and delivered financial results in loss reduction, accident cost mitigation and regulatory compliance.  Led a team of 4 field based regional directors and 21 market asset protection managers that provided safety and security support to their respective markets.

Regional Director of Asset Protection, Safety and Compliance - Sam's Club 2003-2010
Responsible for 113 Sam's Clubs, with 11 direct reports.  Led initiatives including shrinkage reduction, accident prevention, food safety and compliance, as well as additional asset protection functions to ensure clubs operated at safe and profitable level.

Director of Security and Alarm Services - Walmart Stores, Inc., 2001-2003
Directed initiatives for alarm division of UL certified 24-hour central station and 120 field technicians, who installed and serviced alarm systems for locations throughout the United States.  Created budgets, managed P&L statements and procured CCTV and alarm equipment.

Security Services Director, Walmart Stores, Inc., 1998-2001
Implemented corporate security initiatives, procedures, training material for CCTV, and parking lot patrol security measures.  Worked closely with legal department on discovery for premise liability lawsuits and served as corporate representative at depositions and trials.  Consulted with internal real estate department to evaluate and implement security measures for new Walmart and Sam's locations.

Regional Loss Prevention Director, Walmart Stores, Inc., 1995-1998
Directed loss prevention initiatives and accident reduction for a region of stores in Northeast U.S.  Led and developed talent for 12 market level direct reports. Developed training initiatives for market and store associates on reduction of shrinkage and accidents.

**PLAINTIFF'S EXHIBIT**

**2**

Texas DPS License #C04076701

CASTRO, Nancy 000411

# S. MELIA CONSULTING, LLC

P.O. Box 93363, Southlake, TX 76092

479-644-4120 ● s.meliaconsulting@gmail.com ● www.meliaconsulting.com

## Career Contributions to Security and Safety Initiatives

SECURITY:

Stephen Melia conducted hundreds of investigations related to criminal activity such as internal theft, embezzlement and external theft which led to criminal charges being filed, prosecution and recovery of assets.

- Attended first coalition meeting to address Organized Retail Crime (ORC) impacting multiple retailers with directors of security from Walmart, Target, Kmart, and Venture stores
- Implementation of security measures at club level to mitigate the theft of tobacco products in Houston, TX
- Identified and contracted third party company to install protective laminate on front doors to prevent jewelry and electronics burglaries in San Antonio, TX
- Assessment of Puerto Rico asset protection structure to effectively allocate the security resources
- Parking lot patrol creation and implementation of corporate training manual for stores
- Designed security measures for data center and David Glass technology building in Bentonville, AR
- Evaluation and enhancement of alarm technician position to support CCTV initiatives and reduce cost of third party services
- Implementation of CAP index to assess current store locations and worked closely with real estate on new site survey and design of security systems
- Organized an active shooter training drill with local law enforcement for enhanced preparedness procedures

SAFETY AND COMPLIANCE:

Mr. Melia conducted regular visits to retail stores and wholesale clubs to inspect procedures related to safety standards that included slip/fall prevention, falling merchandise, OSHA compliance, accident reviews and employee safety practices to mitigate risk for customers and employees. The findings resulted in determination of root causes of risk with the expectation of corrective measures taken at store and club level by the leadership team. Stephen frequently met with store safety teams to review accident trends and provide solutions on reducing same or similar risks in the future.

- Development and implementation of asset protection manager position for Sam's Club
- Oversight related to civil unrest, including initiatives to ensure protection of associates and property
- Created corporate response procedures to post September 11, 2001 bomb threat protocol and physical security assessment of corporate offices
- Creation of holiday safety and security guidelines to inform employees of personal safety
- Directed emergency command centers in the gulf coast region during hurricane seasons to ensure safe evacuation of staff, protection of property, and community support of supply needs during recovery effort

Texas DPS License #C04076701

CASTRO, Nancy 000412

# S. MELIA CONSULTING, LLC

P.O. Box 93363, Southlake, TX 76092

479-644-4120  ●  s.meliaconsulting@gmail.com  ●  www.meliaconsulting.com

## Certifications

Texas Private Security Certification Level III & Level IV
Texas DPS Private Security Manager, Private Investigator, Security Consultant
American Heart Association Basic Life Safety and First Aid Certification
Occupational Safety and Health Administration Certification, 2009
Wicklander-Zulawski Interview and Interrogation Techniques

## Professional Development

Dale Carnegie
Walton Institute of Retailing I and II
Advanced Leadership
Management Development Seminar
Leadership Foundation
Lead First
Situational Leadership

## Affiliations

Member American Society of Industrial Security - North Texas Chapter
Loss Prevention Foundation
Loss Prevention Research Council (Served on Board of Advisors from 2007-2009)

Texas DPS License #C04076701

Stephen Melia

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF TEXAS
 2                  SAN ANTONIO DIVISION

 3
    NANCY CASTRO,                      &
 4  PLAINTIFF                          &
                                       &
 5  VS.                                &
                                       & Civil Action No.
 6  WAL-MART, INC., CINTAS             & 5:1-CV-00702-XR
    CORPORATION NO. 2 D/B/A CINTAS     &
 7  CORPORATION, WAL-MART STORES       &
    TEXAS, LLC, AND WAL-MART REAL      &
 8  ESTATE BUSINESS TRUST,             &
    DEFENDANTS                         &
 9

10

11        _____

12              ORAL AND VIDEOTAPED DEPOSITION OF
                      STEPHEN MELIA
13                  SEPTEMBER 15, 2022

14        _____

15        ORAL AND VIDEOTAPED DEPOSITION of STEPHEN MELIA
    produced as a witness at the instance of the Plaintiff, and
16  duly sworn, was taken in the above-styled and numbered cause
    on the 15th of September 2022 from 2:03 p.m. to 4:36 p.m.,
17  before Christie Tawater, CSR, RPR, in and for the State of
    Texas, reported by computerized stenotype machine remotely
18  via Zoom from her home located in Fort Worth, Texas
    pursuant to the Federal Rules of Civil Procedure and the
19  provisions stated on the record or attached hereto; that the
    deposition shall be read and signed before any notary public
20  pursuant to Rule 30(e)(1).  Job No. 57851

21

22

23

24                                    PLAINTIFF'S
                                       EXHIBIT
25
                                          3
```

Stephen Melia

2

```
 1              A P P E A R A N C E S

 2

 3   FOR PLAINTIFF(S):  NANCY CASTRO

 4

 5        Mr. Lucas W. Williams
         DESOUZA INJURY LAWYERS
 6        3201 Cherry Ridge Drive
         Suite C-300
         San Antonio, Texas 78230
 7        Phone:  (210) 714-4215
         E-mail:  lucas@jfdlawfirm.com
 8

 9

10

11   FOR DEFENDANT(S):  WAL-MART, INC., ET AL

12

13        Ms. Elizabeth Ferguson Herrera
         COLVIN, SAENZ, RODRIGUEZ & KENNAMER, LLP
14        1201 East Van Buren Street
         Brownsville, Texas 78520
15        Phone:  (956) 542-7441
         E-mail:  e.herrera@rcclaw.com
16

17

18

19   FOR DEFENDANT(S):  CINTAS CORPORATION

20

21        Mr. Evan F. Patterson
         NAMAN, HOWELL, SMITH & LEE, PLLC
22        10001 Reunion Pl.
         Suite 600
23        San Antonio, Texas 78216
         Phone:  (210) 731-6300
24        E-mail:  epatterson@namanhowell.com

25
```

Stephen Melia

3

1          A P P E A R A N C E S   C O N T I N U E D

2

3   ALSO PRESENT:   THE VIDEOGRAPHER

4

5       Ms. Brittany McCarble
        Firm Registration No. 189
6       Southwest Reporting & Video Service, Inc.
        826 Heights Boulevard
7       Houston, Texas 77007
        Phone:  (713) 650-1800
8       Fax:  (713) 650-6245

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Stephen Melia

```
                                                            4
 1                          INDEX

 2    Appearances ......................................... 2

 3
         Stephen Melia
 4
              Examination by Mr. Williams .............. 6
 5

 6    Signature and Change ................................ 107

 7    Reporter's Certificate .............................. 109

 8

 9                        EXHIBITS

10
      NO.            DESCRIPTION                          PAGE
11
      Exhibit 1        Curriculum Vitae of              28
12                     Stephen Melia

13    Exhibit 2        ASTM Standard                    28

14    Exhibit 3        American National Standard       31
                       on Commercial Entrance Matting
15

16    Exhibit 4        Walmart Standard                 35

17    Exhibit 5        Photographs                       46

18    Exhibit 6        Photo                             48

19    Exhibit 7        Video                             54

20    Exhibit 8        Affidavit of Stephen Melia        –

21    Exhibit 9        Report by Stephen Melia          77
                       Dated 2/16/2022
22

23    Exhibit 10       Testimonial History             78
                       of Stephen Melia
24

25    Exhibit 11     Updated Curriculum Vitae          78
                     for Stephen Melia
```

Stephen Melia

5

1                          EXHIBITS

2

    NO.            DESCRIPTION                      PAGE
3

4   Exhibit 12    S. Melia Consulting, LLC,          83
                  Invoice Dated 2/17/2022
5

6   Exhibit 13    Photo                             103

7

8

9              REQUESTED DOCUMENTS/INFORMATION

10

11  NO.            DESCRIPTION                   PAGE/LINE

12  Exhibit 10    Testimonial History           78 / 14
                  of Stephen Melia
13
    Exhibit 11    Updated Curriculum Vitae       78 / 23
14                for Stephen Melia

15

16

17

18    CERTIFIED QUESTIONS/INSTRUCTIONS NOT TO ANSWER

19  NONE

20

21

22

23

24

25

Stephen Melia

6

1                   P R O C E E D I N G S
2                  THE VIDEOGRAPHER:  We can go on the
3    record at 2:03 p.m.
4                      (Witness sworn.)
5                  THE COURT REPORTER:  Can you, please,
6    state where you are located, city, state and county.
7                  THE WITNESS:  Yes.  It is in Forney,
8    F-O-R-N-E-Y, Texas, and that is in Kaufman County.
9                  THE COURT REPORTER:  Okay.  And I am
10   Christie Moss.  I'm the court reporter.  I'm located
11   in Fort Worth, Texas, Tarrant County.
12                  Counsel, you may proceed.
13                      STEPHEN MELIA,
14   having been first duly sworn, testified as follows:
15                      EXAMINATION
16   BY MR. WILLIAMS:
17        Q.    Good afternoon, sir.
18        A.    Good afternoon.
19        Q.    Can you, please, state your name for the
20   record.
21        A.    Yes.  Stephen Melia.
22        Q.    And when I say the incident, can we agree
23   that I'm talking about Nancy Castro's trip-and-fall
24   that happened on February 25th, 2020 at the Walmart
25   gas station in Universal City, Texas?

Stephen Melia

7

1     A.     Yes.

2     Q.     And when I say Walmart, can we agree that

3 I'm referring to the Walmart gas station that's

4 located at 510 Kitty Hawk Road in Universal City,

5 Texas?

6     A.     Yes.

7     Q.     Have you ever worked at Walmart or Sam's

8 Club?

9     A.     Yes, I have.

10    Q.     When did you first start working there?

11    A.     It was in 1984 when I first was hired on

12 with Walmart.

13    Q.     How many years total did you work for them?

14    A.     With Walmart Stores, Inc., which included

15 the -- the Walmart store format as well as Sam's Club

16 division, it was 31 years.

17    Q.     What did your role consist of whenever you

18 first started out with them?

19    A.     Well, initially, started working in the

20 stores at -- at the age of 19 and was just a general

21 stocker, cart attendant, associate to assist the

22 store on a part-time basis.  Through the years it

23 evolved into newer elevated positions to an assistant

24 manager within a store and then to a district loss

25 prevention supervisor throughout my career, remainder

Stephen Melia

8

1  of the time was spent in the safety and loss

2  prevention or SF protection division for Walmart and

3  Sam's.

4        Q.    Now, you talked a little bit about a loss

5  prevention director.

6              Did you get promoted to a regional

7  loss prevention director?

8        A.    Yes.  I was promoted, I believe, in 1995

9  from a district LP manager to a regional loss

10  prevention director.

11       Q.    And what does that role consist of?

12       A.    All of the aspects of -- of loss prevention

13  in the role as Walmart defined it involved every

14  aspect of providing a safe environment for the

15  customers and the associates, investigating incident

16  or accident claims, ensuring stores were maintaining

17  safety within the guidelines, as well as the more

18  traditional loss prevention aspect of conducting

19  internal and external investigations, audits,

20  reviewing general operational procedures within

21  the -- within the stores.

22       Q.    What does accident prevention mean?

23       A.    It simply states the process of knowing

24  your environment, assessing the environment for any

25  known risks and then taking steps to mitigate or

Stephen Melia

9

1  correct unsafe conditions to prevent an incident from

2  happening, obviously, before it occurs is the

3  objective.

4      Q.    And were you in charge of preventing

5  accidents and mitigating unsafe conditions?

6      A.    Well, it's certainly everyone's

7  responsibility, and in my role it would have been in

8  the area of teaching, leading, directing, correcting,

9  situations, be it a -- a process breakdown or a -- a

10  new risk that may be identified that we want to

11  ensure we have compliance, adequate measures in place

12  within the store.  So as my position developed over

13  the years from a store level to a district to

14  regional level, of course, that scope expanded into

15  traveling to the store locations, meeting with

16  management teams, safety teams, to not only teach and

17  educate but also inspect the premises and -- and

18  ensure that procedures were being followed.

19      Q.    Did you teach and educate Walmart employees

20  on how to prevent customers from tripping over rugs?

21      A.    It would have been one of the standard

22  expectations, if you will, when I would go to a store

23  for a -- a -- a visit certainly would look at a

24  number of things, slip-and-falls being one of them,

25  or I should say the risk of, so that would include

Stephen Melia

10

1  the entrances.  Of course, it'd really start in the

2  parking lot, from the parking lot to the entrance

3  doors, all the way to the back room just to ensure

4  safe standards were being followed in relation to the

5  floor conditions.

6      Q.   And do you remember what you taught about

7  how to -- or excuse me.

8           Do you remember what you taught about

9  how to prevent customers from tripping over rugs to

10  these Walmart employees?

11     A.   Well, in a -- in a general sense, I mean,

12  certainly training, and -- and over time procedures

13  are developed and -- and improved, if you will.  But

14  in -- in the general sense over the years it has

15  always started with an awareness certainly of what

16  the procedure is that is expected.  And by the

17  awareness is the observation to ensure that the

18  floors are inspected as part of the -- the routine

19  of -- of maintaining a safe floor environment if it

20  involved elevation changes or going from a carpeted

21  area to a -- a tile area or from a mat that may be

22  placed on the floor to a tile area.  So there were a

23  number of expectations from a safety professional

24  that you would look at, and then, of course, teach

25  and train to -- to those expectations.

Stephen Melia

11

1    Q.    After that role did you get promoted to

2    security services director?

3    A.    I did.  It was a lateral move.

4              THE COURT REPORTER:  Hold on.  Hold on

5    one second, sir.  Sir, one second.

6              Mr. Williams, you cut out that whole

7    question.

8              MR. WILLIAMS:  Oh.

9              THE COURT REPORTER:  So if you can

10   reask it.  I -- I -- I -- I just got that you did

11   promote, promoted to.

12             MR. WILLIAMS:  Beth, Evan, you guys

13   having that same audio issue?

14             MR. PATTERSON:  No.  I heard you.

15             MS. HERRERA:  Mine was okay.

16             THE COURT REPORTER:  Okay.

17             MR. WILLIAMS:  Okay.  I'll -- I'll

18   just reask it then.

19   Q.    (BY MR. WILLIAMS)  Sir, did you get

20   promoted to security and services director?

21   A.    Yes, I did.

22   Q.    And what did that role consist of?

23   A.    That role involved more of the security

24   functions to support all of the Walmart stores, Sam's

25   Clubs and distribution centers with the

Stephen Melia

12

1   implementation of closed-circuit TV, the procurement

2   of the items, the installation through our in-house

3   or through third-party contractors, so it was more of

4   the physical security, premise's security from that

5   perspective.

6        Q.    And when did you get promoted to that

7   position?

8        A.    Probably need to refer to my resume if I

9   can grab it here.

10            That was in, let's see, summer of

11   transition from a regional loss prevention role in

12   1999, and again, as more of a lateral move over to

13   the security services director, and that was for 1999

14   to 2001.

15       Q.    Did you testify on behalf of Walmart during

16   that time?

17       A.    I have testified on behalf of Walmart in

18   various capacities over my years.  I don't have a --

19   a recollection of the specific years or -- or

20   anything of that nature, but that would have been one

21   of my responsibilities at that time, so likely the

22   answer would be, yes.

23       Q.    And when Walmart prepared you to testify on

24   their behalf did they teach you about when a rug is

25   safe or unsafe?

Stephen Melia

13

1          MS. HERRERA:  Objection, form.

2          THE WITNESS:  Yeah.  I -- I wouldn't

3    recall any of the specifics.  Again, the -- the

4    deposition testimony certainly would have been --

5    relate to the facts in the case and in giving factual

6    testimony based on whatever the -- the case may have

7    involved.

8       Q.   (BY MR. WILLIAMS)  And how long were you in

9    this role for?

10      A.    I was in that role for about two years,

11   and -- and then moved into the role of director of

12   security and alarm services until 2003.  So the

13   transition, essentially, went from leading and

14   directing the -- the premise's security, CCTB,

15   procurement and installation to taking on additional

16   responsibility for the Walmart corporate alarm

17   division which then became the security and alarm

18   services, so it was really combined and elevated to

19   that next level of supervision of that -- of that

20   entire grate [SIC] for the security and the alarm

21   division.

22      Q.    And whenever you were in that role did you

23   learn about how the cameras and security footage in

24   Walmart worked?

25      A.    Yes.  Of course, I was familiar with it

Stephen Melia

14

1   prior to that but more directly involved in the

2   aspect of purchase and installation.

3       Q.    And did you learn about the quality of

4   video footage that those cameras take for their

5   security footage?

6       A.    I would say, yes, in the general sense.  I

7   was not the technical expert.  There were people that

8   worked for me that have a greater understanding of

9   the technical aspects.  It certainly has evolved from

10  black and white cameras to color cameras and now

11  digital and IP cameras, so -- but familiar enough,

12  but not -- not an expert in those areas.

13      Q.    How long were you in the role -- or how

14  long were you in that role for?

15      A.    So the two combined roles as security

16  service director and director of security and alarm

17  services, 1999 to 2003, so about four years.

18      Q.    And after that did you get promoted to the

19  regional director of safety and asset protection as

20  well.

21      A.    That would have been, I would say, more of

22  a lateral move again, just different title, headings,

23  but the basic same level of supervision, if you will,

24  (Zoom failure) work for the same (Zoom failure)

25  division and learned aspect of (Zoom failure) and

Stephen Melia

15

1    then as the regional director of asset protection

2    safety and compliance in 2003, which, essentially,

3    evolved from the older terminology of loss prevention

4    or safety and loss prevention.

5        Q.    And what did your job as the regional

6    director of safety consist of?

7        A.    So in that role it was, again, responsible

8    for a number of Sam's Clubs.  At different times it

9    was different geographic locations across the country

10   and traveling to those locations with operation vice

11   presidents and other members of the team to visit the

12   Sam's Club locations, meet with the teams, inspect

13   the premises, of course, and appreciate them for

14   doing a good job, as well as ensuring corrections

15   were in place if something was needing to be

16   addressed in the area of safety or -- or asset

17   protection or compliance.

18       Q.    Now, all total, about how many stores were

19   you responsible for the customer safety?

20       A.    Well, I would say that there certainly were

21   expectations that it started at the store level with

22   the associates and the assistant manager, store

23   manager, on up the line, so it was a -- a combined

24   effort, but my overall responsibility was to help

25   lead, teach and direct those leaders and visit the

Stephen Melia

16

1    stores.  It -- it would range from 100 stores.  I

2    think the most I had at -- at one time was a little

3    over 200 Sam's Clubs in my area of responsibility.

4        Q.    How long were you in that role for?

5        A.    I was with Sam's from 2003 until 2015.

6    Some of that time in Bentonville, Arkansas, and then

7    from 2010 to 2015 was here in the Dallas/Fort Worth

8    area.

9        Q.    And what were you doing from 2010 to 2015?

10       A.    So I was the senior director of asset

11   protection, safety compliance, again, for Sam's

12   Clubs.  Reorganization of the company, I believe at

13   one point, I had half of the company, mostly from the

14   southern territories from California to Florida

15   and -- and the number of Sam's Clubs, and, of course,

16   in those areas and -- same basic expectation,

17   leading, directing teams in -- in the field of

18   operations and the asset protection teams to ensure

19   we were maintaining safe, secure premises and

20   following compliance procedures.

21       Q.    So you went from the regional director of

22   safety to the senior director of safety; is that

23   fair?

24       A.    That's correct.

25       Q.    And all total about how many stores did you

Stephen Melia

17

1  oversee regarding customer safety whenever you were

2  the senior director of safety?

3     A.    So towards the end it was -- it was

4  continuing to evolve, but it went from about 200

5  Sam's Clubs to -- to having half of the company, so

6  about 300 Sam's Clubs there towards the later part

7  of, you know, the time that I was with Sam's in 2015.

8     Q.    And are the safety standards the same in

9  Walmart and Sam's Club?

10    A.    Well, there certainly are differences

11 because of the nature of the business involving Sam's

12 and -- and the type of -- size of merchandise and --

13 and the set up of the facility.  But, in general,

14 safety procedures in many cases in retail and

15 grocery, you know, entities where the public is

16 invited, the same standards apply in relation to

17 customer safety, preventing slips, trips, falls from

18 occurring in the standards that go with, you know,

19 providing that level of awareness, notification

20 and -- and prevention of those types of incidents I

21 would say were very -- very consistent with -- with

22 Walmart and Sam's and -- and within the industry.

23    Q.    And would you say that Walmart safety

24 standards and Sam's safety standards are the same or

25 similar whenever it comes to trip-and-fall prevention

Stephen Melia

18

1  or entrance mats?

2      A.    Yes, I would say that is correct.

3      Q.    Okay.  And why would you say that?

4      A.    Well, just certainly my knowledge of

5  expectations there's, you know, a very defined

6  location of -- of an entranceway.  While you may have

7  different flooring materials you certainly have

8  procedures, and Walmart and Sam's were very similar

9  in the procedures in the placement of the floor mats

10 and the purpose of the floor mats during inclement

11 weather, or otherwise, to ensure that the transitions

12 from outside of the facility to the inside provided a

13 safe transition for customers --

14     Q.    Are you familiar with the general industry

15 safety standards for trip-and-fall prevention?

16     A.    I am, yes.

17     Q.    How so?

18     A.    Well, certainly the experience obtained

19 over the years and attending numerous conferences,

20 understanding OSHA expectations for floor safety,

21 and, obviously, OSHA deals with employee safe work

22 practices, but many of the same standards in safe

23 walking conditions apply to areas where you have

24 customers walking in -- in generally the same area,

25 so entrance doors, for example.  So the standards are

Stephen Melia

19

1  fairly consistent and common in the areas of
2  entrances, entrance mats that are utilized.
3  Certainly there are companies that provide mats for
4  stores and businesses to provide that level of
5  consistency across an organization.  And, of course,
6  some stores may utilize their own or purchase their
7  own mats.  But the standards are generally there and
8  aligned to, again, provide a safe walking surface
9  then transition, for speaking specifically as in this
10  case, of an entrance to a facility to ensure that
11  safe transition from outside to inside the store.
12      Q.    And are you here today to offer your
13  opinions as a safety expert on trip-and-fall
14  prevention?
15      A.    Yes, I am.
16      Q.    And I'm going to briefly share my screen
17  with you.  Okay.  Mr. Melia, can you see my screen
18  fine?
19      A.    Yes, I can.
20      Q.    Is this a copy of your CV?
21      A.    It is.  It's actually an older copy, but it
22  is, I think, the one I would have submitted at the
23  time for this case.
24      Q.    Has your CV changed any recently?
25      A.    It has.

Stephen Melia

20

1    Q.    How so?

2    A.    So from my last tenure there at Gateway

3    Church as director -- as executive director of safety

4    services I have started my own consulting business in

5    2015.  I don't believe that's listed on there.  So

6    in -- in that role as the position in which -- as an

7    independent security consultant would be providing

8    review -- documentation review, providing opinions

9    for litigation -- litigation support in areas of

10   premise's safety and security.  So that would be

11   listed there.  And I can certainly send an updated

12   copy.  But that's one area over the past seven years

13   that I've maintained S dot [SIC] Melia Consulting.

14   In that capacity I've also worked as an independent

15   security contractor for my church through a third

16   party, and then most recently, as of about three or

17   four weeks ago, started a new position as a director

18   of asset protection for a grocery -- a grocery store

19   that has stores in Texas, Arkansas, Oklahoma and

20   Louisiana.

21   Q.    Well, congratulations.

22   A.    Thanks.

23   Q.    When answering my questions today you agree

24   you will only give an answer if it's to a reasonable

25   degree of professional certainty?

Stephen Melia

21

1    A.    Yes.

2    Q.    Who were you hired by in this case?

3    A.    I was hired in this case to give

4  consultation -- hired by the DeSouza Law Firm.

5    Q.    And what for?

6    A.    To review the matter of Nancy Castro vs.

7  Walmart Stores and Cintas in relation to a

8  trip-and-fall incident that occurred at the Walmart

9  fuel station there in Universal City, to provide

10 review as well as testimony in the event that it was

11 necessary, to offer opinions related to my

12 conclusions of this incident.

13   Q.    And are your opinions regarding

14 trip-and-fall prevention?

15   A.    Yes, they are.

16   Q.    And would your opinions today be any

17 different if the Defendants or Walmart hired you?

18             MS. HERRERA:   Objection, form.

19             THE WITNESS:   No.  I base my review on

20 the facts of the case, as well as the industry

21 standards, what's not only published but what's known

22 to me in my experience, and those -- those would not

23 change regardless of which -- defense or -- or

24 plaintiff counsel would have retained me.  The facts

25 are as I would state them and offer opinions in this

Stephen Melia

22

1    case.

2         Q.    (BY MR. WILLIAMS)   Is there a method that

3    you use to arrive at your opinions and conclusions?

4         A.    The terminology that I apply is, of course,

5    based on the experience, but also based on the

6    general OSHA industry standard with looking at a root

7    cause analysis in determining not just what happened.

8    So, in other words, not just to say someone tripped

9    and fell, and not just to say someone tripped on a

10   mat and fell, but to go further into examining the

11   facts and defining it to the point where you really

12   establish the point where the risk was generated.

13   And -- and I've done that many times over the years

14   to -- certainly as OSHA would state in their

15   documentation, I believe I cited in one of my

16   references, that your goal is to identify that root

17   cause and put procedures in place to ensure that it

18   doesn't occur again.

19        Q.    Is it standard practice in your industry to

20   do a root cause analysis?

21        A.    It is, yes.

22        Q.    Why is that?

23        A.    Well, again, as I was giving the example if

24   you -- if you just take an incident and stop at the

25   initial conclusion you may not find the actual cause

Stephen Melia

23

1  agent or the point in which the risk was originated

2  that needs to be corrected, and so it's very common

3  in -- in investigative work, which accident review or

4  accident investigation would be considered, to ask

5  all of the questions until you are at a point where

6  you have that -- that conclusion of what caused the

7  risk.

8       Q.    Did you do a root cause analysis in this

9  case?

10      A.    I did.

11      Q.    And is your root cause analysis repeatable

12 by a peer in your industry?

13      A.    Yes.

14      Q.    And how did you do a root cause analysis in

15 this case?

16      A.    Again, from the study of the facts that

17 were provided in this case, that being the incident

18 report provided by Walmart, the photographs, the

19 video, and then testimony, witness statements, et

20 cetera.  Again, a baseline of what the facts are.

21 And from that begin to examine the points of risk

22 throughout that process and determining what I would

23 consider to be the root cause of -- of the incident

24 and what more so would have likely prevented the

25 incident from occurring had additional procedures

Stephen Melia

24

1   been taken.

2        Q.    And so you learned the industry standards,

3   learned the facts and determined the cause of

4   incident?

5        A.    Yes.

6        Q.    Now, I want to go over those industry

7   standards with you first.  Okay?

8              Are you familiar with safety first?

9        A.    Well, safety first is generally a slogan

10  that a lot of companies adopt, and -- and sometimes

11  in the construction industry, and certainly in the

12  retail and other sectors, but certainly familiar with

13  the slogan.

14       Q.    What does safety first mean to you?

15             MS. HERRERA:  Objection, form.

16             THE WITNESS:  Well, it certainly means

17  that safety is an important factor in any business,

18  providing a safe environment for customers, for

19  associates.  And so, again, it's a -- very much a --

20  a -- a tag line, if you will, in the safety industry

21  and in various other industries to ensure that it is

22  creating an awareness for businesses to operate in a

23  safe manner.

24       Q.    (BY MR. WILLIAMS)  All right.  And as a

25  safety expert do you have an opinion on what safety

Stephen Melia

25

1  first means?

2             MS. HERRERA:  Objection, form.

3             THE WITNESS:  Again, I -- I think it

4  could be defined in a number of different industries,

5  but in -- in my opinion and experience it is

6  certainly designed to elevate the -- the level of

7  participation and expectation to maintain a safe

8  environment regardless of what else may be going on,

9  and taking those steps to place safety above other

10  factors that -- you know, that may also be competing

11  for attention, if you will, but that safety is a top

12  priority and in the location of the industry in which

13  is using that slogan.

14       Q.   (BY MR. WILLIAMS)  So you would say that

15  you put safety above everything else?

16             MS. HERRERA:  Objection, form.

17             THE WITNESS:  Yeah.  I mean, my

18  opinion, and, obviously, what I've seen and taught

19  and reviewed is that safety is a top priority and

20  that safety first (unintelligible) that -- that

21  slogan to ensure that that is easily reviewed and an

22  easy reminder for people.  I understand that -- that

23  safety is -- is more important than anything else so

24  that when you have the opportunity to correct a

25  hazard that you stop and correct the hazard.  So

Stephen Melia

26

1  before you go and, you know, take a -- a lunch break,

2  or before you go and stock your shelf, for example,

3  if you see an unsafe condition, safety first.  And --

4  and that's the premise of having that awareness

5  campaign, if you will, for -- for companies to ensure

6  that is in place.

7        Q.    (BY MR. WILLIAMS)  Do you have an opinion

8  on whether Walmart must put safety first or safety

9  above everything else?

10              MS. HERRERA:  Objection, form.

11              THE WITNESS:  Well, it's certainly a

12  practice that is put into place, and so I guess my

13  opinion is that safety is a priority and would be

14  first above taking care of other task items, if you

15  will.

16        Q.    (BY MR. WILLIAMS)  Why do you believe that?

17        A.    Well, certainly, I'll speak to the

18  experience at Walmart, and some of the other

19  businesses would apply the same principle, is you

20  just don't want to injure people, whether it's your

21  customers, whether it's your associates, you want

22  them to be able to -- to walk out of the store the

23  same way they came in.  Again, whether they're

24  working or shopping you -- you want to maintain

25  safety for the benefit of their -- their personal

Stephen Melia

27

1   health and their personal safety.

2        Q.    Do you have an opinion on whether Walmart's

3   day-to-day business is more important than the safety

4   of its customers?

5                  MS. HERRERA:  Objection, form.

6                  THE WITNESS:  Well, you know, my

7   opinion would be that -- that it is interwoven, or

8   should be interwoven, into the day-to-day business,

9   so it is as important as anything else that -- that

10  is to be done, and safety, whether it's a risk of a

11  [SIC] accident or incident or violent situation is a

12  top priority above anything else.

13       Q.    (BY MR. WILLIAMS)  Now, should Walmart ever

14  place profits over safety?

15                 MS. HERRERA:  Objection, form.

16                 THE WITNESS:  Again, I would say that

17  that is not a good business practice for any company

18  to have unsafe conditions that exist and in -- you

19  know, with the opportunity to save a -- a dollar, if

20  you will, which is my -- my experience and -- and

21  understanding.

22       Q.    (BY MR. WILLIAMS)  And are you familiar

23  with the industry standards for maintaining a safe

24  entrance mat?

25       A.    I am, yes.

Stephen Melia

28

1    Q.    I'm going to show you what's marked as
2  Plaintiff's Exhibit 2.
3              MR. WILLIAMS:   And then for the record
4  I marked his CV as Plaintiff's Exhibit 1.
5    Q.    (BY MR. WILLIAMS)  Okay.  Mr. Melia, do you
6  see what I'm marking as Plaintiff's Exhibit 2?
7    A.    Yes.  Is that the -- yeah, ASTM standard,
8  yes.
9    Q.    Now, is -- you said the ASTM standard.
10             Is this document the American Society
11  for Testing and Material Standard?
12    A.    Yes, that's correct.
13    Q.    Okay.  And are you familiar with this
14  standard?
15    A.    I am.
16    Q.    And is this more of the industry standards
17  regarding a safe entrance mat?
18    A.    Yes.  There is a section in this document,
19  I think it starts at 5.4, and that discusses mats and
20  runners as they are often referred to.
21    Q.    And what does the applicable industry
22  standard say regarding the American Society for
23  Testing and Materials?
24             MR. PATTERSON:   Form.
25             THE WITNESS:  Well, I can certainly

Stephen Melia

29

 1   read from the document in front of me as well, but

 2   expectations, the standards that apply here, are to

 3   include entrance -- or -- or mats and runners at the

 4   entrance.  Obviously, inclement weather is one of the

 5   key focus points because you have not only a -- a

 6   transition potentially from outside to inside, but

 7   the mats are designed to provide that number of steps

 8   and transition if you're bringing water into a store,

 9   you know, based upon precipitation, whether it's

10   rain, sleet, snow, et cetera.  So many of these

11   standards are designed for that.  There's points in

12   there in relation to how they are to be maintained to

13   not create pedestrian hazards in a specific point.

14   If you want me to continue.  I'm sorry.

15       Q.   (BY MR. WILLIAMS)  Yeah.  Let me just

16   highlight this for you real quick.

17            Do you see the section that's titled

18   5.46?

19       A.   Yes.  That -- that was the point I was

20   going to -- yes, sir.

21       Q.   Okay.  Can you read that standard for me,

22   please?

23            MS. HERRERA:  Objection, form.

24            THE WITNESS:  Sure.  5.4.6 states,

25   mats, runners and areas rugs shall be maintained so

Stephen Melia

30

1   as to -- it says to -- I'm sorry -- to not create

2   pedestrian hazards, mats, runners and area rugs shall

3   not have loose or frayed edges, worn areas, holes,

4   wrinkles or other hazards that may cause a trip

5   occurrence.

6       Q.    (BY MR. WILLIAMS)  Do you agree with the

7   standard?

8       A.    I do.

9                 MS. HERRERA:  Objection, form.

10      Q.    (BY MR. WILLIAMS)  Why is that?

11      A.    Well --

12                MS. HERRERA:  Objection, form.

13                THE WITNESS:  -- it -- it's a standard

14  --

15                MR. PATTERSON:  (Zoom failure), Lucas?

16                MR. WILLIAMS:  What's that?

17                MS. HERRERA:  You want an agreement

18  that one objection's good for all.

19                MR. WILLIAMS:  Sure.  I don't think it

20  matters much.

21                MS. HERRERA:  Agreed for Walmart

22  Defendants [SIC].  I -- I did not agree then [SIC].

23                MR. WILLIAMS:  Yeah.  Yeah.  It

24  doesn't matter.  You can -- it's -- but, sure.

25  It's -- it's fine.

Stephen Melia

31

1      Q.     (BY MR. WILLIAMS)  Anyways, let me reask
2  that question.
3              Why do you agree with that statement,
4  Steven -- or Mr. Melia?
5      A.     Well, the standard -- procedures and
6  standards are generally created due to a known
7  history of incidents occurring, and so my agreement
8  with it is certainly in a -- the publication that
9  provides direction and clarity for the industry in
10  relation to this, and also cite my experience in
11  knowing risks that can occur when a -- mats or carpet
12  areas are not maintained or they may have loose or
13  frayed edges or curled.  In addition to mats that
14  are -- are not properly placed at an entrance during
15  inclement weather leaves that risk of some slip
16  occurrence more prevalent in areas where you don't
17  have a -- a mat transition from outside to inside
18  during inclement weather.
19      Q.     Can you see my screen fine?
20      A.     I can.
21      Q.     Do you see that I'm showing you what's been
22  marked as Plaintiff's Exhibit 3?
23      A.     Yes, I can see that.
24      Q.     Do you see that this document is the
25  American National Standard on commercial entrance

Stephen Melia

1    matting?

2         A.    Yes, I see that.

3         Q.    And do you see at Section 8.10 of this

4    standard?

5         A.    I do, yes.

6         Q.    And can you read that standard to me,

7    please, on the left side of the table?

8                   MS. HERRERA:  Objection, form.

9                   THE WITNESS:  It's in reference to

10   mats.  And the -- the point made here in 8.10 is mats

11   may buckle and not lay flat while in service where

12   traffic may catch and curl the border or the end of

13   the mat, and, obviously, all those create hazards.

14   And it cites a number of solutions for ensuring that

15   their edges are not curled or cannot be at risk of

16   moving as either -- and my opinion I'm not reading

17   directly from this, but as carts roll over areas, or

18   people walk over areas, to ensure that the mats

19   remain in place and that the edges are not curled

20   or -- or worn.

21        Q.    (BY MR. WILLIAMS)  Mr. Melia, do you see

22   what I've just highlighted?

23        A.    Yes, I do.

24        Q.    Okay.  Can you read that to me, please?

25        A.    Yes.

Stephen Melia

33

```
 1                  MS. HERRERA:  Objection, form.
 2                  THE WITNESS:  8.10.  Mats not lying
 3    flat.  Where mats do not lie flat the mat shall be
 4    secured to the floor so that it lies flat or is
 5    removed from service.
 6         Q.    (BY MR. WILLIAMS)  And do you agree with
 7    this standard?
 8                  MS. HERRERA:  Objection, form.
 9                  THE WITNESS:  Well, I -- I don't
10    necessarily agree with it in 100 percent of the
11    cases.  I believe there are environments and
12    industries that have to evaluate the best course of
13    action for placing a mat in determining how that mat
14    should be placed which could include it being secured
15    mechanically or otherwise or whether the mat should
16    be easily placed and removed, again, at different
17    times.  So there are -- there's a -- a (Zoom failure)
18    to be made, but certainly I would not say across the
19    board.  It would be dependent upon the environment or
20    location where the mat is placed.
21         Q.    (BY MR. WILLIAMS)  Do you agree that a -- a
22    mat should lie flat or it should be removed from
23    service?
24         A.    That I agree with, yes.
25         Q.    And why do you agree with that?
```

Stephen Melia

1          MS. HERRERA:  Objection, form.

2          THE WITNESS:  Well, if -- if the mat

3   cannot be -- if it's not lying flat or -- and, again,

4   it's one of the reasons you have to conduct a [SIC]

5   evidence-based review and get to the root cause

6   analysis, if it's not lying flat and the -- the edges

7   or any portion of the mat is rippled, curled, edged

8   in a way that creates a trip hazard, then certainly

9   if it cannot be laid flat and cannot be secured then

10  the next course of action is to remove that mat

11  and -- and place a more appropriate mat in its place

12  if it is deemed necessary.

13      Q.   (BY MR. WILLIAMS)  Now, based on these

14  standards when does an entrance mat become a trip

15  hazard?

16          MS. HERRERA:  Objection, form.

17          THE WITNESS:  Well, it certainly would

18  become a trip hazard if it is not laid flat in -- in

19  the most simplistic terms.

20      Q.   (BY MR. WILLIAMS)  Now, do you know if

21  Walmart has its own internal standard for floor mats?

22      A.   I -- I do, yes.

23      Q.   Do you see that I'm on what's been Bates

24  stamped as Walmart 143?

25      A.   Yes.

Stephen Melia

35

1    Q.    And do you see that this document is marked

2  as Plaintiff's Exhibit 4?

3    A.    I do see that, yes.

4    Q.    Are you familiar with this standard?

5    A.    I am, yes.

6    Q.    Is this Walmart's standard for maintaining

7  the front end of its stores?

8    A.    It is the standard operating procedures,

9  yes.

10   Q.    And what does the standard operating

11 procedure mean here?

12   A.    It basically provides our -- or provides

13 the management and the associates in the store with

14 the expectation and the understanding of what that

15 particular topic is addressing.  In this case it's

16 the -- the front end and the vestibule area

17 specifically to create a safe environment for the

18 entrance and exits.

19   Q.    All right.  Do you see Line 2 of this

20 standard operating procedure?

21   A.    I do.

22   Q.    All right.  Is Walmart supposed to correct

23 all trip hazards at the front of its store?

24   A.    Yes.  Identify, correct any type of slip,

25 trip-and-fall hazard would be the -- the standard

Stephen Melia

1    expectation.

2         Q.    And you see Line 3, Walmart's procedure?

3         A.    I do.

4         Q.    Is Walmart supposed to ensure that its mats

5    lie flat on the floor?

6         A.    Yes.

7         Q.    And why is that?

8         A.    That goes back to the earlier standards

9    that we referenced.  It's -- many of the standards

10   from my experience that -- that Walmart, and many

11   other retailers for that matter, apply are gained

12   through national standards, and -- and so the -- the

13   fact that this is very consistent with the standards

14   we referenced earlier is not surprising and -- and is

15   expected to ensure you have safe walking and floor

16   conditions.

17        Q.    Now, if Walmart notices that a mat is not

18   lying flat what is it supposed to do?

19             MS. HERRERA:  Objection, form.

20             THE WITNESS:  Well, certainly the

21   identification is -- is critical, but once it's

22   identified even more critical is the immediate

23   correction.  So to answer your -- your question it is

24   to correct the unsafe condition or remove the unsafe

25   condition.

Stephen Melia

37

1    Q.    (BY MR. WILLIAMS)  And right here in the
2  standard operating procedure Walmart even instructs
3  its employees to discard and replace the floor mat;
4  is that right?
5              MS. HERRERA:  Objection, form.
6              THE WITNESS:  Yes.
7    Q.    (BY MR. WILLIAMS)  Why is Walmart supposed
8  to do that?
9              MS. HERRERA:  Objection, form.
10             THE WITNESS:  (Unintelligible) the
11  point I mentioned earlier about the goal is to -- to
12  maintain a safe environment and to not create any
13  hazards that would cause a person to be injured while
14  shopping in the store.
15    Q.    (BY MR. WILLIAMS)  Now, based on your
16  knowledge and experience working at Walmart for more
17  than 30 years do you know if Walmart employees are
18  supposed to look for these trip hazards?
19             MS. HERRERA:  Objection, form.
20             THE WITNESS:  It -- it is an
21  expectation, again, safe -- to place safety first
22  that as they're walking in their general area of work
23  or going to and from that they would be observant to
24  and look for any unsafe condition, not just the floor
25  or mats but any object (Zoom failure) that may (Zoom

Stephen Melia

38

1   failure.

2       Q.   (BY MR. WILLIAMS)  Okay.  So as they're

3   walking to and from wherever they are walking to and

4   from they're supposed to be looking for unsafe

5   conditions?

6       A.   Yes.  As a general rule for all associates

7   and management.  Certainly there are more specific

8   detailed positions generally referred to as -- as

9   maintenance that would more specifically be looking

10  for risks or hazards that may be evident, spills, et

11  cetera, that they would be responsible for

12  identifying and cleaning up or being called to a

13  location to clean the area with the proper equipment.

14      Q.   Now, how is Walmart and its employees

15  supposed to look for these hazards?

16               MS. HERRERA:  Objection, form.

17               THE WITNESS:  Well, it -- it starts

18  with training and awareness, and that, you know,

19  expectation of looking not just in one area but

20  wherever you may be traveling in -- in throughout the

21  store, that your awareness [SIC] and alert to unsafe

22  conditions.  And that is -- again, begins with

23  documentation such as standard operating procedures,

24  training that takes place, communication through

25  weekly meetings, et cetera, to instill that knowledge

Stephen Melia

39

1    and expectation in -- into the employees that work at

2    a location.

3         Q.    (BY MR. WILLIAMS)  What's a safety sweep?

4         A.    A safety sweep in Walmart terms and in --

5    really in -- in the industry it [SIC] used by a

6    variety of -- of companies is to do almost exactly

7    what I described, it's to not necessarily sweep with

8    a broom, as it's often sometimes thought of, it is to

9    visually walk through areas to identify risks and is

10   oftentimes done on a periodic basis, or it can be

11   announced by management over -- over a PA system to

12   conduct a safety sweep, and not uncommon in the

13   industry.  Again, it's that reminder to be vigilant

14   in identifying and addressing unsafe conditions in a

15   facility.

16        Q.    Now, how often are Walmart employees

17   supposed to do a safety sweep and look for these trip

18   hazards?

19                  MS. HERRERA:  Objection, form.

20                  THE WITNESS:  Well, it has certainly

21   changed over the years, and I have, obviously, been

22   out of specific day-to-day operations of Walmart for

23   the past seven years.  To my knowledge and

24   understanding that is a -- a routine that is

25   generally expected anywhere from every 30 minutes to

Stephen Melia

40

1  every hour for associates to stop from the -- the

2  task at hand and -- and look and view their area as

3  termed as a safety sweep.  So that is the

4  understanding that I have at this time.

5       Q.   (BY MR. WILLIAMS)  And you believe doing a

6  safety sweep every 30 minutes to an hour is a safe

7  practice?

8                 MS. HERRERA:  Objection, form.

9                 THE WITNESS:  I believe it's a -- a

10 good standard in the industry, in addition to what we

11 discussed earlier with every associate, management,

12 regardless of the time of day, but if they're walking

13 to and from that they are observant to and looking

14 for risks and correcting risks.

15      Q.   (BY MR. WILLIAMS)  So -- so whenever you

16 were talking I asked how they're supposed to identify

17 trip hazards and two of the things I've got are that

18 they're supposed to do safety sweeps and look for

19 trip hazards while they're walking; is that fair?

20                 MS. HERRERA:  Objection, form.

21                 THE WITNESS:  That is correct.  That

22 is correct.

23      Q.   (BY MR. WILLIAMS)  Now, when there is a mat

24 that is not flush with the floor what is Walmart

25 supposed to do?

Stephen Melia

1                      MS. HERRERA:  Objection, form.
2                      MR. WILLIAMS:  Did we lose him?
3                      MR. PATTERSON:  I think maybe we did.
4                      MR. WILLIAMS:  Well, let me
5      (inaudible).
6          Q.   (BY MR. WILLIAMS)  Let me just reask the
7      question, okay, Mr. Melia.
8                      THE WITNESS:  Stand by.  Let me -- I'm
9      not sure if this is on my end, but I received a
10     notification of a [SIC] Internet signal connection
11     issue.
12                     MR. WILLIAMS:  Let's go off real
13     quick.
14                     THE WITNESS:  Okay.  I -- I'm good.
15                     MR. WILLIAMS:  You're good?
16                     THE WITNESS:  If you-all can hear me,
17     yeah.  But everyone froze and then I lost everyone
18     for a moment.
19         Q.   (BY MR. WILLIAMS)  Okay.  I'm going to
20     reask my question.  Okay?
21         A.   Yes, please.
22         Q.   When there is a mat that's not flush with
23     the floor what is your opinion as to what Walmart is
24     supposed to do?
25                     MS. HERRERA:  Objection, form.

Stephen Melia

42

1            THE WITNESS:  You have really just a

2    few options, maybe two options.  One is reposition

3    the mat to be -- ensure it is flush with the floor.

4    The second option, obviously, is to ensure it is the

5    correct mat for the location, that it's not going to

6    wrinkle or -- or buckle under the weight of shopping

7    carts going in and out, so then the proper mat is

8    important.  And then the last one, obviously, is the

9    removal of a mat if it cannot be laid flat or laid

10   safely on a floor to allow customers to walk over.

11            MR. WILLIAMS:  And what -- what was

12   the basis for that objection?

13            MS. HERRERA:  Relevance.

14       Q.   (BY MR. WILLIAMS)  Do those standards apply

15   in this case?

16       A.   Yes, they -- they do.

17       Q.   And all of those standards we went over,

18   the two standards and Walmart's internal standards,

19   how do they apply in this -- in this case?

20       A.   Well certainly giving direction in what not

21   only is considered the industry standards in --

22   regarding the mats and the proper placement and

23   proper mat, but also Walmart's own standards.  So the

24   importance is that it is clear that the policy and

25   the expectation is would -- and I would say

Stephen Melia

43

1   well-written to the extent that it lays clearly the

2   expectation for the management to follow the

3   execution of that is certainly where a risk can occur

4   when procedures are not followed [SIC].

5       Q.   Now, after you determine these industry

6   standards that apply did you learn the facts of the

7   case?

8       A.   I did.

9       Q.   And what did you learn?

10      A.   I certainly learned from review of the

11  video, as well as the photographs, that this

12  particular mat in question that you see on Page 3 of

13  my report -- I don't know if my report's been

14  introduced yet -- but that the mat was clearly

15  rippled and not laid flat in the photograph, and from

16  the video observation points as well appears that the

17  mat and that location was the cause of Ms. Castro

18  (Zoom failure) --

19              THE COURT REPORTER:  Is he frozen for

20  you-all as well?

21              MR. WILLIAMS:  Yeah.

22              THE COURT REPORTER:  Okay.

23              MS. HERRERA:  Yes.

24              MR. WILLIAMS:  It's not me this time.

25  We're here.  Can you hear us?

Stephen Melia

44

1                    MS. HERRERA:  (Unintelligible).

2                    THE WITNESS:  (Zoom failure).

3                    MR. WILLIAMS:  Yeah.  Yeah.  Yeah.

4     We're here.  Can -- can you hear us?

5                    THE WITNESS:  Are you -- can you hear

6     me?

7                    MR. WILLIAMS:  Yes, sir.  Yeah, I can

8     hear you there.

9                    THE WITNESS:  Lucas, can you hear me?

10                    MR. WILLIAMS:  There -- there you are.

11                    THE WITNESS:  Hello.  Can you hear me?

12                    MR. WILLIAMS:  Yeah.  Yeah.  Your

13    video's cutting in and out on us.

14                    THE WITNESS:  Yeah.  And I -- I

15    apologize.  I could go to my phone if needed.  We --

16    the house is new and the cable company just came out

17    last week and buried the cable and we have had no

18    issues at all until right now, so I apologize.  If we

19    need to -- if I need to try to go to my phone, we

20    can, but hopefully, I'm disconnecting a few other

21    WIFI devices so hopefully that will help.

22                    MR. PATTERSON:  Okay.

23                    MS. HERRERA:  Or sometimes if you do

24    just the audio through your phone it'll give you more

25    bandwidth on your video and it -- it might start

Stephen Melia

45

```
1   working.
2             THE WITNESS:  Okay.
3             MS. HERRERA:  We've -- we've all
4   become Internet savvy over the past couple of years
5   in trying to deal with bandwidth issues.
6             THE WITNESS:  Yeah.  I'm showing a
7   better connection now, but I am -- you guys are still
8   freezing up.
9             MR. WILLIAMS:  Yeah.  Let's say -- do
10  you mind calling in with your phone?  Can you hear
11  us?
12            THE COURT REPORTER:  I'm assuming
13  we're still on the record because the videographer
14  has not gotten us off.
15            THE VIDEOGRAPHER:  We can be off the
16  record.  The recording's been paused, so...
17            THE COURT REPORTER:  Okay.
18            (Short recess taken.)
19       Q.   (BY MR. WILLIAMS)  Mr. Melia, earlier I
20  asked you if you learned the facts of the case; do
21  you remember?
22       A.   Yes.
23       Q.   What did you learn?
24       A.   That Ms. Castro had completed making a
25  purchase at the register and as she was exiting,
```

Stephen Melia

46

1  walking towards the exit door, she tripped and fell.

2      Q.    And how did you learn that?

3      A.    It was through the -- of course, the video

4  in addition into the incident report and the, of

5  course, deposition testimony that was provided from

6  Ms. Castro as to what -- what caused her to

7  trip-and-fall.

8      Q.    And what did she trip-and-fall on?

9      A.    As stated in the Walmart incident report it

10  stated that she tripped and fell on the entrance mat

11  as she was exiting the store.

12      Q.    And did you look at photos of the mat taken

13  after the incident?

14              MR. PATTERSON:  He's gone again.

15              THE COURT REPORTER:  Off the record?

16              MS. HERRERA:  Yeah.

17              MR. WILLIAMS:  Uh-huh.

18              (Short pause in proceedings.)

19              THE VIDEOGRAPHER:  On the record.

20      Q.    (BY MR. WILLIAMS)  Did you look at photos

21  of the mat taken after the incident?

22      A.    I did.

23      Q.    And I'm showing you what's been marked as

24  Plaintiff's Exhibit 5.  Have you seen these photos

25  before today?

Stephen Melia

47

1      A.    Yes, I have.

2      Q.    And you see that it's five photos?

3      A.    Yes.

4      Q.    What do you see in this photo?

5                  MR. PATTERSON:   Form.

6                  THE WITNESS:   It clearly shows a -- a

7    black carpeted mat at the entrance/exit to the -- to

8    the fuel station convenience store.

9      Q.    (BY MR. WILLIAMS)   Can we just call this

10   the mat?

11     A.    Yes.

12     Q.    Do you see any curls on this mat?

13                 MS. HERRERA:   Objection, form.

14                 THE WITNESS:   I do.   I see curls and

15   ripples as I would describe them.

16     Q.    (BY MR. WILLIAMS)   Now, how many curls does

17   it take for a mat to become a trip hazard?

18                 MS. HERRERA:   Objection, form.

19                 THE WITNESS:   Well, it -- it certainly

20   only requires there to be one imperfection of a mat

21   that's not laying flat to become a trip hazard.

22     Q.    (BY MR. WILLIAMS)   And how many curls do

23   you see in this mat?

24                 MS. HERRERA:   Objection, form.

25                 THE WITNESS:   I -- I see at least four

Stephen Melia

48

1  or five.  There's one larger one on the very front of

2  this photo, one directly to the left, a smaller

3  imperfection, and then the sides, each side of the

4  mat, at least from this photograph, appear to have at

5  least two to three ripples along that long edge on

6  each side of the -- the mat that's shown here.

7       Q.    (BY MR. WILLIAMS)  Do you see that I'm

8  showing you what's been marked as Plaintiff's Exhibit

9  6?

10      A.    Yes, I do.

11      Q.    Do you see it's just this exact same photo

12 as the last one we went over except that it has red

13 circles around it?

14      A.    Yes.

15      Q.    Do you see those red circles are where the

16 curls are at?

17      A.    That would be what I was describing as the

18 curls that I was identifying, or the ripples that I

19 was identifying as we spoke earlier.

20      Q.    And how many curls do you see in this mat?

21      A.    Well, again, from the photograph, as I

22 described earlier, the two (Zoom failure) identified

23 as the trip initiated from Ms. Castro and then the --

24 the ones on the side.  If you're asking how many

25 circles I see drawn in this photo, there are seven

Stephen Melia

49

1  circles identified.

2       Q.    So you see seven curls in this mat?

3                 MS. HERRERA:  Objection, form.

4                 THE WITNESS:  Well, there are -- there

5  are certainly seven circles identified.  It is my

6  representation that those are areas of a ripple or

7  a -- a curled section of the mat.

8       Q.    Now, do you have a -- do you have an

9  opinion on whether these curls made this mat a trip

10 hazard?

11                MS. HERRERA:  Objection, form.

12                THE WITNESS:  I do.

13      Q.    (BY MR. WILLIAMS)  And what is that

14 opinion?

15      A.    Well, in my opinion, it is a risk.  It is a

16 trip hazard based on the mat not lying flat and the

17 risk of someone catching one of those curled sections

18 or ripples in the mat that would potentially cause a

19 trip-and-fall to occur.

20      Q.    Looking at this photo is this mat flat or

21 flush with the floor?

22                MS. HERRERA:  Objection, form.

23                MR. PATTERSON:  Objection, form.

24                THE WITNESS:  It is -- it is not.

25 It's just a different angle of the -- the same

Stephen Melia

1  incident photo that was provided, and it is not lying

2  flat, it is -- indicates the ripples as we described

3  previously.

4      Q.   (BY MR. WILLIAMS)  And do you have an

5  opinion on whether the mat not lying flat on the

6  ground is a trip hazard?

7      A.   Yes, I do.

8      Q.   And what's that opinion?

9           MR. PATTERSON:  Form.

10          THE WITNESS:  Well, the opinion is

11  that if the mat is not lying flat it does represent a

12  risk of a trip-and-fall hazard.

13          MR. WILLIAMS:  And, Evan, what was the

14  basis for that objection?

15          MR. PATTERSON:  Ambiguous, vague,

16  speculation.

17          MR. WILLIAMS:  On whether a mat lying

18  flat on the ground is a trip hazard is vague?

19          MR. PATTERSON:  Correct.

20      Q.   (BY MR. WILLIAMS)  Now, Mr. Melia, when I

21  say trip hazard what do you think I am referring to,

22  or how would you like to define the words trip

23  hazard?

24      A.   I -- I would define a trip hazard as any

25  type of object, piece of equipment or item that is on

Stephen Melia

51

1   the floor that would cause an individual to -- their

2   foot to make contact with that object or item that

3   would then cause them to trip over that said item and

4   cause a fall.  Not all trips result in a fall, but it

5   is a trip-and-fall risk.

6        Q.    And based on that definition of trip hazard

7   do you believe that this mat is a trip hazard?

8        A.    I do, yes.

9        Q.    And why is that?

10       A.    Because it is not lying flat and the

11   ripples indicated, as we've discussed, creates that

12   potential for a person to catch their foot or their

13   shoe in the rippled part of the mat that would cause

14   them to potentially lose balance and trip-and-fall.

15       Q.    Okay.  And if a mat is a trip hazard is it

16   a safe or an unsafe mat?

17              MS. HERRERA:  Objection, form.

18              THE WITNESS:  Well, certainly it would

19   be an unsafe mat.

20       Q.    (BY MR. WILLIAMS)  And is Walmart supposed

21   to provide safe mats to its customers to use?

22              MS. HERRERA:  Objection, form.

23              THE WITNESS:  The expectation would be

24   to provide a safe walking surface.  In this case

25   we're obviously referring to a mat, then the answer

Stephen Melia

52

1  would be, yes, the expectation would be to provide an

2  appropriate mat that does not create a tripping

3  hazard.

4      Q.   (BY MR. WILLIAMS)  And did this mat create

5  that tripping hazard?

6              MS. HERRERA:  Objection, form.

7              THE WITNESS:  It is my professional

8  opinion that it did, yes.

9      Q.   (BY MR. WILLIAMS)  Is Walmart supposed to

10  look and correct -- excuse me.

11              Is Walmart supposed to look for and

12  correct trip hazards like this?

13              MS. HERRERA:  Objection, form.

14              THE WITNESS:  Yes.

15      Q.   (BY MR. WILLIAMS)  How so?

16      A.   Part of the standard operating procedures

17  as discussed, the safety sweep, the observation, the

18  maintenance, folks assigned to inspecting the floors

19  to ensure they're safe, that is the -- the standard

20  that not only Walmart but many -- many companies in

21  the -- in the retail grocery sector implement, and

22  the expectation is to inspect and correct the unsafe

23  condition before an incident occurs.

24      Q.   Did you review any video to see if Walmart

25  looked for or found the trip hazards in the mat?

Stephen Melia

53

 1              MS. HERRERA:  Objection, form.

 2              THE WITNESS:  I did review the video

 3   that was provided by Walmart.

 4              MR. WILLIAMS:  And what was the --

 5   what was your basis there for that objection?

 6              MS. HERRERA:  Leading, counsel's

 7   testifying, misstates evidence, mischaracterizes

 8   evidence.  I can go on if you --

 9              MR. WILLIAMS:  Yeah.  Go on.

10              MS. HERRERA:  -- care for me to.  You

11   just proceed with your questioning of him.

12              MR. WILLIAMS:  Oh, okay.

13      Q.   (BY MR. WILLIAMS)  Did you review any video

14   in this case?

15      A.    Yes, I did.

16      Q.    What for?

17      A.    Again, the purpose of -- somewhat of a

18   forensic analysis, to go back and review an incident

19   you want to obtain as many of the facts as you can as

20   they were represented at the time of the incident,

21   that includes video, photographs, witness statements,

22   et cetera.  So the purpose was to go and look at and

23   make observations as to the activity that was taking

24   place and the actual incident itself to help

25   determine that root cause.

Stephen Melia

54

1      Q.    Okay.  And whenever you reviewed the video
2  did you learn if Walmart looked for or found trip
3  hazards in the mat?
4                MS. HERRERA:  Objection, form.
5                THE WITNESS:  Certainly there was only
6  a period of time, approximately an hour, prior to the
7  incident the video provided.  While I believe there
8  were Walmart associates in and around the area and
9  walking past the mat there was no indication during
10 that period of time that there was any identification
11 and certainly no action to remove the mat prior to
12 the incident.
13     Q.    (BY MR. WILLIAMS)  Can you see my screen
14 fine, sir?
15     A.    Yes.
16     Q.    And I'll put on the record that I'm going
17 to mark this as Exhibit 7 which is the video.
18                Do you recognize this video?
19     A.    I do.
20     Q.    And have you reviewed it before today?
21     A.    I have, yes.
22     Q.    And do you see that I'm on the 9 minute 49
23 second mark of this video?
24     A.    Unfortunately, I have to testify that based
25 on me reviewing this from my phone it is difficult

Stephen Melia

55

1  for me to read the -- the numbers, so I don't know

2  that I can testify to that.  Let the record reflect

3  whatever it may show on the larger screen.

4      Q.    Okay.  I'll represent to you that we're on

5  the 9 minute 49 second mark of this video.  Okay?

6      A.    Okay.

7      Q.    And as I'm playing this video can you just

8  see how many Walmart's employees are behind the

9  counter?

10     A.    Well, is it playing right now?  Because it

11 appears to be stopped.

12     Q.    No, no.  Just asking you to -- if you're

13 going to be able to do that?

14     A.    It -- I see at least one and possibly two.

15 It's, unfortunately, a little difficult to tell.  If

16 you play it then I may see the activity that would

17 draw a better answer.

18     Q.    Okay.  Are you able to look at this video

19 on your computer screen?

20     A.    Give me a minute, I will see if I have it.

21 I had to shut down and restart when I was trying to

22 do this on the computer so this may take a moment.

23              MR. WILLIAMS:  You guys want to go off

24 the record and take a break while he does that?

25              MR. PATTERSON:  Up to you.

Stephen Melia

1          MS. HERRERA:  I'm good.

2          MR. WILLIAMS:  Okay.  Well, we'll --

3   we'll stay on it.  Whatever works on you-all

4   (unintelligible).

5          THE WITNESS:  Yeah.  It's going to

6   take me just a minute to get to.

7          MS. HERRERA:  What was Exhibit 6

8   again?

9          MR. WILLIAMS:  The curls in the mat.

10  The red circles.

11         MS. HERRERA:  The other -- all the

12  red -- okay.  Has his report been numbered yet?  I

13  need to know.  Well, just for the record, since we're

14  on the record we do object to having just been

15  provided with his report today, the day of his

16  deposition, but we're still prepared to go forward.

17         MR. WILLIAMS:  You didn't get the

18  report before today?

19         MS. HERRERA:  It was not --

20         MR. PATTERSON:  It was an affidavit.

21         MS. HERRERA:  We didn't -- it wasn't

22  produced to us before today.

23         THE WITNESS:  Working as quickly as I

24  can, folks, to get -- to get back to this.

25         MR. WILLIAMS:  Was the affidavit any

Stephen Melia

57

1   different than the report?

2              MR. PATTERSON:  Yeah.  One's 20 pages.

3              MR. WILLIAMS:  Well, I guess you-all

4   got it the same time I did.  My report or my thing is

5   just an affidavit, so that's -- that's what I got

6   ready to mark, so I don't think it makes any

7   difference on any of the questions I'm going to ask,

8   though, so...

9              THE WITNESS:  All right.  We may have

10  to proceed without the video.  I believe I had to

11  download it to a laptop and not my desktop, and this

12  was months back, so I'm not going to be able to get

13  to it.  I can try to log back in on my desktop for

14  this video deposition so perhaps I can see it in a

15  larger screen, but just due to technical difficulties

16  I apologize.  I certainly can see the video once it's

17  playing on my phone.  I don't think it'll be any

18  different than what my recollection is from watching

19  the video in the past.

20      Q.   (BY MR. WILLIAMS)  Okay.  You ready to

21  proceed then?

22      A.   Yes.  Let's try to continue.

23      Q.   Okay.  Mr. Melia, I'm on the 9 minute 38

24  second mark of this video.  I'll represent that to

25  you.  Okay?

Stephen Melia

58

1    A.    Okay.

2    Q.    How many people do you see behind the

3  counter?

4    A.    So I see three Walmart associates behind

5  the counter.

6    Q.    Do you see four Walmart associates behind

7  the counter?

8    A.    I do now, yes.  One just left.

9    Q.    Now, does the mat seem close or far from

10  where these employees are at?

11    A.    It's just across the counter from where

12  they are ringing up customers.  So I was able to

13  observe two of the associates leave the register and

14  walk past the mat.

15    Q.    And you were able to observe that with the

16  video being played to the 10 minute 25 second mark,

17  right?

18    A.    Again, if the record reflects that time

19  frame.  I -- I can't conclusively state that.  I

20  don't have visual on that.

21    Q.    Now, how many people -- or excuse me.

22          How many Walmart employees did you see

23  walk over the mat?

24    A.    Two.

25    Q.    And could those two employees had noticed

Stephen Melia

59

1   the trip hazard in the mat?

2             MS. HERRERA:  Objection, form.

3             THE WITNESS:  I would believe that

4   that would have been noticeable, yes.

5      Q.   (BY MR. WILLIAMS)  Could they have

6   corrected the trip hazards in the mat?

7             MS. HERRERA:  Objection, form.

8             THE WITNESS:  Yes, I believe they

9   could have.

10     Q.   (BY MR. WILLIAMS)  And did they do so here?

11     A.   They did not.

12     Q.   Okay.  I'll represent to you that we're on

13  the 46 minute and 3 second mark of the video.  Okay?

14     A.   Okay.  Okay.

15     Q.   And I'll represent to you that we just

16  played the video to the 46 minute and 20 second mark

17  of the video.  Okay?

18     A.   Okay.

19     Q.   Did you notice a third Walmart employee

20  walk over the mat?

21     A.   I did.  He was pushing a rolling cart.

22     Q.   And could that employee have also noticed

23  the trip hazard in the mat?

24     A.   He could have, yes.

25     Q.   And could that employee also have corrected

Stephen Melia

60

1   the trip hazards in the mat?

2       A.    Yes.

3       Q.    Did the employee do so?

4       A.    No, they did not.

5       Q.    And I'll represent to you that -- excuse

6   me.

7               I'll represent to you that I'm on the

8   47 minute 45 second mark of the video.  Okay?

9       A.    Okay.

10      Q.    How many people do you see in the store at

11  this time?

12      A.    I believe I -- there is one person behind

13  the counter.

14      Q.    Is that person a Walmart employee?

15      A.    It would appear so, yes.  Yes, they are.

16      Q.    Now, I'm going to play this video for about

17  20 to 30 seconds.  All right.  Do you see that I just

18  played the video to the -- or excuse me.

19              I'll represent to you that I played

20  the video to the 48 minute 6 second mark.  Okay?

21      A.    Okay.

22      Q.    How many people are in that store during

23  the time?

24      A.    There's only one visible through this angle

25  of the video.

Stephen Melia

61

1      Q.     And who is that?

2      A.     It was the Walmart associate that left from

3  behind the counter and then returned.

4      Q.     And when she returned from behind the

5  counter did she look towards the entrance mat?

6      A.     I can't speak to what direction her eyes

7  were -- were looking.  She was walking towards that

8  direction before she -- before she turned -- left to

9  go behind the -- the counter and then into the back

10  room it appears.

11      Q.     And when she was walking towards that

12  direction could she have noticed a trip hazard in the

13  mat if she looked?

14              MS. HERRERA:  Objection, form.

15              THE WITNESS:  I believe that would be

16  observed, yes.

17      Q.     (BY MR. WILLIAMS)  And could she have

18  corrected the trip hazards in the mat?

19      A.     Yes.

20              MS. HERRERA:  Objection, form.

21      Q.     (BY MR. WILLIAMS)  Did she do so?

22      A.     She did not take any action towards the

23  mat.

24      Q.     And there was no one in the store during

25  this time, was there?

Stephen Melia

62

1      A.    Again, I only have this portion of the

2 video.  I know there's one other angle that I did

3 view from the side looking towards the -- the doors

4 and the mat, but I don't have full view of the video,

5 so I can't answer that conclusively.

6      Q.    Did you see -- did you see anyone else in

7 the store during this video?

8      A.    No, not for the time frame that you just

9 represented.

10     Q.    And could this employee have safely removed

11 this mat without interfering with other customers?

12     A.    Yes.

13     Q.    And could this employee have safely removed

14 the mat without interfering with Walmart's day-to-day

15 business?

16     A.    Certainly could have, yes.

17     Q.    Sir, do you see that I paused this video?

18     A.    I do, yes.

19     Q.    Okay.  And I'll represent to you that I'm

20 on the 53 minute 26 second mark of the video.  Okay?

21     A.    Okay.

22     Q.    Sir, do you see that I've paused this

23 video?

24     A.    I do, yes.

25     Q.    And I'll represent to you that I've paused

Stephen Melia

63

1   the video at the 53 minute 30 second mark.  Okay?

2        A.    Okay.

3        Q.    How many people are in the store at this

4   time?

5        A.    One customer appears to have just exited

6   the store you see at the top of the screen, and then

7   you have the one employee associate that has just

8   walked out from behind the counter towards the --

9   towards the doors.

10       Q.    And is that Walmart employee walking

11  towards the mat?

12       A.    It appears that she is at this point

13  towards the mat and the Gatorade display that is

14  there.

15       Q.    Is that Gatorade display orange?

16       A.    It is, yes.

17       Q.    And is that the same orange Gatorade

18  display that we see in the photos?

19       A.    It is, yes.

20       Q.    Is this the -- I'll represent to you that I

21  just played the video to the 53 minute 35 second

22  mark.  Okay?

23       A.    Okay.

24       Q.    Did you see a fourth Walmart employee walk

25  past the mat?

Stephen Melia

64

1      A.    I did see that same employee, yes, walk
2  past the mat and turn to the right.
3      Q.    And is that the fourth employee of Walmart
4  that we've seen walk past this mat in this video?
5      A.    That would be correct, yes.
6      Q.    And how many people did you see in the
7  store (Zoom failure) the mat?
8      A.    Again, there were -- there was one customer
9  that walked out just prior to this associate walking
10 towards the mat and then turning to the right just
11 past the mat.
12     Q.    So whenever she walked past the mat there's
13 no one else in the store at the time store; is that
14 right?
15     A.    Again, I want to qualify based on the --
16 the video angles that we have available I believe
17 there's more parts to the store, but on this video
18 that is correct.
19     Q.    Then when the -- a fourth Walmart employee
20 walked past the mat could she have noticed the trip
21 hazard in that mat?
22             MS. HERRERA:  Objection, form.
23             THE WITNESS:  Yes.
24     Q.    (BY MR. WILLIAMS)  And could she have
25 corrected the trip hazard in the mat?

Stephen Melia

65

1    A.    Yes.

2              MS. HERRERA:  Objection, form.

3    Q.    (BY MR. WILLIAMS)  All right.  Did she do

4    so?

5    A.    No.

6    Q.    And could this employee once again have

7    safely removed this mat without interfering with

8    customers at this time?

9              MS. HERRERA:  Objection, form.

10             THE WITNESS:  Yes.

11   Q.    (BY MR. WILLIAMS)  And could this employee

12   once again have safely removed this mat without

13   interfering with Walmart's day-to-day business at

14   this time?

15             MS. HERRERA:  Objection, form.

16             THE WITNESS:  Yes.

17   Q.    (BY MR. WILLIAMS)  Okay.  Earlier you said

18   that Walmart was supposed to do a safety sweep every

19   30 minutes to an hour; do you remember?

20   A.    Yes, I do.

21   Q.    And what is Walmart supposed to do during a

22   safety sweep again to find these trip hazards?

23   A.    The description in the operating procedures

24   are to walk the aisles in the space in your work area

25   and visibly look for, identify and correct any -- any

Stephen Melia

66

1   unsafe conditions that you might find.

2       Q.    Are these employees supposed to be

3   intentionally looking for trip hazards?

4       A.    Yes.  That is the -- the purpose of

5   conducting the safety sweep on a -- on a regular

6   basis.

7       Q.    Did you see any evidence of Walmart doing a

8   safety sweep in that video?

9               MS. HERRERA:  Objection, form.

10              THE WITNESS:  No, not on the -- the

11  video that we observed.

12      Q.    (BY MR. WILLIAMS)  Did you see any evidence

13  of any Walmart employee intentionally looking for a

14  trip hazard in that video?

15              MS. HERRERA:  Objection, form.

16              THE WITNESS:  Again, they -- if they

17  were they -- there were no actions taken, so I -- I

18  don't want to -- I never want to speak to what they

19  may have been thinking or what they saw through their

20  eyes, but no actions were taken to correct the -- the

21  mat.

22      Q.    (BY MR. WILLIAMS)  Now, what does that

23  indicate to you?

24      A.    I'm sorry.  Could you ask that...

25      Q.    Sure.  Earlier in --

Stephen Melia

67

1    A.    I'm not sure what you're referencing.

2    Q.    Yes.

3          Earlier I -- I asked you if you saw

4    any evidence of Walmarts [SIC] doing a safety sweep

5    and you said no; do you remember?

6    A.    Yes.

7    Q.    What does that indicate to you?

8    A.    Well, it -- it could indicate a number of

9    things.  It certainly, first and foremost, could

10   indicate a lack of training.  It could indicate a

11   lack of awareness of the procedure or simply a lack

12   of execution of the -- of the expected procedure.

13   Q.    Would Walmart have noticed the trip hazards

14   in the mat if they did a safety sweep?

15         MS. HERRERA:  Objection, form.

16         THE WITNESS:  Again, it is -- yes, it

17   is likely proper observation would have identified

18   that.

19   Q.    (BY MR. WILLIAMS)  Is it more likely than

20   not Walmart would have found the trip hazards in the

21   mat if they did a safety keep?

22         MS. HERRERA:  Objection, form.

23         THE WITNESS:  Yes.  And it's my

24   opinion that it would have and could have been

25   identified.

Stephen Melia

68

1    Q.    (BY MR. WILLIAMS)  But did Walmart ever

2  find or correct this trip hazard?

3    A.    Not until after the incident occurred.  It

4  was -- the mat was removed but not prior to at -- at

5  least for the hour of video that we have.

6    Q.    Would it have been helpful to have video

7  for more than an hour before this incident?

8              MS. HERRERA:  Objection, form.

9              THE WITNESS:  I don't believe it would

10  have been necessary.  It's standard to retain video

11  an hour prior to and an hour after an incident

12  occurs, so while it may have provided more footage of

13  what did or didn't occur, for me, it's reviewing the

14  incident investigation, it was sufficient to -- to

15  see that you -- the condition of the mat and what had

16  taken place prior to and -- and after the incident.

17    Q.    (BY MR. WILLIAMS)  Was just that hour of

18  video sufficient for you to learn whether or not

19  Walmart should have noticed the mat was a dangerous

20  condition?

21    A.    Yes, that was sufficient for me.

22    Q.    And why is that?

23    A.    Well, you have a period of time where you

24  have -- well, the customers, but an associate's

25  walking through and past the area and we had

Stephen Melia

1  opportunity -- the associates would have had an

2  opportunity to identify and remove or -- or correct

3  the unsafe condition.

4      Q.   And do you have an opinion on whether that

5  mat was a dangerous condition at the time of the

6  incident?

7               MR. PATTERSON:   Form.

8               THE WITNESS:   I do.

9      Q.   (BY MR. WILLIAMS)   Okay.   And what's that

10  opinion?

11     A.   Well, certainly based on the condition of

12  the mat not lying flat it created the risk exposure

13  for this incident to occur.

14     Q.   And do you have an opinion on whether

15  Walmart should have noticed the mat was a dangerous

16  condition --

17               MS. HERRERA:   Objection, form.

18     Q.   (BY MR. WILLIAMS)   -- at the time of the

19  incident?

20     A.   I do.

21     Q.   And what's that opinion?

22     A.   That it certainly would have been imminent

23  and more likely than not would have been noticed.

24     Q.   What do you mean by would have been

25  noticed?

Stephen Melia

70

1     A.    Based on observations that the

2  observation's been made and -- and conducted by the

3  associates walking through the store, or even through

4  the front doors as they were exiting, the opportunity

5  was there to identify the unsafe condition and take

6  actions to remove it.

7     Q.    And why do you believe that Walmart should

8  have noticed the mat was a dangerous condition?

9              MS. HERRERA:  Objection, form.

10             THE WITNESS:  Well, again, relying on

11  the -- the knowledge that there would have been

12  sufficient training, and the standard procedures are

13  well documented to specifically look for the

14  condition of mats at the entrance of the store, that

15  would be the basis of that opinion.

16    Q.    (BY MR. WILLIAMS)  And do you believe that

17  condition was there long enough for Walmart to find

18  it?

19             MS. HERRERA:  Objection, form.

20             THE WITNESS:  I do, yes.

21    Q.    (BY MR. WILLIAMS)  And why is that?

22    A.    Well, it is a small area, it's not a large

23  footprint of the stores, a smaller confined space,

24  and you've got to -- got to consider four associates

25  working in or passing through that area would have

Stephen Melia

71

1  provided enough time and opportunity to identify the

2  risk and correct it.

3      Q.    Okay.  If this testimony -- excuse me.

4            If there is testimony and evidence

5  that this mat had been on the floor for six days

6  before this incident do you believe that Walmart

7  would have or certainly should have noticed this mat

8  was in a dangerous condition?

9            MS. HERRERA:  Objection, form.

10           THE WITNESS:  Well, I certainly do not

11  want to speculate, of course, on the condition of the

12  mat for the prior days.  I only have the information

13  available for the -- the time frame of the video, so

14  it'd be difficult for me to -- to draw any

15  determinations prior to the condition of the mat in

16  the prior days.

17     Q.    (BY MR. WILLIAMS)  And do you have an

18  opinion on whether this incident would have occurred

19  had Walmart noticed the trip hazards and picked up

20  the mat?

21           MS. HERRERA:  Objection, form.

22           THE WITNESS:  Well, certainly, yes, I

23  do have an opinion on that.

24     Q.    (BY MR. WILLIAMS)  And what's that opinion?

25     A.    I certainly believe that had the -- the mat

Stephen Melia

72

1  not been in the condition it was at the location at

2  the time that it would have eliminated that risk as

3  Ms. Castro was walking towards the exit.

4      Q.    And what do you mean by eliminated a risk?

5      A.    Well, then you have -- when you have

6  conditions that are present that -- that pose a risk

7  for a trip hazard, obviously, you have to mitigate

8  that risk by either correcting the unsafe condition

9  or removing it completely.  And as I've stated, one

10 of my reference materials, the -- the hierarchy of

11 controls that -- that OSHA often refers to is -- is

12 simply that, the -- the opportunity to once a risk is

13 identified take the appropriate steps to correct or

14 mitigate, substitute or remove the condition so that

15 it does not continue to pose a risk.

16     Q.    And do you have opinion [SIC] -- excuse me.

17          Do you have an opinion on whether

18 Walmart was supposed to pick up this mat?

19          MS. HERRERA:  Objection, form.

20          THE WITNESS:  Well, certainly I'll

21 offer this, and it's in -- in my opinions in the

22 report, in typical expectations and standard

23 operating procedures in those that are in the Walmart

24 guidelines and the -- the mats themselves are

25 utilized when there's inclement weather, and the type

Stephen Melia

73

1  of mat is important for those situations, so I cite

2  in my report as one of the opinions that it did not

3  appear to be raining or had rained based on the video

4  and sunshine coming through, so I do have a question

5  as to the necessity of the mat being placed there at

6  this time of the incident, and then certainly had an

7  observation been made that could have easily been

8  removed since it was not raining prior to the

9  incident which would have, of course, removed the

10 risk.

11      Q.    (BY MR. WILLIAMS)  Did Walmart ever pick up

12 this mat before the incident?

13      A.    For the time frame of one hour that I have

14 reviewed prior to the -- the mat was not picked up in

15 that one-hour time frame prior to Ms. Castro tripping

16 on it.

17      Q.    And did Walmart violate any industry

18 standards in not picking up the mat?

19      A.    Well, the industry standard would be to

20 ensure that mats were laying flat properly, so to

21 that regard failure to identify, and -- and, yes,

22 failure to correct the unsafe condition, would be

23 that -- that violation of the standard to maintain a

24 safe environment.

25      Q.    Did Walmart also violate its own standard

Stephen Melia

74

1  in not picking up the mat?

2              MS. HERRERA:  Objection, form.

3              THE WITNESS:  It did in not

4  identifying and correcting the -- the unsafe

5  condition.

6      Q.    (BY MR. WILLIAMS)  And do you have an

7  opinion on whether this incident would have occurred

8  had Walmart picked up this mat?

9      A.    Well, certainly, it is my opinion that

10 the -- the risk -- the -- the fact that the mat was

11 curled, if -- if there was no mat there, then to

12 answer your question there would -- there would be no

13 risk of tripping on a mat.

14             MR. WILLIAMS:  Okay.  Guys, do you

15 mind if I take a break and review my notes?

16             MR. PATTERSON:  Sure.

17             MS. HERRERA:  No problem.

18             THE WITNESS:  And -- and I'd like to

19 try to get logged back in.  We'll use my phone as a

20 standby, but while we're on break I'm going to try to

21 log in on my computer.  It looks like I've got a good

22 connection.

23             MR. WILLIAMS:  Okay.  Thanks.

24             THE WITNESS:  Five minutes?

25             MS. HERRERA:  Yep.

Stephen Melia

75

1      THE VIDEOGRAPHER:  Off the record at

2  3:42.

3           (Short recess taken.)

4      THE VIDEOGRAPHER:  Okay.  On the

5  record at 3:55.

6      Q.   (BY MR. WILLIAMS)  Now, Mr. Melia, earlier

7  you described how Walmart must put safety above

8  everything else; do you remember?

9      A.   Yes.  We were discussing safety first.

10      Q.   Did Walmart do that here, did Walmart put

11  safety above everything else in this case?

12           MS. HERRERA:  Objection, form.

13           THE WITNESS:  Well, they certainly did

14  not identify the risks associated with the mat, so I

15  would answer it that way.

16      Q.   (BY MR. WILLIAMS)  All right.  And did they

17  do a safety sweep in the hour that you watched that

18  video?

19           MS. HERRERA:  Objection, form.

20           THE WITNESS:  There was no evidence of

21  a safety sweep in -- in my understanding of a safety

22  sweep that was performed in the hour meaning after

23  the incident.

24      Q.   (BY MR. WILLIAMS)  And how often are they

25  supposed to do them?

Stephen Melia

76

1      A.      Typically, it's every 30 minutes to an

2  hour.

3      Q.      And so two safety sweeps were supposed to

4  occur on that video?

5                  MS. HERRERA:  Objection, form.

6                  THE WITNESS:  Yes.  And, again, at --

7  the size or the format and the footprint can often

8  make a difference, but, typically, 30 minutes to an

9  hour would be standard for a -- a safety sweep of --

10  of an area where an associate is working.

11      Q.      (BY MR. WILLIAMS)  And had Walmart done

12  that safety sweep, found the mat, removed the mat,

13  would we be here today?

14                  MS. HERRERA:  Objection, form.

15                  THE WITNESS:  Yes, my opinion that the

16  risk would have been -- had it been removed then the

17  incident would not have happened, so, no, we probably

18  would not be here today.

19                  MR. WILLIAMS:  I'll pass the witness.

20                  EXAMINATION

21  BY MS. HERRERA:

22      Q.      All right.  Mr. Melia, I'm going to go

23  first asking you some question.  I'm Elizabeth

24  Herrera.  I represent the Walmart defendants in this

25  case.  And just for the record, I'm going to

Stephen Melia

77

1   introduce your affidavit as Exhibit A.  And you did

2   have a paper copy of that; is that right, Mr. Melia?

3        A.    That is correct.

4        Q.    And how many pages is your paper copy just

5   so I can make sure I've -- we have the same one?

6        A.    Three.

7        Q.    And then you also have a copy of your

8   report, which I have as 23 pages, there with you?

9        A.    That is correct.

10        Q.    Okay.  I'm going to go ahead and mark that

11   report as Exhibit 9.  And in looking at what we've

12   marked as Exhibit 9, your report, that also includes

13   your CV there, which I believe has also been included

14   as Exhibit 1.  Is -- is the CV that's attached there

15   as Exhibit B -- or Appendix B to your report more

16   updated than that other one or is this -- or is this

17   also an older one?

18        A.    It would be an older one that was submitted

19   at the time of this report, so it would likely be the

20   one that we reviewed earlier, the original question.

21        Q.    And also included with your report on Page

22   22 is your testimonial history.  This, then, would

23   also have been current as of the date the report was

24   authored.

25              So do you have other testimonial

Stephen Melia

78

1   history since the date the report was authored?

2       A.    Yes.   I do not have an updated one in front

3   of me, but I can certainly supplement that.   But I

4   believe there's been at least one or two more

5   depositions since this report was submitted.

6       Q.    And in addition to the one or two

7   additional depositions have you testified at trial at

8   all since February 2022?

9       A.    I -- I will need to look.   I would like to

10  verify that through some record at some point.   We

11  can do it maybe at the next break.   I should be able

12  to pull that up and answer that affirmatively, but I

13  don't want to guess.

14      Q.    And then what we'll do is, is if you do

15  find an -- updated documents or updated information

16  for your testimonial history we'll include that as

17  Exhibit 10 to your deposition and we can just confirm

18  that later.   That's fine.

19      A.    Yeah.   I'd be happy to (Zoom failure)

20  depositions included.

21      Q.    Do you also have an updated CV?

22      A.    I do.

23      Q.    Let's attach an updated CV, then, as

24  Exhibit 11.

25      A.    Okay.

Stephen Melia

79

1    Q.    And you can send that to us as well after
2  the deposition.  That's fine.
3              And your fee schedule is also attached
4  as Appendix D on Page 23 of your report.
5              Is this your current fee schedule?
6    A.    I -- I would say, yes, on the hourly rates.
7  I think recently we may have updated the mileage
8  reimbursement, but that's minimal and I don't believe
9  there was any mileage in this case, so -- but it is
10 accurate for the -- the hour -- hourly rates for
11 testimony and deposition and so forth.
12   Q.    What did you do to prepare for your
13 deposition today?
14   A.    I read through my affidavit and read
15 through my report.
16   Q.    Did you meet with or speak with
17 Ms. Castro's attorneys?
18   A.    I did, yes.
19   Q.    And when did you speak to them?
20   A.    It was earlier this afternoon.  I don't
21 recall exactly.  It would have been possibly around
22 11:30 or 12 noon.
23   Q.    And for how long did you speak with them?
24   A.    I would estimate maybe five minutes, five
25 to ten minutes.

Stephen Melia

80

1     Q.   And other than reading through your report

2  and your affidavit did you review any other documents

3  to prepare for your deposition today?

4     A.   No, I did not review necessarily.  Pulled

5  some of my paper copy documents of some of the

6  standards that have been discussed, or at least the

7  ones that I had provided in the appendix as

8  documentation reviewed or relied upon for -- for my

9  opinions.

10     Q.   And that -- that was going to be my next

11  question.

12              So on Page 15 of your report, Appendix

13  A, it has the list of documents that you've reviewed

14  for this case.

15              Are -- other than what's included in

16  that list have you -- you reviewed anything else with

17  respect to this case?

18     A.   No.  That should be the -- the complete

19  list at the time of this report.

20     Q.   And since the time the report was authored

21  have you reviewed any new documents or information

22  with respect to this case?

23     A.   I do not believe I have, but I would need

24  to check.  I know I did not amend the report.  I am

25  fairly certain that no new documentation has been

Stephen Melia

81

1  provided since then, but fairly certain doesn't mean

2  absolute, so I -- I may need to verify that.

3      Q.    And this document here, the -- the cover

4  page states it's expert witness report with a date of

5  February 16, 2022.

6              Is that the only report that you've

7  authored for this case?

8      A.    It is the only report.  I also provided

9  that affidavit, as we discussed, that was on, let's

10  see, the 17th of February 2022.

11      Q.    When were you first contacted about being

12  involved in this case?

13      A.    Let me refer back to my -- Page 2 of my

14  report.

15              It would have been on October 8th,

16  2021.

17      Q.    And you have previously worked with the

18  DeSouza Law Firm; is that right?

19      A.    Yes, I have.

20      Q.    About how many other cases have you

21  reviewed for them in the past five years?

22      A.    I do not have an exact number in front of

23  me.  I would say at least five cases that I can feel

24  comfortable stating.

25      Q.    And did each of these cases involve a

Stephen Melia

82

1    slip-and-fall or trip-and-fall accident at a retail

2    store?

3        A.    I would have to go back and refer to my

4    case history on what the DeSouza firm has retained me

5    for.  I -- it would -- I would have to really confirm

6    that.

7        Q.    How much have you billed the DeSouza firm

8    so far for this case?

9        A.    I do not have a number in front of me.  I

10   can get that to you as well.  I'll certainly have the

11   invoicing that I have no problem submitting, you

12   know, based on the information, what I've reviewed in

13   the case and what I've billed for the case.  I can

14   add that to my list if you'd like.

15       Q.    Yes.  Well, so we'll attach -- I've got an

16   invoice here, and I'm going to see if I can share my

17   screen and you can take a look at this one.  It's

18   dated February 17th of 2022.  Let me know if you need

19   me to zoom in.

20       A.    Yeah, you can -- you can --

21       Q.    Can you see that date?

22       A.    Yes, I can.  You can scroll down.  That is

23   probably going to be the last invoice.  I would say

24   that is most likely the most recent, and there have

25   been no other charges or documents reviewed, of

Stephen Melia

83

1  course, other than what the invoicing for the time

2  today in deposition will be.

3      Q.    And what is your hourly rate for your time

4  preparing for the deposition?

5      A.    It would be 200 an hour, similar to the

6  document review preparation, and then 300 per hour

7  for actual deposition or trial testimony.

8      Q.    And have you been retained to testify at

9  trial for this case?

10     A.    I have, yes.

11     Q.    Well, that -- that invoice that I pulled up

12  there we're going to just attach that as Exhibit 12

13  to your deposition.

14            And, Mr. Melia, you think that's your

15  most recent invoice; is that correct?

16     A.    Yes, that is correct.

17     Q.    When did you first begin doing expert

18  witness work?

19     A.    It would have been in 2015.

20     Q.    And in the CV that's attached as Appendix B

21  to your report it lists S. Melia Consulting, LLC, as

22  your current employer, your current company.

23            Is that your company?

24     A.    Yes, it is.

25     Q.    And you started that business in May of

Stephen Melia

84

1  2015; is that right?

2      A.     That is correct, yes.

3      Q.     Does anyone else work for S. Melia

4  Consulting, LLC?

5      A.     No.  It is just myself.  Of course, my wife

6  is wonderful at assisting with all of the information

7  related to invoicing and taxes and all the other

8  things that go with it, but she is not in any way

9  part of a -- a review, or document review,

10  testifying, et cetera.

11      Q.     What does your company do?

12      A.     So I have -- I started out after I left

13  Sam's Club and the practice area would be providing

14  litigation support in cases involving premise's

15  liability, either safety or security.

16      Q.     And has that been the same since 2015, the

17  same line of work?

18      A.     Yes.  For S. Melia Consulting, that's

19  correct.

20      Q.     And does S. Melia Consulting only do

21  litigation services?

22      A.     That is all that I have done, yes.

23  Certainly available to conduct other risk assessments

24  and other types of security safety assessments, but

25  primarily it has all been in the area of litigation

Stephen Melia

85

1    support.

2        Q.    So all of your work since 2015 through

3    Melia Consulting, LLC, has been providing expert

4    witness services for litigation; would that be

5    correct?

6        A.    That is correct, yes.

7        Q.    Right now what percentage of the time are

8    you retained by plaintiffs versus defense?

9        A.    Are you talking about the course of the

10   seven years?

11       Q.    Well, right now, your current case load.

12       A.    Without looking I may only have one defense

13   case where I've been retained by defense.  All the

14   others would be plaintiff's counsel that has retained

15   me.

16       Q.    And about how many cases are in your case

17   load right now?

18       A.    I have right at 30 cases currently.

19       Q.    And just one of those 30 were you retained

20   by defense; is that right?

21       A.    To the best of my recollection right now in

22   current cases, yes.

23       Q.    Have your opinions ever been excluded from

24   a case by any court?

25       A.    Yes, they have.

Stephen Melia

86

1    Q.    And how many times?

2    A.    There was an instance in, I believe, it was

3  the State of Mississippi where the judge, based on

4  the Daubert filings for both sides, had ruled that --

5  that expert testimony was not necessary, so I was not

6  allowed to testify in that case.

7    Q.    And that was another premise's liability

8  case; is that correct?

9    A.    It was -- yes, it was.  Trying to draw

10  memory from that one, yes.  It's a few years ago.

11    Q.    And in that case the judge had determined

12  that the information that you were providing would be

13  the same as what the jury could decide for

14  themselves; would that be fair to say?

15            MR. WILLIAMS:  Objection --

16            THE WITNESS:  In that case, yes.

17            MR. WILLIAMS:  -- mischaracterization.

18    Q.    (BY MS. HERRERA)  And in referring, again,

19  to your CV and going through your educational

20  background what is your highest level of education?

21    A.    So graduated from high school and then

22  attended about a year and a half, two years, on and

23  off at Sam Houston State University with general

24  business management degree in mind, however, never

25  completed that.  I started working for Walmart while

Stephen Melia

87

1  I was in college and never went back to complete my

2  degree.

3       Q.    So you do not have any college degree from

4  any university; is that correct?

5       A.    That is correct.

6       Q.    So that also means, then, you do not have a

7  college degree in safety or retail safety training as

8  it pertains to customers or -- or employees; is that

9  right?

10      A.    That is correct.

11      Q.    And in reviewing your certifications you're

12 also not certified in safety or retail safety as it

13 pertains to customers; is that right?

14                 MR. WILLIAMS:  Objection, vague.

15                 THE WITNESS:  In -- in what regard in

16 certification?  Clearly, there's OSHA certifications

17 for safety which I've attended OSHA course [SIC] in

18 the past with my time at Walmart.  But, no, I do not

19 currently hold any certifications in safety or safety

20 engineering or anything of that nature.

21      Q.    (BY MS. HERRERA)  Well, and OSHA

22 certifications wouldn't apply to retail customers;

23 would you agree?

24      A.    I disagree with that.

25      Q.    And why would you disagree with that?

Stephen Melia

88

1    A.    In my experience over the years in

2  developing policies and procedures for customers in

3  many instances there are OSHA guidelines that help

4  businesses identify risks to keep employees safe, and

5  it is my experience, professional experience, that

6  where you have risks for employees, if customers are

7  also in those areas, that you have risks for

8  employees, so the same mitigation standards would

9  apply, although, obviously, OSHA does not regulate or

10  inspect for customer incidents, but from a business

11  perspective it is very common that many of the same

12  practices to provide a safe environment for your

13  employees also applies to customers.

14    Q.    So do you agree or disagree that OSHA would

15  have no involvement in an accident like this one that

16  involves a customer?

17    A.    I agree with that.

18    Q.    And this case is not about an accident that

19  happened to an employee, right?

20    A.    That's correct.

21    Q.    And you left your employment with Walmart

22  in 2015; is that correct?

23    A.    That is correct, yes.

24    Q.    And you had been with them for 31 years; is

25  that -- is that right?

Stephen Melia

89

1      A.     Yes.  By the time that I left.

2      Q.     Did you retire?

3      A.     It was -- to explain it, a relocation, a

4   reorganization, so -- and I'll be brief -- so 2010 we

5   moved from Bentonville, Arkansas to Dallas, Texas to

6   open the divisional office for Sam's Club, and we

7   moved here, relocated.  And then in 2015 the decision

8   was made to reorganize again, all of the structure of

9   the Sam's leadership, and move everyone back to

10  Bentonville.  At that point, the restructuring

11  requirements were that everyone had to be displaced

12  and reapply for positions and make a decision to

13  move.  So short story is I accepted a severance

14  package and left employment to remain here in Dallas

15  at that time.

16     Q.     And in looking through your CV, the

17  different titles that you held at Walmart, your most

18  recent one appears to have been as the director of

19  asset protection; is that correct?

20     A.     It was director of asset protection, safety

21  and compliance for Sam's Club.  Senior director.  I

22  think you may have said that.

23     Q.     And the most recent position that you held

24  with Walmart was as director of security and alarm

25  services; is that right?

Stephen Melia

90

1    A.    That is correct, yes.

2    Q.    But while you were in the asset protection

3  position you would have been aware of incidents where

4  customers may have tripped or fallen or other types

5  of accidents like that; is that right?

6    A.    Yes.

7    Q.    And based on your experience in that

8  position you would agree, also, that just because a

9  customer at a retail store falls it's not necessarily

10 the store's fault, right?

11   A.    Well, it would certainly go back to the

12 point earlier on conducting a -- a thorough accident

13 investigation in determining the root cause.  If

14 you're asking if all falls are caused by either the

15 company or the person who was injured that has -- has

16 to be determined based on the facts, so they're --

17 not to belabor the question, but a person could fall

18 if there are no obstructions in just their stepping

19 and their actions upon their own negligence.

20   Q.    Did you ever speak with Ms. Castro about

21 this accident?

22   A.    I did not.

23   Q.    Or have you ever spoken with Ms. Castro at

24 all?

25   A.    I have not.

Stephen Melia

91

1    Q.    Other than speaking to Ms. Castro's

2  attorneys have you talked to anyone else about the

3  accident or about this case?

4    A.    No, I have not.  Just reviewed the facts

5  and depositions and information that was available in

6  conducting my assessment.

7    Q.    And the only documents that you reviewed

8  about the accident were documents that were provided

9  to you by Ms. Castro's lawyers; is that correct?

10            MR. WILLIAMS:  Objection, asked and

11  answered.

12            THE WITNESS:  Well, like, there would

13  have been documents produced by Walmart, photographs,

14  incident reports, policies and procedures that came

15  by way of the DeSouza Law Firm, of course, as well as

16  depositions, and then the industry standards and

17  information that I reviewed as well that's listed in

18  the appendix.

19    Q.    (BY MS. HERRERA)  And that is the Appendix

20  A of your 23-page report; is that correct?

21    A.    I -- yes.  Page 15 of 23, Appendix A, that

22  is correct.

23    Q.    Now, earlier you had testified that three

24  or four Walmart employees walking towards the mat on

25  that video should have seen the mat and seen it was a

Stephen Melia

92

1    trip hazard.

2              If that's so would you agree that Ms.

3    Castro also should have seen the mat and that it was

4    a trip hazard and avoided the accident?

5              MR. WILLIAMS:  Objection, form.

6              THE WITNESS:  No, not necessarily.

7    Q.    (BY MS. HERRERA)  And why not?

8    A.    So certainly --

9              MR. WILLIAMS:  Objection, form.

10             THE WITNESS:  -- I'm sorry?

11             MR. WILLIAMS:  Oh, it was just my

12   objection for the record.

13             THE WITNESS:  Yeah.  So certainly

14   working in the industry and preventing incidents it

15   is clear that policies and procedures are in place

16   for employees, employers to inspect premises and make

17   conditions safe.  In my experience that's the

18   expectation.  Customers certainly would not have that

19   same level of expectation, although they should be

20   careful or they would -- they're typically walking

21   and in looking at merchandise or the direction of

22   their travel they're not required to inspect such as

23   what an -- an employee or a business would be

24   required to inspect premises for safety.  So that's

25   the reason I would disagree with that.

Stephen Melia

93

1    Q.    (BY MS. HERRERA)  You would agree, though,

2    that customers also have a duty to exercise ordinary

3    care in walking around at a retail store, right?

4                    MR. WILLIAMS:  Objection, calls for a

5    legal conclusion.

6                    THE WITNESS:  And certainly --

7    certainly believe everyone should take reasonable

8    steps for their own safety.

9    Q.    (BY MS. HERRERA)  Do you have any opinion

10   in this case based on what you've seen in the

11   photographs and on the video that Ms. Castro should

12   or should not have been able to avoid tripping on the

13   rug?

14   A.    It's my opinion that she did not do

15   anything inappropriately or incorrectly as she was

16   exiting the store.  I believe she was acting as a

17   normal customer leaving a location.

18   Q.    And on Page 3 of your report it includes

19   the photograph of the mat that we were referencing

20   before, and that photograph has also been included as

21   exhibit -- the first photo, I believe, in Exhibit 5,

22   that's been attached to your deposition.

23                    Are your opinions with respect to the

24   condition of the mat at the time of the accident

25   based on how the mat looks in those photographs?

Stephen Melia

94

1    A.    In those photographs, as well as the video

2  and the incident report, allowed me to draw the

3  conclusion that the condition of the mat is clear in

4  this photo as to what I testified to earlier with the

5  ripples and the imperfections of how it is not laying

6  flat onto the floor surface.

7    Q.    And those photographs that you're

8  referencing, you would agree, though, that these were

9  taken only after the accident had happened after that

10  mat had been picked up, put back down and those

11  pictures were taken, right?

12    A.    That is correct.  They were taken by

13  Walmart in documenting the condition of the mat

14  that -- that caused the trip to occur.

15    Q.    So you'll agree, also, then, that those

16  photos do not show how the rug looked before

17  Ms. Castro's accident, correct?

18              MR. WILLIAMS:   Objection,

19  mischaracterization.

20              THE WITNESS:   That is correct.   There

21  were no photos provided immediately at the time of

22  the incident.   We have the video documenting that

23  condition of the mat prior to the incident and at the

24  time of and -- and after the incident.

25    Q.    (BY MS. HERRERA)   And, Mr. Melia, you're

Stephen Melia

95

1    not a medical doctor, right?

2        A.    That's correct, I am not.

3        Q.    And you're not going to be offering any

4    opinions, then, on Ms. Castro's medical prognosis or

5    diagnosis; is that right?

6        A.    Correct.

7        Q.    And you are not offering any opinions on

8    her medical conditions or on injury causation; is

9    that correct?

10       A.    That is correct.  To -- to the injury or

11   the extent of her injuries the causation as relation

12   to her tripping and falling is where I would offer my

13   opinions.

14       Q.    All right.  So we -- we can agree to

15   distinguish between causation for injuries and

16   causation for the incident, but with respect to

17   causation for the injuries you're not offering those

18   opinions; is that right, Mr. Melia?

19       A.    That is correct.

20       Q.    All right.

21              MS. HERRERA:  That's all the questions

22   I have.  I'll pass the witness.

23              MR. PATTERSON:  One second.

24                    EXAMINATION

25   BY MR. PATTERSON:

Stephen Melia

96

1    Q.    Mr. Melia, my name's Evan Patterson.   I

2  represent Cintas in this case.  I just have a few

3  questions for you.

4              I was looking through your opinions,

5  and I think one of them, I'm going to say -- I guess

6  it's opinion No. 1, is it your opinion that Ms.

7  Castro was walking as a normal customer and she did

8  not do anything to cause the incident; is that one of

9  your opinions?

10   A.    Yes, it is.

11   Q.    Would you agree with me that on the video

12  that we watched there was a number of other normal

13  customers who walked in the same place that Ms.

14  Castro did?

15   A.    I would say that that is correct based upon

16  walking over the mat.  To state it was the exact same

17  location would be more difficult to state.

18   Q.    And would you agree with me that no else in

19  the video tripped over the mat?

20   A.    I would agree with that.  I -- I would not

21  actually -- there was -- and it's -- it was after the

22  fact of Ms. Castro's fall, but when you watch the

23  video all the way through, when the paramedics

24  arrived, one of them actually didn't trip-and-fall

25  but caught their foot on the condition of the mat on

1  the right-hand side as we're looking at that video,

2  so it's certainly after this incident, but it draws

3  the correlation for the condition of the mat and how

4  a foot could get caught underneath that mat.

5          MR. PATTERSON:  Objection,

6  nonresponsive.

7      Q.   (BY MR. PATTERSON)  My question, I guess,

8  is a little bit different.

9          Did you see any customers prior to

10  Nancy's fall trip on the mat?

11     A.   No, I did not.

12          MR. WILLIAMS:  Objection, asked and

13  answered.

14     Q.   (BY MR. PATTERSON)  And earlier I think

15  what you were saying about the definition of a trip

16  hazard was it's anything that's on the floor that

17  could cause a person to catch their foot and

18  trip-and-fall; is that correct?

19     A.   It was the -- yes.

20     Q.   In so many words?

21     A.   In -- in so many -- yeah.  Sure.  Yeah.

22     Q.   If you need to elaborate, go ahead.  I'm

23  just -- I don't -- you -- you can go back there, but

24  I'm just -- in so many words that's what I understood

25  it to mean; is that correct?

Stephen Melia

98

1    A.    Yes.  And, typically, there would be in --

2   in the -- what points of incident investigation there

3   is a cause agent, your object, a -- a fixture, if

4   it's a trip incident, of course, a slip incident

5   could be (unintelligible) and other substances, but

6   those are in many cases the -- the causes for

7   trip-and-fall incidents in the -- in a workplace or

8   an environment.

9    Q.    And I'm going to show you my screen.  This

10   is, I think -- I think I heard someone say this is

11   marked as Exhibit 5, but it's in your report.  In any

12   case, it's the mat picture we've kind of been talking

13   about.

14        I see a raised lip there on the door.

15   Do you see that?

16    A.    I do.

17    Q.    Would you agree with me that under your

18   definition of a trip hazard that would also

19   constitute a trip hazard?

20    A.    It -- it could, yeah.

21    Q.    And that's something that every customer

22   just has to watch out for and make sure that they

23   don't trip over, correct?

24    A.    That would be accurate.

25    Q.    Because that's important for any person

Stephen Melia

99

1   who's walking to make sure that they don't trip over

2   things that are on the ground, right?

3       A.    Well, again, in -- in the area of something

4   that is placed there in a normal condition of the

5   business or the expectation walking over a threshold

6   is certainly normal.  I think it is different than

7   the condition of a mat, a mat in and of itself laid

8   properly would be easily to -- to traverse over in

9   the condition and the point that I referenced and my

10  findings was the mat was not laying flat which caused

11  the -- the risk to, you know, be present.

12      Q.    Would you agree with me that a mat that --

13  even if a mat is laying flat it can present a trip

14  hazard?

15      A.    I don't believe it would cause necessarily

16  a trip hazard, although, certainly people can trip on

17  their own shoes.  You know, that's obviously, been

18  shown over years of people walking.  But in this case

19  the evidence that I reviewed reflects the risk

20  condition of being a -- not a normal condition which

21  created the risk.

22            MR. PATTERSON:   I'll object to the

23  nonresponsive portion.

24      Q.    (BY MR. PATTERSON)  Do you have any

25  opinions about how Cintas laid the mat in this case?

Stephen Melia

100

1    A.    The -- there's information that Cintas

2  provided the mats and that the -- nobody had offered

3  any direct opinions, but from recollection that

4  Walmart was to utilize and place the mats, replace

5  them if they are worn, tattered, and then put them in

6  the back room until the next service agreement is --

7  or the next service from Cintas is made, so I do not

8  believe I correlated any specific direction or saw

9  any evidence that Cintas placed the mat there.  It

10 certainly wasn't viewable in the video.

11   Q.    Do you have any specific criticisms of

12 Cintas in this case?

13               MR. WILLIAMS:  Objection, broad,

14 vague.

15               THE WITNESS:  The -- certainly I

16 offered my opinion that the -- the type of mat and

17 the decision to utilize that size, that type of mat

18 at an entrance door in my experience would likely be

19 like a condition of a contract between Walmart and

20 the provider, in this case, Cintas.  I do have an

21 opinion that I do not believe the mat was

22 appropriately positioned or placed, but I, again, do

23 not have any information to say that Cintas made the

24 decision on the timing or the placement of the mat.

25   Q.    Okay.

Stephen Melia

101

1          MR. PATTERSON:  That's all I've got.

2                    EXAMINATION

3   BY MR. WILLIAMS:

4      Q.    Okay.  Mr. Melia, are you fine to continue

5   on or would you like a quick break?

6      A.    I am good to continue considered all the

7   delays I created earlier.

8      Q.    Okay.  Mr. Melia, earlier you and a

9   Mr. Patterson were talking; do you remember that?

10     A.    Yes.

11     Q.    And you and Mr. Patterson were discussing

12  the threshold or and whether or not that's a trip

13  hazard; do you remember that?

14     A.    I do.

15     Q.    More likely than not is that threshold

16  going to cause someone to trip?

17          MS. HERRERA:  Objection, form.

18          THE WITNESS:  Again, it -- it is

19  something someone could trip over, but it is in a

20  consistent normal position and likely expectation of

21  someone stepping over a threshold entering into a

22  facility is considered a -- a normal condition in my

23  opinion where mats are placed differently at

24  different times either based on weather conditions or

25  other needs, and so I -- I do draw a distinction

Stephen Melia

102

1  between a -- a permanent fixture at a known entryway
2  versus items that can be placed or moved, if you
3  will, in such -- such as the case with a mat.
4      Q.   (BY MR. WILLIAMS)  And, Mr. Melia, I
5  understand.
6           My question is:  Is it more likely
7  than not or less likely than not that the threshold
8  is a trip hazard that you and Mr. Patterson
9  discussed?
10           MS. HERRERA:  Objection, form.
11           THE WITNESS:  Well, again, there is a
12  potential of a risk of someone stepping over a
13  threshold and hitting their foot causing them to
14  trip, so there is -- every case has to be reviewed
15  and determined, but if there were a trip over a
16  threshold there are guidelines and standards for the
17  height of thresholds and entryways, that would be a
18  totally different subject that I have not reviewed in
19  this case, but I'm aware of the standards for
20  elevation heights and -- and threshold standards for
21  standard entryways but not that I've reviewed to be
22  able to speak on at this time.
23      Q.   (BY MR. WILLIAMS)  Right.
24           And -- and my understanding is I could
25  win the lottery, but I'm probably not going to win

Stephen Melia

103

1  the lottery.  And the same thing with this one, you

2  could trip over the threshold, but you're probably

3  not going to trip over the threshold; is that your

4  understanding as well?

5         MR. PATTERSON:  Form.

6         MS. HERRERA:  Objection, form.

7         THE WITNESS:  Yeah.  I -- I just -- I

8  hate to say, I'd have to, you know, review every case

9  as the information and facts present itself, so

10 I'm -- I'm not sure how I can answer that.

11    Q.   (BY MR. WILLIAMS)  Okay.  I'm going to

12 share my screen with you.

13         MR. WILLIAMS:  Elizabeth, you left off

14 at 12, Exhibit 12?

15         MS. HERRERA:  Well, so we're on 13.

16    Q.   (BY MR. WILLIAMS)  Okay.  I'm going to mark

17 this as Exhibit 13.  Can you see my screen fine?

18    A.   Yes, I can.

19    Q.   And you recognize the person in the white

20 to be Nancy Castro?

21    A.   Yes, I do.

22    Q.   Okay.  And do you understand that this is a

23 screenshot of the video which is Exhibit 7 in this

24 matter?

25    A.   Yes, I'll accept that is -- that's the

Stephen Melia

104

1   exhibit number.  But, yes, I do recognize that

2   screenshot and that that is Ms. Castro.

3       Q.    I -- I apologize for that.

4             Do you recognize this photo to be a

5   screenshot from the video of the incident?

6       A.    Yes, I do.

7       Q.    Okay.  Do you see a dangerous position on

8   the mat?

9       A.    Since one of the things that I identified

10  in reviewing the video the ripple in the mat is

11  evident from the video and from the screenshot [SIC].

12      Q.    And do you believe that this ripple in the

13  mat is a dangerous condition or not?

14            MS. HERRERA:  Objection, form.

15            THE WITNESS:  I do believe that if it

16  is not laying flat then I would characterize it as a

17  risk or a dangerous condition.

18      Q.    (BY MR. WILLIAMS)  And when you reviewed

19  the video did Nancy's foot get caught underneath that

20  curl in the mat?

21            MS. HERRERA:  Objection, form.

22            THE WITNESS:  Yes, that is my

23  conclusion.

24      Q.    (BY MR. WILLIAMS)  Excuse me.

25            When you reviewed the video where did

Stephen Melia

1    Nancy's foot get caught under the mat?

2                     MS. HERRERA:  Objection, form.

3                     THE WITNESS:  It was at that point

4    another one from a separate angle that were the basis

5    of that conclusion that this was where her foot was

6    caught under that -- that area of ripple.

7       Q.    (BY MR. WILLIAMS)  And do you believe that

8    this incident could have been prevented had the mat

9    simply been picked up?

10                    MS. HERRERA:  Objection, form.

11                    THE WITNESS:  I do, yes.

12      Q.    (BY MR. WILLIAMS)  Okay.

13                    MR. WILLIAMS:  I'll pass the witness.

14                    MS. HERRERA:  We'll reserve.

15                    MR. PATTERSON:  I'm good.

16                    MR. WILLIAMS:  I don't have anything.

17                    MR. PATTERSON:  I think we both said

18   we're good.

19                    MR. WILLIAMS:  Ms. Moss, do you have

20   any spelling corrections or questions for us.

21                    THE COURT REPORTER:  I just need to

22   know if Ms. Herrera and Mr. -- where did he go --

23   Patterson, do you guys want copies of this?

24                    MS. HERRERA:  Yes.

25                    THE COURT REPORTER:  What about you,

Stephen Melia

106

1   Mr. Patterson?

2              MR. PATTERSON:  No, I'm okay.  Thank

3   you.

4              THE COURT REPORTER:  Okay.

5              THE WITNESS:  And I would like to

6   receive a copy and read and sign.

7              THE COURT REPORTER:  Okay.

8              THE VIDEOGRAPHER:  Are we okay to go

9   off the record?

10             MR. WILLIAMS:  Yes.

11             THE VIDEOGRAPHER:  Off the record at

12  4:36.

13      (Whereupon, the proceedings were concluded.)

14

15

16

17

18

19

20

21

22

23

24

25

Stephen Melia

107

1          WITNESS CORRECTIONS AND SIGNATURE
           TO THE ORAL DEPOSITION OF
2                  STEPHEN MELIA
                   Volume 1 of 1
3               September 15, 2022


4

Please indicate changes on this sheet of paper, giving
5   the change, page number, and line number and reason
    for the change.  Please sign each page of changes.
6

7   PAGE/LINE      CORRECTION              REASON FOR CHANGE

8   _____

9   _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  _____

24  _____

25  _____

**Stephen Melia**

108

1          I,   STEPHEN MELIA, have read the foregoing

2     deposition and hereby affix my signature that same is

3     true and correct, except as noted above.

4

5

6                              _____
                               STEPHEN MELIA
7

8     THE STATE OF _____)

9     COUNTY OF _____)

10         Before me,_____, on this day
      personally appeared STEPHEN MELIA, known to me ( or proved
      to me under oath or through _____)
11    (description of identity card or other document)) to be the
12    person whose name is subscribed to the foregoing instrument
      and acknowledged to me that they executed the same for the
13    purposed and consideration therein expressed.

14         Given under my hand and seal of office this _____
      day of _____, _____.
15

16                              _____
                                NOTARY PUBLIC IN AND FOR
17                              THE STATE OF _____

18

19

20

21

22

23

24

25

Stephen Melia

109

1                    UNITED STATES DISTRICT COURT
                   FOR THE WESTERN DISTRICT OF TEXAS
2                         SAN ANTONIO DIVISION

3
NANCY CASTRO,                          &
4  PLAINTIFF                            &
                                       &
5  VS.                                  &
                                       & Civil Action No.
6  WAL-MART, INC., CINTAS               & 5:1-CV-00702-XR
   CORPORATION NO. 2 D/B/A CINTAS       &
7  CORPORATION, WAL-MART STORES         &
   TEXAS, LLC, AND WAL-MART REAL        &
8  ESTATE BUSINESS TRUST,               &
   DEFENDANTS                           &
9

10

11                    REPORTER'S CERTIFICATION

12  THE STATE OF TEXAS:
    COUNTY OF TARRANT:
13

14      I, Christie L. Tawater, Shorthand Reporter in and for

15  the State of Texas, hereby certify to the following:

16      That the witness, STEPHEN MELIA, was duly sworn by the

17  officer and that the transcript of the oral deposition is a

18  true record of the testimony given by the witness;

19      That the deposition transcript was submitted on

20  September 30, 2022, to the attorney for the witness, for

21  examination, signature, and to Southwest Reporting & Video

22  Service, Inc., by October 30, 2022;

23      That the original deposition was delivered to Mr. Lucas

24  W. Williams, Custodial Attorney;

25

Stephen Melia

110

 1        That the amount of time used by each party to the

 2   deposition is as follows:

 3        Mr. Lucas W. Williams - 1 hour and 42 minutes
          Ms. Elizabeth Ferguson Herrera - 27 minutes
 4        Mr. So and So Patterson - 6 minutes

 5        I further certify that I am neither counsel for,

 6   related to, nor employed by any of the parties or

 7   attorneys in the action in which this proceeding was

 8   taken, and further that I am not financially or

 9   otherwise interested in the outcome of the action.

10        GIVEN UNDER MY HAND AND SEAL OF OFFICE, on this

11   the 30th day of September, 2022.

12

13

14

15        _____
          Christie L. Tawater, CSR 7352
16        Expiration Date:  12/31/2024
          Firm Registration No. 189
17        Southwest Reporting & Video Service, Inc.
          826 Heights Boulevard
18        Houston, Texas 77007
          Phone:  (713) 650-1800
19        Fax:  (713) 650-6245

20

21

22

23   Job No. 57851

24

25

Stephen Melia

111

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Stephen Melia                    Index: 1..apologize

**1**

**1**  28:4 77:14 96:6
**10**  58:16 78:17
**100**  16:1 33:10
**11**  78:24
**11:30**  79:22
**12**  79:22 83:12 103:14
**13**  103:15,17
**143**  34:24
**15**  80:12 91:21
**16**  81:5
**17th**  81:10 82:18
**19**  7:20
**1984**  7:11
**1995**  8:8
**1999**  12:12,13 14:17

**2**

**2**  28:2,6 35:19 81:13
**20**  57:2 59:16 60:17
**200**  16:3 17:4 83:5
**2001**  12:14
**2003**  13:12 14:17 15:2 16:5
**2010**  16:7,9 89:4
**2015**  16:5,7,9 17:7 20:5 83:19 84:1,16 85:2 88:22 89:7
**2020**  6:24
**2021**  81:16
**2022**  78:8 81:5,10 82:18
**22**  77:22
**23**  77:8 79:4 91:21
**23-page**  91:20

**25**  58:16
**25th**  6:24
**26**  62:20
**2:03**  6:3

**3**

**3**  31:22 36:2 43:12 59:13 93:18
**30**  37:17 39:25 40:6 60:17 63:1 65:19 76:1,8 85:18,19
**300**  17:6 83:6
**31**  7:16 88:24
**35**  63:21
**38**  57:23
**3:42**  75:2
**3:55**  75:5

**4**

**4**  35:2
**45**  60:8
**46**  59:13,16
**47**  60:8
**48**  60:20
**49**  54:22 55:5
**4:36**  106:12

**5**

**5**  46:24 93:21 98:11
**5.4**  28:19
**5.4.6**  29:24
**5.46**  29:18
**510**  7:4
**53**  62:20 63:1,21

**6**

**6**  48:9 56:7 60:20

**7**

**7**  54:17 103:23

**8**

**8.10**  32:3,10 33:2
**8th**  81:15

**9**

**9**  54:22 55:5 57:23 77:11,12

**A**

**absolute**  81:2
**accept**  103:25
**accepted**  89:13
**accident**  8:16,22 23:3,4 27:11 82:1 88:15,18 90:12,21 91:3,8 92:4 93:24 94:9,17
**accidents**  9:5 90:5
**accurate**  79:10 98:24
**acting**  93:16
**action**  33:13 34:10 54:11 61:22
**actions**  66:17,20 70:6 90:19
**activity**  53:23 55:16
**actual**  22:25 53:24 83:7
**add**  82:14
**addition**  31:13 40:10 46:4 78:6
**additional**  13:15 23:25 78:7
**addressed**  15:16
**addressing**  35:15 39:14

**adequate**  9:11
**adopt**  24:10
**affidavit**  56:20,25 57:5 77:1 79:14 80:2 81:9
**affirmatively**  78:12
**afternoon**  6:17,18 79:20
**age**  7:20
**agent**  23:1 98:3
**agree**  6:22 7:2 20:23 30:6,22 31:3 33:6,10, 21,24,25 87:23 88:14,17 90:8 92:2 93:1 94:8,15 95:14 96:11,18,20 98:17 99:12
**Agreed**  30:21
**agreement**  30:17 31:7 100:6
**ahead**  77:10 97:22
**aisles**  65:24
**alarm**  13:12,16,17, 20 14:16 89:24
**alert**  38:21
**aligned**  19:8
**allowed**  86:6 94:2
**Ambiguous**  50:15
**amend**  80:24
**American**  28:10,22 31:25
**analysis**  22:7,20 23:8,11,14 34:6 53:18
**angle**  49:25 60:24 62:2 105:4
**angles**  64:16
**announced**  39:11
**answering**  20:23
**apologize**  44:15,18 57:16 104:3

**Stephen Melia**                    Index: appears..cases

**appears** 43:16 55:11 61:10 63:5,12 89:18

**appendix** 77:15 79:4 80:7,12 83:20 91:18, 19,21

**applicable** 28:21

**applies** 88:13

**apply** 17:16 18:23 22:4 26:19 29:2 36:11 42:14,19 43:6 87:22 88:9

**appropriately** 100:22

**approximately** 54:6

**area** 9:8 10:21,22 15:16 16:3,8 18:24 20:12 30:2 35:16 37:22 38:13,19 40:2 54:8 65:24 68:25 70:22,25 76:10 84:13,25 99:3 105:6

**areas** 14:12 16:16 18:23 19:1 20:9 29:25 30:3 31:12,16 32:17,18 39:9 49:6 88:7

**Arkansas** 16:6 20:19 89:5

**arrive** 22:3

**arrived** 96:24

**aspect** 8:14,18 14:2, 25

**aspects** 8:12 14:9

**assessing** 8:24

**assessment** 91:6

**assessments** 84:23,24

**asset** 14:19 15:1,16 16:10,18 20:18 89:19,20 90:2

**assigned** 52:18

**assist** 7:21

**assistant** 7:23 15:22

**assisting** 84:6

**associate** 7:21 40:11 61:2 63:7 64:9 76:10

**associate's** 68:24

**associates** 8:15 15:22 24:19 26:21 35:13 38:6 40:1 54:8 58:4,6,13 69:1 70:3, 24

**assuming** 45:12

**ASTM** 28:7,9

**attach** 78:23 82:15 83:12

**attached** 77:14 79:3 83:20 93:22

**attendant** 7:21

**attended** 86:22 87:17

**attending** 18:19

**attention** 25:11

**attorneys** 79:17 91:2

**audio** 11:13 44:24

**audits** 8:19

**authored** 77:24 78:1 80:20 81:7

**avoid** 93:12

**avoided** 92:4

**aware** 90:3 102:19

**awareness** 10:15,17 17:19 24:22 26:4 38:18,21 67:11

**B**

**back** 10:3 36:8 53:18 56:24 57:12,13 61:9 74:19 81:13 82:3 87:1 89:9 90:11 94:10 97:23 100:6

**background** 86:20

**balance** 51:14

**bandwidth** 44:25

45:5

**base** 21:19

**based** 13:6 22:5 29:9 34:13 37:15 49:16 51:6 54:24 64:15 69:11 70:1 73:3 82:12 86:3 90:7,16 93:10,25 96:15 101:24

**baseline** 23:20

**basic** 14:23 16:16

**basically** 35:12

**basis** 7:22 39:10 42:12 50:14 53:5 66:6 70:15 105:4

**Bates** 34:23

**begin** 23:21 83:17

**begins** 38:22

**behalf** 12:15,17,24

**belabor** 90:17

**benefit** 26:25

**Bentonville** 16:6 89:5,10

**Beth** 11:12

**billed** 82:7,13

**bit** 8:4 97:8

**black** 14:10 47:7

**board** 33:19

**border** 32:12

**break** 26:1 55:24 74:15,20 78:11 101:5

**breakdown** 9:9

**briefly** 19:16

**bringing** 29:8

**broad** 100:13

**broom** 39:8

**buckle** 32:11 42:6

**buried** 44:17

**business** 17:11 20:4 24:17 27:3,8,17

62:15 65:13 83:25 86:24 88:10 92:23 99:5

**businesses** 19:4 24:22 26:19 88:4

**C**

**cable** 44:16,17

**California** 16:14

**call** 47:9

**called** 38:12

**calling** 45:10

**calls** 93:4

**cameras** 13:23 14:4, 10,11

**campaign** 26:5

**capacities** 12:18

**capacity** 20:14

**care** 26:14 53:10 93:3

**career** 7:25

**careful** 92:20

**carpet** 31:11

**carpeted** 10:20 47:7

**cart** 7:21 59:21

**carts** 32:17 42:7

**case** 13:5,6 19:10,23 21:2,3,20 22:1 23:9, 15,17 35:15 42:15,19 43:7 45:20 51:24 53:14 75:11 76:25 79:9 80:14,17,22 81:7,12 82:4,8,13 83:9 85:11,13,16,24 86:6,8,11,16 88:18 91:3 93:10 96:2 98:12 99:18,25 100:12,20 102:3,14, 19 103:8

**cases** 17:14 33:11 81:20,23,25 84:14 85:16,18,22 98:6

**Castro** 21:6 43:17
45:24 46:6 48:23
72:3 73:15 90:20,23
92:3 93:11 96:7,14
103:20 104:2

**Castro's** 6:23 79:17
91:1,9 94:17 95:4
96:22

**catch** 32:12 51:12
97:17

**catching** 49:17

**caught** 96:25 97:4
104:19 105:1,6

**causation** 95:8,11,
15,16,17

**caused** 23:6 46:6
90:14 94:14 99:10

**causing** 102:13

**CCTB** 13:14

**centers** 11:25

**certainty** 20:25

**certification** 87:16

**certifications**
87:11,16,19,22

**certified** 87:12

**cetera** 23:20 29:10
38:11,25 53:22 84:10

**change** 21:23

**changed** 19:24
39:21

**characterize** 104:16

**charge** 9:4

**charges** 82:25

**check** 80:24

**Christie** 6:10

**church** 20:3,15

**Cintas** 21:7 96:2
99:25 100:1,7,9,12,
20,23

**circles** 48:13,15,25
49:1,5 56:10

**cite** 31:10 73:1

**cited** 22:15

**cites** 32:14

**city** 6:6,25 7:4 21:9

**claims** 8:16

**clarity** 31:9

**clean** 38:13

**cleaning** 38:12

**clear** 42:24 92:15
94:3

**close** 58:9

**closed-circuit** 12:1

**Club** 7:8,15 15:12
17:9 84:13 89:6,21

**Clubs** 11:25 15:8
16:3,12,15 17:5,6

**college** 87:1,3,7

**color** 14:10

**combined** 13:18
14:15 15:23

**comfortable** 81:24

**commercial** 31:25

**common** 19:1 23:2
88:11

**communication**
38:24

**companies** 19:3
24:10 26:5 39:6
52:20

**company** 16:12,13
17:5 27:17 44:16
83:22,23 84:11 90:15

**competing** 25:10

**complete** 80:18 87:1

**completed** 45:24
86:25

**completely** 72:9

**compliance** 9:11
15:2,17 16:11,20
89:21

**computer** 55:19,22
74:21

**concluded** 106:13

**conclusion** 22:25
23:6 93:5 94:3
104:23 105:5

**conclusions** 21:12
22:3

**conclusively** 58:19
62:5

**condition** 26:3
36:24,25 37:24 52:23
68:15,20 69:3,5,11,
16 70:5,8,14,17 71:8,
11,15 72:1,8,14
73:22 74:5 93:24
94:3,13,23 96:25
97:3 99:4,7,9,20
100:19 101:22
104:13,17

**conditions** 9:1,5
10:5 18:23 27:18
36:16 38:5,22 39:14
66:1 72:6 92:17 95:8
101:24

**conduct** 34:4 39:12
84:23

**conducted** 70:2

**conducting** 8:18
66:5 90:12 91:6

**conferences** 18:19

**confined** 70:23

**confirm** 78:17 82:5

**congratulations**
20:21

**connection** 41:10
45:7 74:22

**considered** 23:4
42:21 101:6,22

**consist** 7:17 8:11
11:22 15:6

**consistency** 19:5

**consistent** 17:21
19:1 36:13 101:20

**constitute** 98:19

**construction** 24:11

**consultant** 20:7

**consultation** 21:4

**consulting** 20:4,13
83:21 84:4,18,20
85:3

**contact** 51:2

**contacted** 81:11

**continue** 29:14
57:22 72:15 101:4,6

**continuing** 17:4

**contract** 100:19

**contractor** 20:15

**contractors** 12:3

**controls** 72:11

**convenience** 47:8

**copies** 105:23

**copy** 19:20,21 20:12
77:2,4,7 80:5 106:6

**corporate** 13:16

**correct** 9:1 16:24
18:2 25:24,25 28:12
35:22,24 36:24
40:21,22 42:5 50:19
52:10,12,22 64:5,18
65:25 66:20 68:2
69:2 71:2 72:13
73:22 77:3,9 83:15,
16 84:2,19 85:5,6
86:8 87:4,5,10 88:20,
22,23 89:19 90:1
91:9,20,22 94:12,17,
20 95:2,6,9,10,19
96:15 97:18,25 98:23

**corrected** 23:2 59:6,
25 61:18 64:25

**correcting** 9:8 40:14
72:8 74:4

**correction** 36:23

**corrections** 15:14
105:20

**correlated** 100:8

**correlation** 97:3

counsel 6:12 21:24 85:14

counsel's 53:6

counter 55:9 58:3,5, 7,11 60:13 61:3,5,9 63:8

country 15:9

county 6:6,8,11

couple 45:4

court 6:5,9,10 11:4, 9,16 43:19,22 45:12, 17 46:15 85:24 105:21,25 106:4,7

cover 81:3

create 29:13 30:1 32:13 35:17 37:12 52:2,4

created 31:6 69:12 99:21 101:7

creates 34:8 51:11

creating 24:22

critical 36:21,22

criticisms 100:11

curl 32:12 104:20

curled 31:13 32:15, 19 34:7 49:7,17 74:11

curls 47:12,14,16,22 48:16,18,20 49:2,9 56:9

current 77:23 79:5 83:22 85:11,22

customer 15:19 17:1,17 63:5 64:8 88:10,16 90:9 93:17 96:7 98:21

customers 8:15 9:20 10:9 18:13,24 24:18 26:21 27:4 42:10 51:21 58:12 62:11 65:8 68:24 87:8,13,22 88:2,6,13 90:4 92:18 93:2 96:13 97:9

cut 11:6

cutting 44:13

CV 19:20,24 28:4 77:13,14 78:21,23 83:20 86:19 89:16

—————————

D

Dallas 89:5,14

Dallas/fort 16:7

dangerous 68:19 69:5,15 70:8 71:8 104:7,13,17

date 77:23 78:1 81:4 82:21

dated 82:18

Daubert 86:4

day 40:12 56:15

day-to-day 27:3,8 39:22 62:14 65:13

days 71:5,12,16

deal 45:5

deals 18:21

decide 86:13

decision 89:7,12 100:17,24

deemed 34:12

defendants 21:17 30:22 76:24

defense 21:23 85:8, 12,13,20

define 50:22,24

defined 8:13 18:5 25:4

defining 22:11

definition 51:6 97:15 98:18

degree 20:25 86:24 87:2,3,7

delays 101:7

dependent 33:19

deposition 13:4 46:5 56:16 57:14 78:17 79:2,11,13 80:3 83:2,4,7,13 93:22

depositions 78:5,7, 20 91:5,16

describe 47:15

describing 48:17

description 65:23

designed 25:6 29:7, 11

desktop 57:11,13

Desouza 21:4 81:18 82:4,7 91:15

detailed 38:8

determinations 71:15

determine 43:5 53:25

determined 24:3 86:11 90:16 102:15

determining 22:7 23:22 33:13 90:13

developed 9:12 10:13

developing 88:2

devices 44:21

diagnosis 95:5

difference 57:7 76:8

differences 17:10

differently 101:23

difficult 54:25 55:15 71:14 96:17

difficulties 57:15

digital 14:11

direct 15:25 100:3

directing 9:8 13:14 16:17

direction 31:9 42:20 61:6,8,12 92:21 100:8

directly 14:1 32:17 48:2

director 8:5,7,10 11:2,20 12:13 13:11 14:16,19 15:1,6 16:10,21,22 17:2 20:3,17 89:18,20,21, 24

disagree 87:24,25 88:14 92:25

discard 37:3

disconnecting 44:20

discussed 40:11 51:11 52:17 80:6 81:9 102:9

discusses 28:19

discussing 75:9 101:11

displaced 89:11

display 63:13,15,18

distinction 101:25

distinguish 95:15

distribution 11:25

district 7:24 8:9 9:13

division 7:16 8:2 13:17,21 14:25

divisional 89:6

doctor 95:1

document 28:10,18 29:1 31:24 35:1 81:3 83:6 84:9

documentation 20:8 22:15 38:23 80:8,25

documented 70:13

documenting 94:13,22

documents 78:15 80:2,5,13,21 82:25 91:7,8,13

dollar 27:19

**door** 46:1 98:14
100:18

**doors** 10:3 18:25
62:3 63:9 70:4

**dot** 20:13

**download** 57:11

**draw** 55:17 71:14
86:9 94:2 101:25

**drawn** 48:25

**draws** 97:2

**due** 31:6 57:15

**duly** 6:14

**duty** 93:2

---

**E**

---

**earlier** 36:8,14 37:11
40:11 45:19 48:19,22
65:17 66:25 67:3
75:6 77:20 79:20
90:12 91:23 94:4
97:14 101:7,8

**easily** 25:21 33:16
73:7 99:8

**easy** 25:22

**edge** 48:5

**edged** 34:7

**edges** 30:3 31:13
32:15,19 34:6

**educate** 9:17,19

**education** 86:20

**educational** 86:19

**effort** 15:24

**elaborate** 97:22

**elevate** 25:6

**elevated** 7:23 13:18

**elevation** 10:20
102:20

**eliminated** 72:2,4

**Elizabeth** 76:23
103:13

**employee** 18:21
59:19,22,25 60:3,14
62:10,13 63:7,10,24
64:1,3,19 65:6,11
66:13 88:19 92:23

**employees** 9:19
10:10 37:3,17 38:14
39:1,16 55:8 58:10,
22,25 66:2 87:8 88:4,
6,8,13 91:24 92:16

**employer** 83:22

**employers** 92:16

**employment** 88:21
89:14

**end** 17:3 32:12 35:7,
16 41:9

**engineering** 87:20

**ensure** 9:11,18 10:3,
17 16:18 18:11 19:10
22:17 24:21 25:21
26:5 32:18 36:4,15
42:3,4 52:19 73:20

**ensuring** 8:16 15:14
32:14

**entering** 101:21

**entire** 13:20

**entities** 17:15

**entrance** 10:2 18:1,
25 19:2,10 27:24
28:17 29:3,4 31:14,
25 34:14 35:18 46:10
61:5 70:14 100:18

**entrance/exit** 47:7

**entrances** 10:1 19:2

**entranceway** 18:6

**entryway** 102:1

**entryways** 102:17,
21

**environment** 8:14,
24 10:19 24:18 25:8
33:19 35:17 37:12
73:24 88:12 98:8

**environments**
33:11

**equipment** 38:13
50:25

**essentially** 13:13
15:2

**establish** 22:12

**estimate** 79:24

**evaluate** 33:12

**Evan** 11:12 50:13
96:1

**event** 21:10

**everyone's** 9:6

**evidence** 53:7,8
66:7,12 67:4 71:4
75:20 99:19 100:9

**evidence-based**
34:5

**evident** 38:10
104:11

**evolve** 17:4

**evolved** 7:23 14:9
15:3

**exact** 48:11 81:22
96:16

**EXAMINATION**
6:15 76:20 95:24
101:2

**examine** 23:21

**examining** 22:10

**excluded** 85:23

**excuse** 10:7 52:10
58:21 60:5,18 71:3
72:16 104:24

**execution** 43:3
67:12

**executive** 20:3

**exercise** 93:2

**exhibit** 28:2,4,6
31:22 35:2 46:24
48:8 54:17 56:7 77:1,
11,12,14,15 78:17,24
83:12 93:21 98:11
103:14,17,23 104:1

**exist** 27:18

**exit** 46:1 72:3

**exited** 63:5

**exiting** 45:25 46:11
70:4 93:16

**exits** 35:18

**expanded** 9:14

**expectation** 16:16
25:7 35:14 36:1
37:21 38:19 39:1
42:25 43:2 51:23
52:1,22 92:18,19
99:5 101:20

**expectations** 9:22
10:23,25 15:21 18:5,
20 29:2 72:22

**expected** 10:16
36:15 39:25 67:12

**experience** 18:18
21:22 22:5 25:5
26:18 27:20 31:10
36:10 37:16 88:1,5
90:7 92:17 100:18

**expert** 14:7,12 19:13
24:25 81:4 83:17
85:3 86:5

**explain** 89:3

**exposure** 69:12

**extent** 43:1 95:11

**external** 8:19

**eyes** 61:6 66:20

---

**F**

---

**F-O-R-N-E-Y** 6:8

**facility** 17:13 18:12
19:10 39:15 101:22

**fact** 36:13 74:10
96:22

**factor** 24:17

**factors** 25:10

**facts** 13:5 21:20,24
22:11 23:16,20 24:3
43:6 45:20 53:19

90:16 91:4 103:9

**factual** 13:5

**failure** 14:24,25
30:15 33:17 37:25
38:1 43:18 44:2
48:22 64:7 73:21,22
78:19

**fair** 16:23 40:19
86:14

**fairly** 19:1 80:25 81:1

**fall** 51:4 90:17 96:22
97:10

**fallen** 90:4

**falling** 95:12

**falls** 17:17 90:9,14

**familiar** 13:25 14:11
18:14 24:8,12 27:22
28:13 35:4

**fault** 90:10

**February** 6:24 78:8
81:5,10 82:18

**fee** 79:3,5

**feel** 81:23

**fell** 22:9,10 46:1,10

**field** 16:17

**filings** 86:4

**find** 22:25 65:22 66:1
68:2 70:17 78:15

**findings** 99:10

**fine** 19:18 30:25
31:19 54:14 78:18
79:2 101:4 103:17

**firm** 21:4 81:18 82:4,
7 91:15

**fixture** 98:3 102:1

**flat** 32:11 33:3,4,22
34:3,6,9,18 36:5,18
42:9 43:15 47:21
49:16,20 50:2,5,11,
18 51:10 69:12 73:20
94:6 99:10,13 104:16

**floor** 10:5,19,22
18:9,10,20 33:4

34:21 36:5,15 37:3,
24 40:24 41:23 42:3,
10 49:21 51:1 71:5
94:6 97:16

**flooring** 18:7

**floors** 10:18 52:18

**Florida** 16:14

**flush** 40:24 41:22
42:3 49:21

**focus** 29:5

**folks** 52:18 56:24

**follow** 43:2

**foot** 51:2,12 96:25
97:4,17 102:13
104:19 105:1,5

**footage** 13:23 14:4,5
68:12

**footprint** 70:23 76:7

**foremost** 67:9

**forensic** 53:18

**form** 13:1 21:18
24:15 25:2,16 26:10
27:5,15 28:24 29:23
30:9,12 32:8 33:1,8
34:1,16 36:19 37:5,9,
19 38:16 39:19 40:8,
20 41:1,25 47:5,13,
18,24 49:3,11,22,23
50:9 51:17,22 52:6,
13 53:1 54:4 59:2,7
61:14,20 64:22 65:2,
9,15 66:9,15 67:15,
22 68:8 69:7,17 70:9,
19 71:9,21 72:19
74:2 75:12,19 76:5,
14 92:5,9 101:17
102:10 103:5,6
104:14,21 105:2,10

**format** 7:15 76:7

**Forney** 6:7

**Fort** 6:11

**forward** 56:16

**found** 52:25 54:2
67:20 76:12

**fourth** 63:24 64:3,19

**frame** 58:19 62:8
71:13 73:13,15

**frayed** 30:3 31:13

**freezing** 45:8

**front** 29:1 35:7,16,23
48:1 70:4 78:2 81:22
82:9

**froze** 41:17

**frozen** 43:19

**fuel** 21:9 47:8

**full** 62:4

**functions** 11:24

**— G —**

**gained** 36:11

**gas** 6:25 7:3

**Gateway** 20:2

**Gatorade** 63:13,15,
17

**general** 7:20 8:20
10:11,14 14:6 17:13
18:14 22:6 37:22
38:6 86:23

**generally** 18:24 19:7
24:9 31:6 38:8 39:25

**generated** 22:12

**geographic** 15:9

**give** 20:24 21:3
44:24 55:20

**giving** 13:5 22:23
42:20

**goal** 22:16 37:11

**good** 6:17,18 15:14
27:17 30:18 40:10
41:14,15 56:1 74:21
101:6 105:15,18

**grab** 12:9

**graduated** 86:21

**grate** 13:20

**greater** 14:8

**grocery** 17:15 20:18
52:21

**ground** 50:6,18 99:2

**guess** 26:12 57:3
78:13 96:5 97:7

**guidelines** 8:17
72:24 88:3 102:16

**guys** 11:12 45:7
55:23 74:14 105:23

_____

**— H —**

_____

**half** 16:13 17:5 86:22

**hand** 40:2

**happened** 6:24 22:7
76:17 88:19 94:9

**happening** 9:2

**happy** 78:19

**hate** 103:8

**Hawk** 7:4

**hazard** 25:25 34:8,
15,18 35:25 47:17,21
49:10,16 50:6,12,18,
21,23,24 51:6,7,15
52:3,5 59:1,23 61:12
64:21,25 66:14 68:2
72:7 92:1,4 97:16
98:18,19 99:14,16
101:13 102:8

**hazards** 29:13 30:2,
4 32:13 35:23 37:13,
18 38:10,15 39:18
40:17,19 52:12,25
54:3 59:6 60:1 61:18
65:22 66:3 67:13,20
71:19

**headings** 14:22

**health** 27:1

**hear** 41:16 43:25
44:4,5,8,9,11 45:10

**heard** 11:14 98:10

**height** 102:17

**heights** 102:20

**held** 89:17,23

**Stephen Melia**

**helpful** 68:6

**Herrera** 11:15 13:1
21:18 24:15 25:2,16
26:10 27:5,15 29:23
30:9,12,17,21 32:8
33:1,8 34:1,16 36:19
37:5,9,19 38:16
39:19 40:8,20 41:1,
25 42:13 43:23 44:1,
23 45:3 46:16 47:13,
18,24 49:3,11,22
51:17,22 52:6,13
53:1,6,10 54:4 56:1,
7,11,19,21 59:2,7
61:14,20 64:22 65:2,
9,15 66:9,15 67:15,
22 68:8 69:17 70:9,
19 71:9,21 72:19
74:2,17,25 75:12,19
76:5,14,21,24 86:18
87:21 91:19 92:7
93:1,9 94:25 95:21
101:17 102:10 103:6,
15 104:14,21 105:2,
10,14,22,24

**hierarchy** 72:10

**high** 86:21

**highest** 86:20

**highlight** 29:16

**highlighted** 32:22

**hired** 7:11 21:2,3,4,
17

**history** 31:7 77:22
78:1,16 82:4

**hitting** 102:13

**hold** 11:4 87:19

**holes** 30:3

**hour** 40:1,6 54:6
65:19 68:5,7,11,17
73:13 75:17,22 76:2,
9 79:10 83:5,6

**hourly** 79:6,10 83:3

**house** 44:16

**Houston** 86:23

**I**

**identification** 36:21
54:10

**identified** 9:10
36:22 48:22 49:1,5
67:17,25 72:13 104:9

**identify** 22:16 35:24
39:9 40:16 65:25
69:2 70:5 71:1 73:21
75:14 88:4

**identifying** 38:12
39:14 48:18,19 74:4

**immediately** 94:21

**imminent** 69:22

**imperfection** 47:20
48:3

**imperfections** 94:5

**implement** 52:21

**implementation**
12:1

**importance** 42:24

**important** 24:17
25:23 27:3,9 42:8
73:1 98:25

**improved** 10:13

**in-house** 12:2

**inappropriately**
93:15

**inaudible** 41:5

**incident** 6:22 8:15
9:1 21:8,12 22:24
23:17,23,25 24:4
27:11 46:4,9,13,21
50:1 52:23 53:18,20,
24 54:7,12 68:3,7,11,
14,16 69:6,13,19
71:6,18 73:6,9,12
74:7 75:23 76:17
91:14 94:2,22,23,24
95:16 96:8 97:2 98:2,
4 104:5 105:8

**incidents** 17:20 31:7
88:10 90:3 92:14
98:7

**inclement** 18:10
29:4 31:15,18 72:25

**include** 9:25 29:3
33:14 78:16

**included** 7:14 77:13,
21 78:20 80:15 93:20

**includes** 53:21
77:12 93:18

**incorrectly** 93:15

**independent** 20:7,
14

**indication** 54:9

**individual** 51:1

**industries** 24:21
25:4 33:12

**industry** 17:22
18:14 21:20 22:6,19
23:12 24:2,6,11,20
25:12 27:23 28:16,21
31:9 39:5,13 40:10
42:21 43:5 73:17,19
91:16 92:14

**information** 71:12
78:15 80:21 82:12
84:6 86:12 91:5,17
100:1,23 103:9

**initial** 22:25

**initially** 7:19

**initiated** 48:23

**injure** 26:20

**injured** 37:13 90:15

**injuries** 95:11,15,17

**injury** 95:8,10

**inside** 18:12 19:11
29:6 31:17

**inspect** 9:17 15:12
52:22 88:10 92:16,
22,24

**inspected** 10:18

**inspecting** 52:18

**installation** 12:2
13:15 14:2

**instance** 86:2

**instances** 88:3

**instill** 38:25

**instructs** 37:2

**intentionally** 66:3,
13

**interfering** 62:11,14
65:7,13

**internal** 8:19 34:21
42:18

**Internet** 41:10 45:4

**interwoven** 27:7,8

**introduce** 77:1

**introduced** 43:14

**investigating** 8:15

**investigation** 23:4
68:14 90:13 98:2

**investigations** 8:19

**investigative** 23:3

**invited** 17:16

**invoice** 82:16,23
83:11,15

**invoicing** 82:11 83:1
84:7

**involve** 81:25

**involved** 8:13 10:20
11:23 13:7 14:1
81:12

**involvement** 88:15

**involves** 88:16

**involving** 17:11
84:14

**IP** 14:11

**issue** 11:13 41:11

**issues** 44:18 45:5

**item** 50:25 51:2,3

**items** 12:2 26:14
102:2

**Stephen Melia**

**J**

**job** 15:5,14

**judge** 86:3,11

**jury** 86:13

**K**

**Kaufman** 6:8

**key** 29:5

**kind** 98:12

**Kitty** 7:4

**knowing** 8:23 31:11

**knowledge** 18:4
37:16 38:25 39:23
70:11

**L**

**lack** 67:10,11

**laid** 34:9,18 42:9
43:15 99:7,25

**laptop** 57:11

**large** 70:22

**larger** 48:1 55:3
57:15

**lateral** 11:3 12:12
14:22

**Law** 21:4 81:18
91:15

**lawyers** 91:9

**lay** 32:11

**laying** 47:21 73:20
94:5 99:10,13 104:16

**lays** 43:1

**lead** 15:25

**leaders** 15:25

**leadership** 89:9

**leading** 9:8 13:13
16:17 53:6

**learn** 13:23 14:3
43:6,9 45:23 46:2
54:2 68:18

**learned** 14:25 24:2,3
43:10 45:20

**leave** 58:13

**leaves** 31:15

**leaving** 93:17

**left** 32:7 48:2 58:8
61:2,8 84:12 88:21
89:1,14 103:13

**legal** 93:5

**level** 9:13,14 13:19
14:23 15:21 17:19
19:4 25:6 86:20
92:19

**liability** 84:15 86:7

**lie** 33:3,22 36:5

**lies** 33:4

**lip** 98:14

**list** 80:13,16,19
82:14

**listed** 20:5,11 91:17

**lists** 83:21

**litigation** 20:9
84:14,21,25 85:4

**LLC** 83:21 84:4 85:3

**load** 85:11,17

**located** 6:6,10 7:4

**location** 18:6 25:12
33:20 38:13 39:2
42:5 43:17 72:1
93:17 96:17

**locations** 9:15 15:9,
10,12

**log** 57:13 74:21

**logged** 74:19

**long** 13:8 14:13,14
16:4 48:5 70:17
79:23

**looked** 52:25 54:2
61:13 94:16

**loose** 30:3 31:12

**lose** 41:2 51:14

**loss** 7:24 8:1,4,7,9,
12,18 12:11 15:3,4

**lost** 41:17

**lot** 10:2 24:10

**lottery** 102:25 103:1

**Louisiana** 20:20

**LP** 8:9

**Lucas** 30:15 44:9

**lunch** 26:1

**lying** 33:2 34:3,6
36:18 49:16 50:1,5,
11,17 51:10 69:12

**M**

**made** 32:10 33:18
49:9 70:2 73:7 89:8
100:7,23

**maintain** 25:7 26:24
37:12 73:23

**maintained** 20:13
29:12,25 31:12

**maintaining** 8:16
10:19 16:19 27:23
35:6

**maintenance** 38:9
52:18

**make** 51:2 53:23
76:8 77:5 89:12
92:16 98:22 99:1

**makes** 57:6

**making** 45:24

**management** 9:16
35:13 38:7 39:11
40:11 43:2 86:24

**manager** 7:24 8:9
15:22,23

**manner** 24:23

**mark** 54:17,23 55:5
57:6,24 58:16 59:13,
16 60:8,20 62:20

**loose** 63:1,22 77:10 103:16

**marked** 28:1,4 31:22
35:1 46:23 48:8
77:12 98:11

**marking** 28:6

**mat** 10:21 22:10
27:24 28:17 31:17
32:13 33:3,13,15,20,
22 34:2,7,10,11,14
36:17 37:3 40:23
41:22 42:3,5,7,9,23
43:12,14,17 46:10,
12,21 47:7,10,12,17,
20,23 48:4,6,20 49:2,
7,9,16,18,20 50:5,11,
17 51:7,13,15,16,19,
25 52:2,4,25 54:3,9,
11 56:9 58:9,14,23
59:1,6,20,23 60:1
61:5,13,18,23 62:4,
11,14 63:11,13,25
64:2,4,7,10,11,12,20,
21,25 65:7,12 66:21
67:14,21 68:4,15,19
69:5,12,15 70:8 71:5,
7,12,15,20,25 72:18
73:1,5,12,14,18 74:1,
8,10,11,13 75:14
76:12 91:24,25 92:3
93:19,24,25 94:3,10,
13,23 96:16,19,25
97:3,4,10 98:12 99:7,
10,12,13,25 100:9,
16,17,21,24 102:3
104:8,10,13,20
105:1,8

**Material** 28:11

**materials** 18:7 28:23
72:10

**mats** 18:1,9,10 19:2,
3,7 28:19 29:3,7,25
30:2 31:11,13 32:10,
18 33:2,3 34:21 36:4
37:25 42:22 51:21
70:14 72:24 73:20
100:2,4 101:23

**matter** 21:6 30:24
36:11 103:24

**matters** 30:20

**matting** 32:1

**meaning** 75:22

**means** 24:16 25:1 87:6

**measures** 9:11

**mechanically** 33:15

**medical** 95:1,4,8

**meet** 15:12 79:16

**meeting** 9:15

**meetings** 38:25

**Melia** 6:13,21 19:17 20:13 28:5 31:4 32:21 41:7 45:19 50:20 57:23 75:6 76:22 77:2 83:14,21 84:3,18,20 85:3 94:25 95:18 96:1 101:4,8 102:4

**members** 15:11

**memory** 86:10

**mentioned** 37:11

**merchandise** 17:12 92:21

**method** 22:2

**mileage** 79:7,9

**mind** 45:10 74:15 86:24

**Mine** 11:15

**minimal** 79:8

**minute** 54:22 55:5, 20 56:6 57:23 58:16 59:13,16 60:8,20 62:20 63:1,21

**minutes** 39:25 40:6 65:19 74:24 76:1,8 79:24,25

**mischaracterizatio n** 86:17 94:19

**mischaracterizes** 53:7

**Mississippi** 86:3

**misstates** 53:7

**mitigate** 8:25 72:7,

14

**mitigating** 9:5

**mitigation** 88:8

**moment** 41:18 55:22

**months** 57:12

**Moss** 6:10 105:19

**move** 11:3 12:12 14:22 89:9,13

**moved** 13:11 89:5,7 102:2

**moving** 32:16

————————

**N**

**name's** 96:1

**Nancy** 6:23 21:6 103:20

**Nancy's** 97:10 104:19 105:1

**national** 31:25 36:12

**nature** 12:20 17:11 87:20

**necessarily** 33:10 39:7 80:4 90:9 92:6 99:15

**necessity** 73:5

**needed** 44:15

**needing** 15:15

**negligence** 90:19

**newer** 7:23

**nonresponsive** 97:6 99:23

**noon** 79:22

**normal** 93:17 96:7, 12 99:4,6,20 101:20, 22

**notes** 74:15

**notice** 59:19

**noticeable** 59:4

**noticed** 58:25 59:22 61:12 64:20 67:13

68:19 69:15,23,25 70:8 71:7,19

**notices** 36:17

**notification** 17:19 41:10

**number** 9:24 10:23 15:8 16:15 25:4 29:7 32:14 67:8 81:22 82:9 96:12 104:1

**numbered** 56:12

**numbers** 55:1

**numerous** 18:19

————————

**O**

**object** 37:25 50:25 51:2 56:14 98:3 99:22

**objection** 13:1 21:18 24:15 25:2,16 26:10 27:5,15 29:23 30:9,12 32:8 33:1,8 34:1,16 36:19 37:5,9, 19 38:16 39:19 40:8, 20 41:1,25 42:12 47:13,18,24 49:3,11, 22,23 50:14 51:17,22 52:6,13 53:1,5 54:4 59:2,7 61:14,20 64:22 65:2,9,15 66:9, 15 67:15,22 68:8 69:17 70:9,19 71:9, 21 72:19 74:2 75:12, 19 76:5,14 86:15 87:14 91:10 92:5,9, 12 93:4 94:18 97:5, 12 100:13 101:17 102:10 103:6 104:14, 21 105:2,10

**objection's** 30:18

**objective** 9:3

**observant** 37:23 40:13

**observation** 10:17 43:16 52:17 67:17 73:7

**observation's** 70:2

**observations** 53:23 70:1

**observe** 58:13,15

**observed** 61:16 66:11

**obstructions** 90:18

**obtain** 53:19

**obtained** 18:18

**occur** 22:18 31:11 43:3 49:19 68:13 69:13 76:4 94:14

**occurred** 21:8 68:3 71:18 74:7

**occurrence** 30:5 31:16

**occurring** 17:18 23:25 31:7

**occurs** 9:2 52:23 68:12

**October** 81:15

**offer** 19:12 21:11,25 72:21 95:12

**offered** 100:2,16

**offering** 95:3,7,17

**office** 89:6

**oftentimes** 39:10

**Oklahoma** 20:19

**older** 15:3 19:21 77:17,18

**One's** 57:2

**one-hour** 73:15

**open** 89:6

**operate** 24:22

**operating** 35:8,10, 20 37:2 38:23 52:16 65:23 72:23

**operation** 15:10

**operational** 8:20

**operations** 16:18 39:22

Stephen Melia

**opinion** 24:25 25:5, 18 26:7,13 27:2,7 32:16 41:23 49:9,14, 15 50:5,8,10 52:8 67:24 69:4,10,14,21 70:15 71:18,23,24 72:16,17 74:7,9 76:15 93:9,14 96:6 100:16,21 101:23

**opinions** 19:13 20:8 21:11,13,16,25 22:3 72:21 73:2 80:9 85:23 93:23 95:4,7, 13,18 96:4,9 99:25 100:3

**opportunity** 25:24 27:19 69:1,2 70:4 71:1 72:12

**option** 42:4

**options** 42:2

**orange** 63:15,17

**ordinary** 93:2

**organization** 19:5

**original** 77:20

**originated** 23:1

**OSHA** 18:20,21 22:6, 14 72:11 87:16,17,21 88:3,9,14

**oversee** 17:1

———————

**P**

**p.m.** 6:3

**PA** 39:11

**package** 89:14

**pages** 57:2 77:4,8

**paper** 77:2,4 80:5

**paramedics** 96:23

**parking** 10:2

**part** 10:18 17:6 51:13 52:16 84:9

**part-time** 7:22

**participation** 25:7

**parts** 64:17

**party** 20:16

**pass** 76:19 95:22 105:13

**passing** 70:25

**past** 20:12 39:23 45:4 54:9 57:19 58:14 63:25 64:2,4, 11,12,20 68:25 81:21 87:18

**Patterson** 11:14 28:24 30:15 41:3 44:22 46:14 47:5 49:23 50:9,15,19 55:25 56:20 57:2 69:7 74:16 95:23,25 96:1 97:5,7,14 99:22, 24 101:1,9,11 102:8 103:5 105:15,17,23 106:1,2

**pause** 46:18

**paused** 45:16 62:17, 22,25

**pedestrian** 29:13 30:2

**peer** 23:12

**people** 14:7 25:22 26:20 32:18 58:2,21 60:10,22 63:3 64:6 99:16,18

**percent** 33:10

**percentage** 85:7

**performed** 75:22

**period** 54:6,10 68:23

**periodic** 39:10

**permanent** 102:1

**person** 37:13 51:12 60:12,14 90:15,17 97:17 98:25 103:19

**personal** 26:25 27:1

**perspective** 12:5 88:11

**pertains** 87:8,13

**phone** 44:15,19,24

45:10 54:25 57:17 74:19

**photo** 47:4 48:2,11, 25 49:20 50:1 93:21 94:4 104:4

**photograph** 43:15 48:4,21 93:19,20

**photographs** 23:18 43:11 53:21 91:13 93:11,25 94:1,7

**photos** 46:12,20,24 47:2 63:18 94:16,21

**physical** 12:4

**pick** 72:18 73:11

**picked** 71:19 73:14 74:8 94:10 105:9

**picking** 73:18 74:1

**picture** 98:12

**pictures** 94:11

**piece** 50:25

**place** 9:11 15:15 22:17 25:9 26:6,12 27:14 32:19 34:11 37:21 38:24 53:24 68:16 92:15 96:13 100:4

**placement** 18:9 42:22 100:24

**placing** 33:13

**plaintiff** 21:24

**plaintiff's** 28:2,4,6 31:22 35:2 46:24 48:8 85:14

**plaintiffs** 85:8

**play** 55:16 60:16

**played** 58:16 59:16 60:18,19 63:21

**playing** 55:7,10 57:17

**point** 16:13 22:11,12 23:1,5 29:13,19 32:10 37:11 63:12 78:10 89:10 90:12 99:9 105:3

**points** 23:21 29:5,11 43:16 98:2

**policies** 88:2 91:14 92:15

**policy** 42:24

**portion** 34:7 62:1 99:23

**pose** 72:6,15

**position** 9:12 12:7 20:6,17 89:23 90:3,8 101:20 104:7

**positioned** 100:22

**positions** 7:23 38:8 89:12

**possibly** 55:14 79:21

**potential** 51:12 102:12

**potentially** 29:6 49:18 51:14

**practice** 22:19 26:12 27:17 40:7 84:13

**practices** 18:22 88:12

**precipitation** 29:9

**premise** 26:4

**premise's** 12:4 13:14 20:10 84:14 86:7

**premises** 9:17 15:13 16:19 92:16,24

**preparation** 83:6

**prepare** 79:12 80:3

**prepared** 12:23 56:16

**preparing** 83:4

**present** 72:6 99:11, 13 103:9

**presidents** 15:11

**prevalent** 31:16

**prevent** 9:1,20 10:9

**prevented** 23:24
105:8

**preventing** 9:4
17:17 92:14

**prevention** 7:25 8:2,
5,7,10,12,18,22
12:11 15:3,4 17:20,
25 18:15 19:14 21:14

**previously** 50:3
81:17

**primarily** 84:25

**principle** 26:19

**prior** 14:1 54:6,11
64:9 68:4,11,16
71:12,15,16 73:8,14,
15 94:23 97:9

**priority** 25:12,19
26:13 27:12

**problem** 74:17
82:11

**procedure** 10:16
35:11,20 36:2 37:2
67:11,12

**procedures** 8:20
9:18 10:12 16:20
17:14 18:8,9 22:17
23:25 31:5 35:8
38:23 43:4 52:16
65:23 70:12 72:23
88:2 91:14 92:15

**proceed** 6:12 53:11
57:10,21

**proceedings** 46:18
106:13

**process** 8:23 9:9
23:22

**procurement** 12:1
13:15

**produced** 56:22
91:13

**professional** 10:23
20:25 52:7 88:5

**profits** 27:14

**prognosis** 95:4

**promote** 11:11

**promoted** 8:6,8
11:1,11,20 12:6
14:18

**proper** 38:13 42:7,
22,23 67:17

**properly** 31:14
73:20 99:8

**protection** 8:2 14:19
15:1,17 16:11,18
20:18 89:19,20 90:2

**provide** 19:3,4,8
21:9 29:7 51:21,24
52:1 88:12

**provided** 18:12
23:17,18 46:5 50:1
53:3 54:7 56:15
68:12 71:1 80:7 81:1,
8 91:8 94:21 100:2

**provider** 100:20

**providing** 8:14
17:19 20:7,8 24:18
84:13 85:3 86:12

**public** 17:15

**publication** 31:8

**published** 21:21

**pull** 78:12

**pulled** 80:4 83:11

**purchase** 14:2 19:6
45:25

**purpose** 18:10
53:17,22 66:4

**pushing** 59:21

**put** 22:17 25:15 26:8,
12 54:16 75:7,10
94:10 100:5

**Q**

**qualify** 64:15

**quality** 14:3

**question** 11:7 31:2
36:23 41:7,20 43:12
73:4 74:12 76:23
77:20 80:11 90:17
97:7 102:6

**questioning** 53:11

**questions** 20:23
23:5 57:7 95:21 96:3
105:20

**quick** 29:16 41:13
101:5

**quickly** 56:23

**R**

**rain** 29:10

**rained** 73:3

**raining** 73:3,8

**raised** 98:14

**range** 16:1

**rate** 83:3

**rates** 79:6,10

**read** 29:1,21 32:6,24
55:1 79:14 106:6

**reading** 32:16 80:1

**ready** 57:6,20

**real** 29:16 41:12

**reapply** 89:12

**reask** 11:10,18 31:1
41:6,20

**reason** 92:25

**reasonable** 20:24
93:7

**reasons** 34:4

**recall** 13:3 79:21

**receive** 106:6

**received** 41:9

**recent** 82:24 83:15
89:18,23

**recently** 19:24 20:16
79:7

**recess** 45:18 75:3

**recognize** 54:18
103:19 104:1,4

**recollection** 12:19
57:18 85:21 100:3

**record** 6:3,20 28:3
45:13,16 46:15,19
54:16 55:2,24 56:13,
14 58:18 75:1,5
76:25 78:10 92:12
106:9,11

**recording's** 45:16

**red** 48:12,15 56:10,
12

**refer** 12:8 81:13 82:3

**reference** 32:9
72:10

**referenced** 36:9,14
99:9

**references** 22:16

**referencing** 67:1
93:19 94:8

**referred** 28:20 38:8

**referring** 7:3 50:21
51:25 86:18

**refers** 72:11

**reflect** 55:2

**reflects** 58:18 99:19

**regard** 73:21 87:15

**regional** 8:6,9 9:14
12:11 14:19 15:1,5
16:21

**register** 45:25 58:13

**regular** 66:5

**regulate** 88:9

**reimbursement**
79:8

**relate** 13:5

**related** 21:11 84:7

**relation** 10:4 17:16
21:7 29:12 31:10
95:11

**Relevance** 42:13

**relied** 80:8

**relocated** 89:7

**relocation** 89:3

**relying** 70:10

**remain** 32:19 89:14

**remainder** 7:25

**remember** 10:6,8 45:21 65:19 67:5 75:8 101:9,13

**reminder** 25:22 39:13

**removal** 42:9

**remove** 34:10 36:24 54:11 69:2 70:6 72:14

**removed** 33:5,16,22 62:10,13 65:7,12 68:4 73:8,9 76:12,16

**removing** 72:9

**reorganization** 16:12 89:4

**reorganize** 89:8

**repeatable** 23:11

**replace** 37:3 100:4

**report** 23:18 43:13 46:4,9 56:12,15,18 57:1,4 72:22 73:2 77:8,11,12,15,19,21, 23 78:1,5 79:4,15 80:1,12,19,20,24 81:4,6,8,14 83:21 91:20 93:18 94:2 98:11

**report's** 43:13

**reporter** 6:5,9,10 11:4,9,16 43:19,22 45:12,17 46:15 105:21,25 106:4,7

**reports** 91:14

**reposition** 42:2

**represent** 50:11 55:4 57:24 59:12,15 60:5,7,19 62:19,25 63:20 76:24 96:2

**representation** 49:6

**represented** 53:20 62:9

**required** 92:22,24

**requirements** 89:11

**requires** 47:20

**reserve** 105:14

**respect** 80:17,22 93:23 95:16

**responsibilities** 12:21

**responsibility** 9:7 13:16 15:24 16:3

**responsible** 15:7,19 38:11

**restart** 55:21

**restructuring** 89:10

**result** 51:4

**resume** 12:8

**retail** 17:14 24:12 52:21 82:1 87:7,12, 22 90:9 93:3

**retailers** 36:11

**retain** 68:10

**retained** 21:24 82:4 83:8 85:8,13,14,19

**retire** 89:2

**returned** 61:3,4

**review** 20:8 21:6,10, 19 23:3 34:5 43:10 52:24 53:2,13,18 74:15 80:2,4 83:6 84:9 103:8

**reviewed** 25:19,21 54:1,20 73:14 77:20 80:8,13,16,21 81:21 82:12,25 91:4,7,17 99:19 102:14,18,21 104:18,25

**reviewing** 8:20 54:25 68:13 87:11 104:10

**right-hand** 97:1

**ringing** 58:12

**ripple** 49:6 104:10, 12 105:6

**rippled** 34:7 43:15 51:13

**ripples** 47:15 48:5, 18 49:18 50:2 51:11 94:5

**risk** 9:10,25 22:12 23:1,7,21 27:10 31:15 32:15 43:3 49:15,17 50:12 51:5 69:12 71:2 72:2,4,6, 8,12,15 73:10 74:10, 13 76:16 84:23 99:11,19,21 102:12 104:17

**risks** 8:25 31:11 38:10 39:9 40:14 75:14 88:4,6,7

**Road** 7:4

**role** 7:17 8:11,13 9:7 11:1,22,23 12:11 13:9,10,11,22 14:13, 14 15:7 16:4 20:6

**roles** 14:15

**roll** 32:17

**rolling** 59:21

**room** 10:3 61:10 100:6

**root** 22:6,16,20 23:8, 11,14,23 34:5 53:25 90:13

**routine** 10:18 39:24

**rug** 12:24 93:13 94:16

**rugs** 9:20 10:9 29:25 30:2

**rule** 38:6

**ruled** 86:4

**runners** 28:20 29:3, 25 30:2

---

## S

**safe** 8:14 10:4,19 12:25 16:19 18:13, 21,22 19:8,11 24:18, 23 25:7 27:23 28:17

35:17 36:15 37:12,21 40:6 51:16,21,24 52:19 73:24 88:4,12 92:17

**safely** 42:10 62:10, 13 65:7,12

**safety** 8:1,17 9:16 10:23 14:19 15:2,4,6, 16,19 16:11,22 17:1, 2,8,14,17,23,24 18:15,20 19:13 20:3, 10 24:8,9,14,17,20, 25 25:9,11,15,19,20, 23 26:3,8,13,25 27:1, 3,10,14 37:21 39:3,4, 12,17 40:3,6,18 52:17 65:18,22 66:5, 8 67:4,14,21 75:7,9, 11,17,21 76:3,9,12 84:15,24 87:7,12,17, 19 89:20 92:24 93:8

**Sam** 86:23

**Sam's** 7:7,15 8:3 11:24 15:8,12 16:3,5, 11,15 17:5,6,7,9,11, 22,24 18:8 84:13 89:6,9,21

**save** 27:19

**savvy** 45:4

**schedule** 79:3,5

**school** 86:21

**scope** 9:14

**screen** 19:16,17 31:19 54:13 55:3,19 57:15 63:6 82:17 98:9 103:12,17

**screenshot** 103:23 104:2,5,11

**scroll** 82:22

**seconds** 60:17

**section** 28:18 29:17 32:3 49:7

**sections** 49:17

**sector** 52:21

**sectors** 24:12

**secure** 16:19

**secured** 33:4,14 34:9

**security** 11:2,20,23 12:4,13 13:12,14,17, 20,23 14:5,15,16 20:7,10,15 84:15,24 89:24

**send** 20:11 79:1

**senior** 16:10,22 17:2 89:21

**sense** 10:11,14 14:6

**separate** 105:4

**service** 14:16 32:11 33:5,23 100:6,7

**services** 11:2,20 12:13 13:12,18 14:17 20:4 84:21 85:4 89:25

**set** 17:13

**severance** 89:13

**SF** 8:2

**share** 19:16 82:16 103:12

**shelf** 26:2

**shoe** 51:13

**shoes** 99:17

**shopping** 26:24 37:14 42:6

**short** 45:18 46:18 75:3 89:13

**show** 28:1 55:3 94:16 98:9

**showing** 31:21 45:6 46:23 48:8

**shown** 48:6 99:18

**shows** 47:6

**shut** 55:21

**SIC** 13:20 20:13 27:11 30:22 34:4 38:21 39:5 41:10 43:4 67:4 72:16 87:17 104:11

**side** 32:7 48:3,6,24 62:3 97:1

**sides** 48:3 86:4

**sign** 106:6

**signal** 41:10

**similar** 17:25 18:8 83:5

**simplistic** 34:19

**simply** 8:23 67:11 72:12 105:9

**sir** 6:17 11:5,19 29:20 44:7 54:14 62:17,22

**situation** 27:11

**situations** 9:9 73:1

**size** 17:12 76:7 100:17

**sleet** 29:10

**slip** 31:15 35:24 98:4

**slip-and-fall** 82:1

**slip-and-falls** 9:24

**slips** 17:17

**slogan** 24:9,13 25:13,21

**small** 70:22

**smaller** 48:2 70:23

**snow** 29:10

**Society** 28:10,22

**solutions** 32:14

**southern** 16:14

**space** 65:24 70:23

**speak** 26:17 61:6 66:18 79:16,19,23 90:20 102:22

**speaking** 19:9 91:1

**specific** 12:19 29:13 38:7 39:22 100:8,11

**specifically** 19:9 35:17 38:9 70:13

**specifics** 13:3

**speculate** 71:11

**speculation** 50:16

**spelling** 105:20

**spent** 8:1

**spills** 38:10

**spoke** 48:19

**spoken** 90:23

**stamped** 34:24

**Stand** 41:8

**standard** 9:21 22:6, 19 28:7,9,11,14,22 29:21 30:7,13 31:5, 25 32:4,6 33:7 34:21 35:4,6,8,10,20,25 37:2 38:23 40:10 52:16,19 68:10 70:12 72:22 73:19,23,25 76:9 102:21

**standards** 10:4 17:8,16,18,24 18:15, 22,25 19:7 21:21 24:2,7 27:23 28:16 29:2,11 31:6 34:14 36:8,9,12,13 42:14, 17,18,21,23 43:6 73:18 80:6 88:8 91:16 102:16,19,20

**standby** 74:20

**start** 7:10 10:1 44:25

**started** 7:18,19 10:15 15:21 20:4,17 83:25 84:12 86:25

**starts** 28:19 38:17

**state** 6:6,19 21:25 22:14 58:19 86:3,23 96:16,17

**stated** 46:9,10 72:9

**statement** 31:3

**statements** 23:19 53:21

**states** 8:23 29:24 81:4

**stating** 81:24

**station** 6:25 7:3 21:9

47:8

**stay** 56:3

**Stephen** 6:13,21

**stepping** 90:18 101:21 102:12

**steps** 8:25 25:9 29:7 72:13 93:8

**Steven** 31:4

**stock** 26:2

**stocker** 7:21

**stop** 22:24 25:25 40:1

**stopped** 55:11

**store** 7:15,22,24 9:12,13,15,22 15:21, 22 19:11 20:18 26:22 29:8 35:13,23 37:14 38:21 46:11 47:8 60:10,22 61:24 62:7 63:3,6 64:7,13,17 70:3,14 82:2 90:9 93:3,16

**store's** 90:10

**stores** 7:14,20 8:16, 21 11:24 15:18 16:1, 25 19:4,6 20:19 21:7 35:7 70:23

**story** 89:13

**structure** 89:8

**study** 23:16

**subject** 102:18

**submitted** 19:22 77:18 78:5

**submitting** 82:11

**substances** 98:5

**substitute** 72:14

**sufficient** 68:14,18, 21 70:12

**summer** 12:10

**sunshine** 73:4

**supervision** 13:19 14:23

**supervisor** 7:25

**supplement** 78:3

**support** 11:24 20:9 84:14 85:1

**supposed** 35:22 36:4,18 37:7,18 38:4, 15 39:17 40:16,18,25 41:24 51:20 52:9,11 65:18,21 66:2 72:18 75:25 76:3

**surface** 19:8 51:24 94:6

**surprising** 36:14

**sweep** 39:3,4,7,12, 17 40:3,6 52:17 65:18,22 66:5,8 67:4, 14 75:17,21,22 76:9, 12

**sweeps** 40:18 76:3

**sworn** 6:4,14

**system** 39:11

---

**T**

**table** 32:7

**tag** 24:20

**takes** 38:24

**taking** 8:25 13:15 25:9 26:14 53:23

**talked** 8:4 91:2

**talking** 6:23 40:16 85:9 98:12 101:9

**Tarrant** 6:11

**task** 26:14 40:2

**tattered** 100:5

**taught** 10:6,8 25:18

**taxes** 84:7

**teach** 9:16,19 10:24 12:24 15:25

**teaching** 9:8

**team** 15:11

**teams** 9:16 15:12

16:17,18

**technical** 14:7,9 57:15

**ten** 79:25

**tenure** 20:2

**termed** 40:3

**terminology** 15:3 22:4

**terms** 34:19 39:4

**territories** 16:14

**testified** 6:14 12:17 78:7 91:23 94:4

**testify** 12:15,23 54:24 55:2 83:8 86:6

**testifying** 53:7 84:10

**testimonial** 77:22, 25 78:16

**testimony** 13:4,6 21:10 23:19 46:5 71:3,4 79:11 83:7 86:5

**Testing** 28:11,23

**Texas** 6:8,11,25 7:5 20:19 89:5

**thing** 57:4 103:1

**things** 9:24 40:17 67:9 84:8 99:2 104:9

**thinking** 66:19

**third-party** 12:3

**thought** 39:8

**threshold** 99:5 101:12,15,21 102:7, 13,16,20 103:2,3

**thresholds** 102:17

**tile** 10:21,22

**time** 8:1 10:12 12:16, 21 16:2,6 17:7 19:23 40:4,12 43:24 53:20 54:6,10 57:4 58:18 60:11,23 61:25 62:8 63:4 64:13 65:8,14 68:23 69:5,18 71:1,

13 72:2 73:6,13,15 77:19 80:19,20 83:1, 3 85:7 87:18 89:1,15 93:24 94:21,24 102:22

**times** 15:8 22:13 33:17 86:1 101:24

**timing** 100:24

**title** 14:22

**titled** 29:17

**titles** 89:17

**today** 19:12 20:23 21:16 46:25 54:20 56:15,18,22 76:13,18 79:13 80:3 83:2

**top** 25:11,19 27:12 63:6

**topic** 35:15

**total** 7:13 15:18 16:25

**totally** 102:18

**traditional** 8:18

**traffic** 32:12

**train** 10:25

**training** 10:12 38:18,24 67:10 70:12 87:7

**transition** 12:11 13:13 18:13 19:9,11 29:6,8 31:17

**transitions** 18:11

**travel** 92:22

**traveling** 9:15 15:10 38:20

**traverse** 99:8

**trial** 78:7 83:7,9

**trip** 30:4 34:8,14,18 35:23 37:18 39:17 40:17,19 47:17,21 48:23 49:9,16 50:6, 18,21,22,24 51:3,6,7, 15 52:12,25 54:2 59:1,6,23 60:1 61:12, 18 64:20,25 65:22

66:3,14 67:13,20 68:2 71:19 72:7 92:1, 4 94:14 97:10,15 98:4,18,19,23 99:1, 13,16 101:12,16,19 102:8,14,15 103:2,3

**trip-and-fall** 6:23 17:25 18:15 19:13 21:8,14 35:25 46:7,8 49:19 50:12 51:5,14 82:1 96:24 97:18 98:7

**tripped** 22:8,9 46:1, 10 90:4 96:19

**tripping** 9:20 10:9 52:2,5 73:15 74:13 93:12 95:12

**trips** 17:17 51:4

**turn** 64:2

**turned** 61:8

**turning** 64:10

**TV** 12:1

**type** 17:12 35:24 50:25 72:25 100:16, 17

**types** 17:20 84:24 90:4

**typical** 72:22

**typically** 76:1,8 92:20 98:1

---

**U**

**Uh-huh** 46:17

**uncommon** 39:12

**underneath** 97:4 104:19

**understand** 25:22 102:5 103:22

**understanding** 14:8 18:20 27:21 35:14 39:24 40:4 75:21 102:24 103:4

**understood** 97:24

**unintelligible** 25:20 37:10 44:1 56:4 98:5

**Universal** 6:25 7:4 21:9

**university** 86:23 87:4

**unsafe** 9:1,5 12:25 26:3 27:18 36:24 37:24 38:4,21 39:14 51:16,19 52:22 66:1 69:3 70:5 72:8 73:22 74:4

**updated** 20:11 77:16 78:2,15,21,23 79:7

**utilize** 19:6 100:4,17

**utilized** 19:2 72:25

---

**V**

**vague** 50:15,18 87:14 100:14

**variety** 39:6

**verify** 78:10 81:2

**versus** 85:8 102:2

**vestibule** 35:16

**vice** 15:10

**video** 14:4 23:19 43:11,16 44:25 46:3 52:24 53:2,13,21 54:1,7,17,18,23 55:5, 7,18 57:10,14,16,19, 24 58:16 59:13,16,17 60:8,16,18,20,25 62:2,4,7,17,20,23 63:1,21 64:4,16,17 66:8,11,14 68:5,6,10, 18 71:13 73:3 75:18 76:4 91:25 93:11 94:1,22 96:11,19,23 97:1 100:10 103:23 104:5,10,11,19,25

**video's** 44:13

**view** 40:2 62:3,4

**viewable** 100:10

**vigilant** 39:13

**violate** 73:17,25

**violation** 73:23

**violent** 27:11

**visible** 60:24

**visibly** 65:25

**visit** 9:23 15:11,25

**visual** 58:20

**visually** 39:9

---

**W**

**walk** 26:22 32:18 39:9 42:10 58:14,23 59:20 63:24 64:1,4 65:24

**walked** 63:8 64:9,12, 20 96:13

**walking** 18:23,24 19:8 36:15 37:22 38:3 40:12,19 46:1 51:24 54:9 61:7,11 63:10 64:9 68:25 70:3 72:3 91:24 92:20 93:3 96:7,16 99:1,5,18

**Walmart** 6:24 7:2,3, 7,12,14,15 8:2,13 9:19 10:10 11:24 12:15,17,23 13:16,24 17:9,22,23 18:8 21:7, 8,17 23:18 26:8,18 27:13 30:21 34:21,24 35:22 36:4,10,17 37:2,7,16,17 38:14 39:4,16,22 40:24 41:23 46:9 51:20 52:9,11,20,24 53:3 54:2,8 58:4,6,22 59:19 60:14 61:2 63:10,24 64:3,19 65:18,21 66:7,13 67:13,20 68:1,19 69:15 70:7,17 71:6, 19 72:18,23 73:11, 17,25 74:8 75:7,10 76:11,24 86:25 87:18 88:21 89:17,24 91:13,24 94:13 100:4,19

**Walmart's** 27:2 35:6 36:2 42:18,23 55:8 62:14 65:13

**Walmarts** 67:4

**watch** 96:22 98:22

**watched** 75:17 96:12

**watching** 57:18

**water** 29:8

**weather** 18:11 29:4 31:15,18 72:25 101:24

**week** 44:17

**weekly** 38:25

**weeks** 20:17

**weight** 42:6

**well-written** 43:1

**white** 14:10 103:19

**wife** 84:5

**WIFI** 44:21

**Williams** 6:16 11:6, 8,12,17,19 13:8 22:2 24:24 25:14 26:7,16 27:13,22 28:3,5 29:15 30:6,10,16,19, 23 31:1 32:21 33:6, 21 34:13,20 37:1,7, 15 38:2 39:3 40:5,15, 23 41:2,4,6,12,15,19 42:11,14 43:21,24 44:3,7,10,12 45:9,19 46:17,20 47:9,16,22 48:7 49:13 50:4,13, 17,20 51:20 52:4,9, 15 53:4,9,12,13 54:13 55:23 56:2,9, 17,25 57:3,20 59:5, 10 61:17,21 64:24 65:3,11,17 66:12,22 67:19 68:1,17 69:9, 18 70:16,21 71:17,24 73:11 74:6,14,23 75:6,16,24 76:11,19 86:15,17 87:14 91:10 92:5,9,11 93:4 94:18 97:12 100:13 101:3 102:4,23 103:11,13,

16 104:18,24 105:7, 12,13,16,19 106:10

**win** 102:25

**wonderful** 84:6

**words** 22:8 50:22 97:20,24

**work** 7:13 14:24 18:21 23:3 37:22 39:1 65:24 83:18 84:3,17 85:2

**worked** 7:7 13:24 14:8 20:14 81:17

**working** 7:10,19 26:24 37:16 45:1 56:23 70:25 76:10 86:25 92:14

**workplace** 98:7

**works** 56:3

**worn** 30:3 32:20 100:5

**Worth** 6:11 16:7

**wrinkle** 42:6

**wrinkles** 30:4

---

**Y**

**year** 86:22

**years** 7:13,16,22 9:13 10:14 12:18,19 13:10 14:17 18:19 20:12 22:13 37:17 39:21,23 45:4 81:21 85:10 86:10,22 88:1, 24 99:18

**you-all** 41:16 43:20 56:3 57:3

---

**Z**

**zoom** 14:24,25 30:15 33:17 37:25 43:18 44:2 48:22 64:7 78:19 82:19

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| NANCY CASTRO | § | |
| PLAINTIFF | § | |
| | § | |
| v. | § | **CIVIL ACTION NO.** |
| | § | |
| | § | 5:21-cv-00702 |
| WAL-MART INC.; CINTAS | § | |
| CORPORATION NO 2 D/B/A CINTAS | § | |
| CORPORATION; WAL-MART STORES | § | |
| TEXAS, LLC; AND WAL-MART REAL | § | |
| ESTATE BUSINESS TRUST | § | |
| DEFENDANTS | § | |

---

## ORDER DENYING DEFENDANTS' MOTION TO STRIKE STEPHEN MELIA

---

On _____, 2022, this Court heard Defendants' *Motion to Strike Stephen Melia*. After considering the motion, the responses and arguments of counsel, it appears to the Court that the Defendant's motion be **DENIED.**

**IT IS THEREFORE ORDERED ADJUDGED AND DECREED** that Defendants' *Motion to Strike Stephen Melia* is **DENIED.**

SIGNED on this the_____day of_____, 2022.

_____
**JUDGE PRESIDING**

**PLAINTIFF'S EXHIBIT**

**4**